**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SAMANTHA J. COMFORT, on behalf of her minor child and friend, ELIZABETH NEUMYER, et al.,    ) ) ) ) | |
|     Plaintiffs,     ) ) | |
|     v.     ) ) | C.A. No. 99-11811-NG |
| LYNN SCHOOL COMMITTEE, et al.,)     Defendants,     ) and,     ) ) | |
| COMMONWEALTH OF MASSACHUSETTS,)     Defendant-Intervenor.     ) | |

| | |
|---|---|
| TODD BOLLEN, et al.,     ) | |
|     Plaintiffs,     ) ) | |
|     v.     ) ) | C.A. No. 01-10365-NG |
| LYNN SCHOOL COMMITTEE, et al.,     )     Defendants.     ) | |

GERTNER, D.J.:

**TABLE OF CONTENTS**
**AMENDED MEMORANDUM AND ORDER**
September 5, 2003

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . -1-

II.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . -8-
    A.  The Comfort Litigation . . . . . . . . . . . . . . . -8-
        1.  Parties . . . . . . . . . . . . . . . . . . . -8-
        2.  Preliminary Injunction . . . . . . . . . . . -10-
        3.  Motions to Dismiss . . . . . . . . . . . . . -11-
    B.  The Bollen Litigation . . . . . . . . . . . . . . . -12-

III. TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . -13-
    A.  Plaintiffs' Case . . . . . . . . . . . . . . . . . -13-
    B.  Defendants' Case . . . . . . . . . . . . . . . . . -16-
        1.  The Administrators: . . . . . . . . . . . . -17-
        2.  The Parents and Students: . . . . . . . . . -19-
        3.  Defendants' Experts: . . . . . . . . . . . . -19-

C.   Plaintiffs' Rebuttal . . . . . . . . . . . . . . . . . . -22-

IV.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . -22-
A.   The Racial Imbalance Act . . . . . . . . . . . . . . -22-
B.   Racial Imbalance in Lynn's Public Schools . . . . . . -27-
     1.   1977:  The First Warning . . . . . . . . . -29-
     2.   1979:  Washington, the First Magnet School . . . . -30-
     3.   1980s:  Profound Changes in Lynn . . . . . . -31-
     4.   1986:  A Series of Failed Voluntary Plans . . . . . -33-
     5.   1987-1988:  Greater Imbalance; More
          Accusations . . . . . . . . . . . . . . -33-
     6.   1988-1990:  Drafting the Current Plan . . . . . . . -34-
C.   The Current Plan . . . . . . . . . . . . . . . . . . -36-
D.   Continuous Monitoring . . . . . . . . . . . . . . . . -41-
E.   A Current Snapshot of the Lynn School District . . . . . -42-
     1.   Residential Segregation and Geographical Separation -42-
     2.   "White Flight" and Its Decline after Implementation
          of the Lynn Plan . . . . . . . . . . . . . . -43-
     3.   Racial Balance or Imbalance . . . . . . . . . . -44-
     4.   The Special Problem of Poverty . . . . . . . . . -45-
     5.   School Construction and Renovation . . . . . . . . -46-
     6.   "Magnet" Schools . . . . . . . . . . . . . . -46-
F.   The Lynn Schools at Present . . . . . . . . . . . . . -47-
     1.   Observations by Participants . . . . . . . . . . -48-
     2.   Expert Testimony . . . . . . . . . . . . . . -49-
          a.   Dr. Orfield:  Desegregation Expert . . . . . -52-
          b.   Drs. Dovidio and Killen:  Social and Developmental
               Psychologist, Respectively
               . . . . . . . . . . . . . . . . . . -54-
               (1)  Intergroup Contact Theory . . . . . . . -56-
               (2)  "Critical Mass" . . . . . . . . . . -58-
               (3)  Impact of Resegregation . . . . . . . -59-
          c.   Nancy McArdle:  Limitations Imposed
               by the Demographics in Lynn . . . . . . -59-
          d.   Plaintiffs' Rebuttal . . . . . . . . . . -61-

V.   LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . -66-
A.   Jurisdictional Issues . . . . . . . . . . . . . . . -66-
     1.   Amendments to Prior Decisions (Comfort
          Plaintiffs) . . . . . . . . . . . . . . . -66-
     2.   Partial Motion to Dismiss (Bollen Plaintiffs) . . . . -68-
          a.   Claims for Injunctive and Declaratory
               Relief . . . . . . . . . . . . . . . -68-
          b.   Nominal Damages . . . . . . . . . . . . -71-
B.   Equal Protection . . . . . . . . . . . . . . . . . -71-
     1.   Strict or Intermediate Scrutiny? . . . . . . . . . -73-
     2.   Facial Challenge to the Racial Imbalance Act
          . . . . . . . . . . . . . . . . . . . . -77-
     3.   The Strict Scrutiny Standard . . . . . . . . . . -82-

     a.  Compelling State Interest . . . . . . . . . . .  -83-
     b.  Narrow Tailoring  . . . . . . . . . . . . . . .  -87-
         (1)  Are the means necessary; are there adequate
              race-neutral alternatives? . . . . . . . .  -87-
         (2)  Is the policy proportional to the compelling
              interest . . . . . . . . . . . . . . . . .  -89-
         (3)  What Is the Impact on Third
              Parties?  . . . . . . . . . . . . . . . . .  -91-
         (4)  Miscellaneous Concerns:
              Deference to School Boards'
              "Narrow Tailoring  . . . . . . . . . . . .  -93-
  4.  The Goals of the Plan . . . . . . . . . . . . . . .  -96-
     a.  Curricular Goals: "Promoting Racial and Ethnic
         Diversity," "Increasing Educational Opportunities for
         All Students and Improving the Quality of Education,"
         "Ensuring Safety"
         . . . . . . . . . . . . . . . . . . . . . . . .  -97-
         (1)  Are These Curricular Goals Compelling State
              Interests? . . . . . . . . . . . . . . . .  -97-
         (2)  Is the Plan Narrowly Tailored to These
              Compelling Interests? . . . . . . . . . . .  -99-
              (a)  Are the Plan's Means Necessary to
                   Achieve its Ends? . . . . . . . . . .  -99-
              (b)  Proportionality of the Means . . . . .  -100-
              (c)  Minimal Burden on Third Parties;
                   the Issue of Stigma . . . . . . . . .  -102-
         (3)  Plaintiffs' Arguments Do Not Apply in Lynn .  -104-
              (a)  A White/Nonwhite Distinction
                   Is Appropriate . . . . . . . . . . . .  -105-
              (b)  Additional Resources Would Not Have Been
                   Adequate to Accomplish the Curricular
                   Goals; the Significance of
                   "Critical Mass" . . . . . . . . . . .  -108-
     b.  Remedying the Effects of De Facto Segregation:
         "Reducing Minority Isolation" . . . . . . . . .  -117-
         (1)  Is this Remedial Interest Compelling? . . .  -117-
         (2)  Is the Lynn Plan Narrowly Tailored to this
              Compelling Interest? . . . . . . . . . . .  -121-
         (3)  Race-Neutral Alternatives are not Feasible .  -123-
     c.  Interest (5): "Providing an Education to All Students
         that Satisfies Federal and State Constitutional
         Requirements" . . . . . . . . . . . . . . . . .  -129-
         (1)  The Command and Promise of Brown v. Board of
              Education . . . . . . . . . . . . . . . . .  -129-
         (2)  State Constitutional Requirements . . . . .  -132-
C.  Other Federal Claims  . . . . . . . . . . . . . . . .  -134-
  1.  Title VI  . . . . . . . . . . . . . . . . . . . . .  -135-
  2.  42 U.S.C. § 1981 . . . . . . . . . . . . . . . . .  -135-

        3.   42 U.S.C. §§ 1985, 1986 . . . . . . . . . . . . . . -137-
   D.   Article 111 of the Massachusetts Declaration of Rights  . . -137-
        1.   Applicable Principles of Constitutional Interpretation
             . . . . . . . . . . . . . . . . . . . . . . . . . . -138-
        2.   The Lynn Plan and the Purpose of Article 111 . . . . . -140-
        3.   SJC Interpretation of Similar Language . . . . . . . -143-
        4.   State Constitutional Harmony and Federal Constitutional
             Doubt  . . . . . . . . . . . . . . . . . . . . . . . -146-

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . -152-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAMANTHA J. COMFORT, on behalf of her minor child and friend, ELIZABETH NEUMYER, et al., )<br>    Plaintiffs, )<br> )<br>        v. )<br> )<br>LYNN SCHOOL COMMITTEE, et al.,)<br>    Defendants, )<br> )<br>and, )<br> )<br>COMMONWEALTH OF MASSACHUSETTS,)<br>    Defendant-Intervenor.     ) | C.A. No. 99-11811-NG |
| TODD BOLLEN, et al., )<br>    Plaintiffs, )<br> )<br>        v. )<br> )<br>LYNN SCHOOL COMMITTEE, et al.,)<br>    Defendants.     ) | Civil Action No. 01-10365-NG |

GERTNER, D.J.:

AMENDED[1] MEMORANDUM AND ORDER
September 5, 2003

I.  **INTRODUCTION**

The issues raised in this litigation are critically important, not just for the parties, but for the nation.  This case and others like it around the country require courts to grapple with whether and how public school officials may implement race-conscious programs in order to fulfill the Constitution's promise of the Equal Protection of the laws, a promise

---

[1] This decision amends factual and typographical errors in the Court's decision of June 6, 2003.

articulated with special force fifty years ago in <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954).

Plaintiffs, parents of elementary school children in Lynn, Massachusetts, challenge their city's school assignment plan (the "Lynn Plan")[2] because it takes race into account in permitting children to transfer from their neighborhood schools to other schools within the district.[3]  Since the implementation of the Lynn Plan entitles the Lynn Public Schools to certain additional aid from the Commonwealth of Massachusetts under the state's Racial Imbalance Act ("RIA"),[4] the plaintiffs also challenge the state law on its face and as applied in this case.  Both the Lynn Plan and the state laws under which it was enacted, they say, violate the Constitutions of the United States and Massachusetts, as well as various federal civil rights statutes.  They petition the Court to invalidate the Lynn Plan and to enjoin the defendants from employing racial classifications in student assignments and in the distribution of state aid.  For the reasons set forth below, I **DISMISS** plaintiffs' claims and enter **JUDGMENT** in favor of the defendants.

---

[2] The Plan, which incorporates other reforms not at issue in this case, is known officially as "A Voluntary Plan for School Improvement and the Elimination of Racial Isolation."

[3] The Lynn Public Schools comprise a single school district.  That district is further divided into attendance zones also referred to as districts.  Students are assigned to their "district" schools but may also request transfers to "out-of-district" schools.  The term "out-of-district" school is misleading as these schools are still within the same school district.  For the sake of clarity, I will refer to "district" schools as "neighborhood schools" and "out-of-district" schools as "non-neighborhood schools."

[4] Mass. Gen. Laws c. 71 §§ 37C, 37D and c. 15 §§ 1I, 1J, 1K.

To the plaintiffs, the issues could not be simpler:  Taking race into account in school transfers violates the Equal Protection Clause. They contend that it sends the wrong message to the children of Lynn, namely, that their race matters when, in fact, the Constitution requires color blindness.  Plaintiffs concede that reducing racial isolation and educating students to be citizens in a multiracial nation are important goals.  They also concede that Lynn has accomplished those goals and has vastly improved its schools since the Plan's implementation.  But they claim that neither these goals nor this record are sufficiently compelling under the Constitution to justify Lynn's race-conscious school transfer policy.

To the defendants, the Lynn Plan not only complies with the Equal Protection Clause but is critical to maintaining that compliance.  The Plan seeks to encourage learning and good citizenship in a racially diverse environment.  The message it conveys to the students is that our society is heterogeneous, that racial harmony matters -- a message that cannot be conveyed meaningfully in segregated schools.  In order to teach that the "content of [one's] character"[5] does not depend on color, a child must interact with children of other races, an interaction that necessarily challenges nascent stereotypes.  Without meaningful social contact, talk of tolerance and cooperation is nothing but an abstraction.  If the Lynn school transfer plan were

---

[5] Martin Luther King, Jr., "I Have a Dream," in A Call to Conscience: Landmark Speeches of Dr. Martin Luther King Jr. 75 (2002).

-3-

eliminated, the elementary schools of Lynn would become more and more racially segregated, with a host of pernicious consequences.

While there has been a rising tide of litigation challenging the government's use of racial preferences, both in and outside of the educational context, and while courts increasingly treat such programs with suspicion, it is not established -- as the plaintiffs, not to mention many in the media, contend -- that <u>any</u> government use of race for the purpose of promoting diversity is unconstitutional.  The answer to the question "Can schools constitutionally use race in furtherance of education in a multiracial society?" is and has always been "It depends."  It depends upon the setting -- for example, K-12 education,[6] in contrast to higher education or employment, raises very different issues requiring distinct legal analysis.  And it depends upon the nature of the plan -- its purposes, its flexibility, the level of coercion involved, its history, its administration.

On both axes -- the setting and the nature of the plan -- the Lynn Plan is different from race-conscious plans that have been successfully challenged.  In constitutional parlance, the Lynn Plan passes muster even under the most stringent "strict scrutiny" test: It serves "compelling" state interests and is "narrowly tailored" to achieve them.

On the setting:  Unlike cases involving law schools, undergraduate degree programs, or even elite "magnet" high schools,

---

[6] "K-12" means kindergarten through twelfth grade.

Lynn's school transfer policies are not about admissions or rejections in a competitive environment where merit supposedly determines "winners" and "losers" in a zero-sum game.  The fact that one child may transfer to a particular elementary school while another may not does not affect the quality of the educational experience for either. The parties agree that, under the Plan, all Lynn schools are not only comparable, but by 2003, equally successful.

Indeed, K-12 education involves a setting in which diversity has a different resonance than in any other.  The goal of elementary education is, as the Supreme Court noted nearly fifty years ago, to foster good citizenship[7] -- not, for example, to train skilled professionals or to engage in a commercial enterprise.  And in the twenty-first century, good citizenship necessarily entails the ability to function in an ever more heterogeneous democracy.

On the Plan:  The Plan that Lynn officials created, and that the state authorities approved, is minimally intrusive.  It uses public funds for two critical public goals -- to enable parents to choose integrated schools over segregated ones and to minimize racial imbalance across the school system.  Since a racially diverse learning environment is essential for citizens-to-be, the Plan is a critical part of a comprehensive, districtwide plan to improve the quality of education for all Lynn's children.

---

[7] Brown, 347 U.S. at 493 (explaining that public education provides "the very foundation of good citizenship.  Today it is a principal instrument in awakening the child to cultural values in preparing him for later professional training, and in helping him to adjust normally to his environment").

Unlike many of the school desegregation efforts that have roiled courts and legislatures in the years since <u>Brown</u>, the Lynn Plan does not entail coercive assignments or forced busing; nor does it prefer one race over another.  It allows every child to attend his or her neighborhood school.  It also allows -- and indeed encourages -- elective transfers to schools outside the neighborhood, not to offer "choice" for its own sake, but to promote as much integration as possible while maintaining a neighborhood school system.  Space permitting, transfers are approved unless they thwart the goal of reducing segregation in the city.

The history and track record of the Plan also set it apart. Before the Plan, Lynn's neighborhood schools were troubled, overcrowded, and racially segregated.  City officials were accused of exacerbating these problems by allowing white students to transfer out of minority schools, but not <u>vice versa</u>.  And even when official discrimination ended, racial divisions persisted, with documented results:  Schools that were largely populated by minority students received less funding, had high teacher turnover, and had lower test scores.  Throughout the system, even in the largely white schools, racial tensions and divisions persisted.  White enrollment was declining at an alarming rate -- the phenomenon known as "white flight."

After experimenting with race-neutral alternatives without success, Lynn officials sought the advice of experts, including social psychologists, educators, and even demographers.  They concluded that

-6-

the only way to improve the schools was to implement a comprehensive program that employed not only the race-conscious transfer policy at issue here, but a host of other innovations and resource infusions. Their goal was not simply to create a diverse learning environment, but also to support it and to ensure its success through curricular changes and materials, teacher and staff training, as well as improved facilities.  They created a flexible plan, based on sophisticated data collection and analysis, that changes with the conditions in Lynn. Anyone denied the placement of his or her choice can appeal, as many of the plaintiffs in this case have done.

By 2002, when the trial of this case began, it was clear that the Lynn Plan played an important part in creating a thriving, diverse, and integrated urban school system, successful on all fronts and by all measures -- where race relations are positive and racial and ethnic tensions are absent; where students from diverse backgrounds maintain friendships and are well represented in student government and extracurricular activities; where student attendance rates are uniformly high and test results reflect substantial gains, particularly in the schools located in Lynn's urban center; and where there are extraordinarily low levels of student conflict, crime, and violence.

Nothing about the plaintiffs' challenge or the government's constitutional and statutory obligations obliges the Court to dismantle this Plan.

## II.  PROCEDURAL HISTORY

Before me presently are two civil actions, Comfort v. Lynn School Committee, Civ. No. 99-11811, and Bollen v. Lynn School Committee, Civ. No. 01-10365.

### A.  The Comfort Litigation

#### 1.  Parties

Samantha J. Comfort, Rhonda Campbell, Karen Agnew, Andrew and Cattibell DiGaetano, and Jean and William O'Neil, all parents of school children enrolled in the Lynn district, brought the Comfort action in 1999.  The Comfort plaintiffs sued the Lynn School Committee, its individual members,[8] the Superintendent of Lynn Schools,[9] the City of Lynn and its Mayor.  In December 1999 the Commonwealth of Massachusetts intervened as a party defendant for limited purposes.[10]

---

[8] The board members, sued in their official capacities, currently include Edward J. Clancy (Mayor and Chairperson), Patricia Capano, Donna M. Coppola, Arthur Fiste, John Ford, Jeffrey Newhall, and Loretta Cuffe O'Donnell.

[9] The current Lynn Superintendent, also sued in his official capacity only, is Nicholas Kostan.

[10] The Commonwealth intervened under 28 U.S.C. § 2403(b) to defend the constitutionality of the RIA.  The Commonwealth expressly preserved its Eleventh Amendment defenses in its Motion to Intervene as a Party Defendant and its Answer to the Plaintiffs' First Amended Complaint.

The NAACP Legal Defense and Education Fund also moved to intervene in this proceeding.  That motion was denied but the organization was permitted to participate as an amicus.  The submissions of amici advance the joint interests of the NAACP Legal Defense and Educational Fund, Inc.; the Lawyers' Committee for Civil Rights Under the Law for the Boston Bar Association; Pamela Freeman on behalf of her minor child, James Freeman, a student in the Lynn public school system; Barbara and Anthony Murkison on behalf of their minor children, Tia, Cassandra, and Jason Murkison, also students in Lynn schools; and the Northshore Branch of the NAACP, on behalf of its membership.

The _Comfort_ plaintiffs challenged the RIA and the Lynn Plan under the Equal Protection Clause of the United States Constitution, Article 111 of the Massachusetts Declaration of Rights, and several federal civil rights statutes, including 42 U.S.C. §§ 1981, 1983, and 2000d. The RIA obliges the state Board of Education to address de facto segregation in Massachusetts' public schools, either by funding voluntary efforts of individual school districts to integrate or, if necessary, by compelling them to adopt plans to improve racial balance in school populations.  _Comfort v. Lynn School Comm._, 100 F. Supp. 2d 57, 62 (D. Mass. 2000).  The Lynn Plan, as I describe more fully below, entails a neighborhood school system that permits transfers to out-of-neighborhood schools, unless such transfers would result in increased "racial isolation (too low a minority percentage) or racial imbalance (too high a minority percentage)" in a particular school. _Id._ at 61.

### 2.  **Preliminary Injunction**

The _Comfort_ plaintiffs sought a preliminary injunction to enjoin the district's use of race in the Plan.  I denied the motion, finding that the plaintiffs showed neither a likelihood of success on the merits nor irreparable harm.  _Id._ at 59-60.  The First Circuit in _Wessmann v. Gittens_, 160 F.3d 790 (1st Cir. 1998), held that diversity "might be sufficiently compelling, in specific circumstances, to justify race-conscious actions."  _Id._ at 796.  The intensely fact-

---

The United States submitted an _amicus_ brief in support of the defendants at the preliminary injunction stage of the case.

bound question of what educational circumstances would permit race-conscious actions was hardly amenable to resolution on the truncated record of a preliminary injunction.  <u>Comfort</u>, 100 F. Supp. 2d at 66. Nor could the <u>Comfort</u> plaintiffs demonstrate irreparable harm from the continuation of the Plan since, as described below, most were content with the schools their children were in and did not intend to seek further transfers.  <u>Id.</u> at 63-64.

The plaintiffs did not appeal the denial of their Motion for a Preliminary Injunction.

### 3.   <u>Motions to Dismiss</u>

The defendants moved to dismiss a number of the <u>Comfort</u> plaintiffs' claims on the grounds that (1) the Constitution does not allow a state to be sued for damages, and (2) the plaintiffs lacked standing to sue because their children had been placed in the schools of their choice and no longer wished to transfer.  With certain exceptions, I granted these motions.

I dismissed the federal statutory civil rights claims for damages against the Commonwealth on Eleventh Amendment grounds, since there was no question that the state may not be sued for damages.  <u>Comfort v. Lynn School Comm.</u>, 131 F. Supp. 2d 253, 254 (D. Mass. 2001).[11]   I

---

[11] The Eleventh Amendment precluded plaintiffs' claims against the Commonwealth under 42 U.S.C. §§ 1981 and 1983, as Congress did not expressly abrogate the sovereign immunity of the states in enacting them.  <u>Comfort</u>, 131 F. Supp. 2d at 255.  I also dismissed the plaintiffs' claims under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, which forbids discrimination "under any program or activity receiving Federal financial assistance," since a state itself is not a "program or activity" for Title VI purposes.  <u>Id.</u> at 254-55.

also held that the Eleventh Amendment barred declaratory relief against the Commonwealth.  Id. at 256.  See infra Section V.A.1.

In a subsequent opinion, Comfort v. Lynn School Comm., 150 F. Supp. 2d 285 (D. Mass. 2001), I held that the plaintiffs lacked standing to seek injunctive relief against any of the defendants.  Id. at 288.  The plaintiffs had children who were contentedly enrolled in schools of their choosing and could not "demonstrate either actual present harm or a likely danger of direct injury in the future."  Id. at 295-98.

I held that the Comfort plaintiffs could pursue limited declaratory relief, as well as nominal damages.  Id. at 298-99, 302. Specifically, I found that "prospective" declaratory relief was unavailable to the plaintiffs, id. at 302, but that they were nonetheless entitled to sue for a "retrospective" declaration that the Lynn Plan violated their legal rights.  I now conclude that this finding was erroneous:  a declaration, prospective or retrospective, is available only to plaintiffs that have standing because of a present case or controversy.  See also infra Section V.A.1.  In any event, the Comfort plaintiffs were free to litigate the substance of their claims for nominal damages.  Comfort, 150 F. Supp. 2d at 298-99.

Of the original <u>Comfort</u> plaintiffs, only Samantha Comfort remains in this case.[12]

**B.   <u>The Bollen Litigation</u>**

Rather than amend the existing action, plaintiffs' counsel added new parent plaintiffs in a separately filed lawsuit.[13]   The <u>Bollen</u> plaintiffs, Todd and Laurie Bollen, Janeen Goodwin, Gina Leone, LeAnne Manuel, Michael and Meta Stinson, and Karen Tsaltas[14] sued the same defendants but added claims under 42 U.S.C. §§ 1985 and 1986 and listed members of the Massachusetts State Board of Education as defendants in their official capacities.   Defendants move to dismiss a number of the <u>Bollen</u> plaintiffs' claims on standing grounds.   That motion [document #174] is **GRANTED IN PART AND DENIED IN PART**.[15]   <u>See</u> <u>infra</u> Section V.A.2.a.

---

[12] The <u>Comfort</u> plaintiffs amended their complaint on December 9, 1999, to eliminate Jean and William O'Neil as plaintiffs.   On January 19, 2001, I allowed the motion of plaintiffs Rhonda Campbell and Andrew and Cattibell DiGaetano to voluntarily dismiss their claims.   Plaintiff Karen Agnew dropped her case as well on October 30, 2001.

[13] The lawsuits were then consolidated.

[14] Sued in their official capacities, the current Board members are James A. Peyser (Chairman), Roberta R. Schaefer (Vice-Chairperson), Charles D. Baker, Patricia A. Crutchfield, William K. Irwin, Jr., and Abigail Thernstrom.

[15] The <u>Bollen</u> plaintiffs originally sought a preliminary injunction as well.   That motion was withdrawn on April 11, 2001, after the defendants agreed to allow all of the children to attend their school of choice for the 2001-2002 school year, pending trial on the merits of their claims. Remarkably, only one of the plaintiffs, Gina Leone, took full advantage of the agreement to place her child, Troy LaMothe, into a school that was not otherwise available to her under Lynn's transfer policy.

On June 5, 2001, I granted the plaintiffs' voluntary motion to dismiss the claims of Janeen Goodwin on behalf of her child Sean.   Plaintiff Michael Stinson, who sued on behalf of Angelica Jackson, noticed his voluntary dismissal on October 11, 2001.

III. **TRIAL**

The parties filed multiple summary judgment motions, all of which I denied.  In June 2002, the parties presented evidence in an eleven-day bench trial.

A.   **Plaintiffs' Case**

Consistent with their view that the case was a simple one, plaintiffs offered one live witness, Meta Stinson, a Lynn parent and plaintiff; the deposition testimony of state Board of Education member Abigail Thernstrom; and several exhibits.

Ms. Stinson, who has three daughters currently attending Lynn schools, sought to have her daughter, Angelica Jackson, transferred from Breed Middle School to Pickering Middle School.  That transfer was initially denied because Stinson had listed her daughter as "white" when she first registered her for school.  Although Angelica's father is white, Stinson herself is of mixed racial and ethnic background -- French Canadian, Irish, Jewish, Barbadian, and African American.  Upon learning of the denial, Stinson went to the Parent Information Center ("PIC") and added an additional racial designation of "black," but to no avail.  Stinson conceded that although she was advised of her right to appeal, and indeed, even though that appeal would have been successful,[16] she elected not to do so.  In the interim, the district announced that at the Sewell-Anderson school

---

[16] It is undisputed that Angelica's multiracial status would have established her right to transfer to any school in the system.

fifth graders could remain for the sixth grade, and Stinson was satisfied with that placement.[17]

Significantly, Stinson testified that Angelica maintains a number of interracial friendships with her classmates, has a positive attitude about race, and gets along well with students of other races, even though Stinson has not personally discussed matters of race with her daughter.  Stinson conceded that it is an important component of Lynn's educational mission to ensure that its students overcome racial stereotypes and acquire a better understanding of students with different racial backgrounds.

The plaintiffs also introduced the deposition testimony of Abigail Thernstrom, a member of the Massachusetts Board of Education. Thernstrom, though not offered as an expert, took issue with the views of certain school desegregation experts -- including Dr. Gary Orfield, a nationally renowned expert who testified in the defendants' case. She challenged Orfield's view that America's schools are growing increasingly racially segregated principally because she did not believe that "[t]he dividing line in America" is "between whites and

---

[17] After Angelica transferred to Sewell-Anderson Elementary School, her sister Gabrielle was able to transfer there as well under Lynn's "sibling unification" provision.

Indeed, Stinson acknowledged that she has sought three transfers for her daughters, only one of which -- Angelica's to Pickering -- met with resistance from the PIC.

nonwhites."[18]  Deposition of Abigail Thernstrom ("Thernstrom Deposition"), Oct. 9, 2001, at 22.

Although a member of the Board of Education and charged with enforcing the RIA, Thernstrom opposed the Act in principle.  She conceded that she could not speak with authority on the law since she lacked day-to-day familiarity with its terms.[19]  Moreover, she acknowledged that she had no personal knowledge or experience of specific conditions in Lynn.

Finally, plaintiffs offered exhibits that pertained to the operation of the Lynn Plan and RIA and the extent to which racial categories are used in making transfer decisions.

B.   **Defendants' Case**

Defendants countered with ten witnesses, five of whom were district administrators and educators with twenty to thirty years' experience in the Lynn system variously as students, teachers, and administrators.  Significantly, these witnesses were in a position to describe the troubled state of Lynn schools before the Lynn Plan was implemented, and to attest to its impact afterward.  They described pre-Plan efforts to improve the schools, all to no avail.  And they

---

[18] Thernstrom would later state:  "I don't believe in any of these classifications, I believe in giving parents maximum choice as to where their children should go to school, and . . . none of these classifications are appropriate in my view.  This kind of social engineering is not appropriate. . ."  Thernstrom Deposition at 26.

[19] The RIA, she agreed, is "low on [her] personal list of priorities." Id. at 37. Indeed, when asked if the Board had conducted studies to determine whether or not the conditions that existed at the time the RIA persist today, Thernstrom replied, "My view of that would be we don't need a study, [those conditions] don't exist."  Id. at 35.

lauded the current state of the school system under the Lynn Plan and the substantial improvements it has effected.  Defendants also offered the testimony of a Lynn parent and a student, who described the actual workings of the system in the schools with which they were familiar.

Finally, defendants offered the testimony of a number of nationally known experts.  The experts based their testimony on their personal observations of Lynn schools, a survey of Lynn students, interviews with teachers and administrators and other Lynn-specific data.  The experts affirmed the importance of Lynn's race-conscious transfer policy to the district's educational objectives.

### 1.   **The Administrators:**

Janet Birchenough has been Director of Equity and Program Support for the Lynn public schools since January 1992.  Birchenough managed and supervised Lynn's Parent Information Center, the school district's central registration office, which oversees the day-to-day implementation of the Lynn Plan.  In addition, the PIC gathers the data that Lynn officials use to certify that the Plan remains precisely tailored to accomplish the Plan's goals -- data about the school system, its schools, its students, simulations about demographic patterns in Lynn, and the likely composition of the schools if the Plan were to be eliminated.[20]  Moreover, Birchenough testified from the

---

[20] Birchenough's responsibilities also include direct oversight of the district's "magnet" schools (see _infra_ Section IV.E.6 for a description of these schools), including program design, budget, management, and other systemwide programs designed to increase the integration of the Lynn schools. In addition, she is responsible for Lynn's language support programs, including its Transitional Bilingual Education Programs; the district's assistance to homeless families; and its Title IX policies, which involve,

-16-

perspective of nearly forty years' experience in the Lynn schools -- as an elementary school teacher, as an art teacher working in eleven of the district's eighteen elementary schools and ultimately as an administrator.  I found her testimony credible and relevant, and her knowledge of the system -- of individual schools and the history of the Plan -- encyclopedic.

Patricia Barton, currently the principal of the Fecteau-Leary Middle School, also has 30 years of professional experience in the Lynn system.  She testified credibly about her experience as a student attending racially isolated schools, as a teacher in a segregated system, and as an administrator who presided over that system's transformation under the Lynn Plan.

Nicholas Kostan, the current Superintendent of the Lynn School Department, also testified with considerable authority about the changes he has seen.  He has been a teacher and a professional administrator in the Lynn school system for 31 years, first as a principal of the Breed Middle School.  He serves as liaison between the Lynn School Committee and the Lynn School Department and at the same time oversees the PIC and works with teachers, parents, students, and the community.

Patricia Mallett is currently a teacher in the media center at the Brickett school, having taught in Lynn schools for twenty-six years.

---

among other things, the coordination of the district's anti-harassment policies.  She co-chaired Lynn's technology plans to make certain that all schools receive the same level of technological support and equipment.  She also worked with the Superintendent to develop the John Collins Writing Program, which addresses writing deficiencies identified through MCAS testing.

During the transition to magnet school programming, she was the
system's Magnet School Facilitator.  Mallett testified from that unique
perspective on the race-neutral alternatives that were tried and
considered, as well as the success of the current Plan.

### 2. **The Parents and Students:**

Karen Horner is an African American parent of two current Lynn
public school students.  She is active in and serves as the Acting
Secretary for the Lynn branch of the NAACP.  She moved from Boston to
avoid living in a segregated neighborhood and to provide her children
with an integrated education.  Horner's children, Kyle, age 17, and
Erroll, age 14, have attended neighborhood and out-of-neighborhood
schools in Lynn, and she spoke movingly about the quality of her
children's experiences.

Nicole Oak is a white student who had just graduated from the Lynn
school system in June 2002 and described her educational experience
there.

### 3. **Defendants' Experts:**

Dr. Gary Orfield is a nationally recognized political scientist
and one of the leading national experts in the field of education and
equal educational opportunity, which encompasses issues such as racial
segregation, racial isolation, desegregation, housing and racial
change, and their effects on students in primary, secondary, and higher

education.[21]   He is a professor of education and social policy at
Harvard University, where he is co-director of the Harvard Project in
School Desegregation.   The Project in school desegregation is an
interdisciplinary research center that commissions research across the
nation on issues of civil rights policy, racial change, and racial
inequality.   Significantly, Dr. Orfield based his testimony not only on
his own research, experience, and studies from other jurisdictions but
also on an extensive amount of data and information about Lynn and its
public schools in particular.   Orfield put the full resources of the
Harvard Civil Rights Project  ("Harvard Project") (a separate entity
from the Project in school desegregation with a broader research focus)
into his study of Lynn and gathered information firsthand during a site
visit as well.

Nancy McArdle testified as an expert on the demographic and
housing trends in Lynn.   She was a researcher with the Joint Center for
Housing Studies at Harvard for fourteen years.   McArdle has researched,
consulted, and published in the field of housing policy, with specific
attention to demographic, population, and immigration trends.   Like Dr.
Orfield, McArdle relied on a wide variety of data sources specific to
Lynn.

Dr. Melanie Killen, a developmental and education psychologist,
testified on how racial segregation and racial diversity impact the

---

[21] Dr. Orfield has been a court-appointed expert in federal
desegregation cases in St. Louis, San Francisco, and Little Rock, and a state
expert in a case in Los Angeles.

-19-

social and moral development of children and adolescents.  She is a Professor of Human Development in the College of Education at the University of Maryland, and she presently serves as Associate Director for the Center for Children, Relationships and Culture, a research department with faculty from developmental psychology and education psychology.  Dr. Killen has focused specifically on how children and adolescents evaluate exclusion based on race and ethnicity, as well as on intergroup relationships and conflict resolution across lines of ethnicity.  She, too, based her expert testimony on a series of direct observations and interviews on site in the Lynn Public Schools, as well as her review of the Harvard data.[22]

Finally, Dr. John Francis Dovidio testified as a nationally renowned social psychologist with a particular interest in the subdiscipline of intergroup relations and the development of racist attitudes.  Dr. Dovidio is presently the Charles A. Dana Professor of Psychology and Dean of Faculty and Provost at Colgate University.  His research has focused on social psychology and race relations among elementary school children, secondary school students, adolescents, and college students.  He testified about how and when stereotypes are formed and what strategies can be deployed to prevent their formation. He offered his expert opinion based on personal visits and the Harvard data.

---

[22] The methodologies Dr. Killen used to evaluate the students and the school environment are the same methodologies she is using in a study funded by the National Institutes of Health.

### C.   __Plaintiffs' Rebuttal__

Plaintiffs offered one witness in rebuttal, Dr. Christine Rossell, a professor of political science at Boston University.  Dr. Rossell's field of interest is the comparative efficacy of different approaches to school integration.

While Dr. Rossell had been a paid consultant to Lynn in the development of its original school desegregation plan in 1987 (when she supported an earlier, and more intrusive iteration of the Plan), at the time of her testimony, she had no current knowledge of the Plan.  She based her conclusions on her research involving other school systems and what she had remembered of that early draft of the Lynn Plan from fifteen years earlier.


## IV.   __FINDINGS OF FACT__

### A.   __The Racial Imbalance Act__

In 1965, Massachusetts became the first state in the nation to enact a law addressing racial imbalance in the public schools.[23]  The Racial Imbalance Act ("RIA"), Mass. St. 1965, c. 641, §§ 1 __et seq.__ (codified at Mass. Gen. Laws c. 71 §§ 37C, 37D, and c. 15 §§ 1I, 1J, 1K), had its origin in a legislative finding that racial imbalance in Massachusetts public schools was so dramatic as to reach a crisis level, with damaging effects on the students.  The Massachusetts Board of Education's "Kiernan Report" not only concluded that "[r]acial

---

[23] Dennis Ford Eagan, __The Past, Present, and Future of Desegregation Law in Massachusetts__, 34 Suffolk U. L. Rev. 541, 556-57 (2001).

imbalance represents a serious conflict with the American creed of
equal opportunity," School Comm. v. Bd. of Education, 366 Mass. 315,
318 n.5 (1974) (quoting the Kiernan Report) (internal quotation marks
omitted), it also underscored the extraordinary impact of racial
imbalance throughout the school system.  Racial imbalance was found to
encourage prejudice among students of all races, inadequately prepare
students for life in multiracial communities, and produce inferior
educational facilities for African Americans.[24]  Id.

As a result, the legislature found that racial imbalance in state
public schools posed an "emergency" situation, see School Comm. v. Bd.
of Education, 352 Mass. 693, 698 (1967), and enacted the RIA to correct
it.  Section 1 of the RIA provides:

_____

[24] A federal district court came to a similar conclusion in Barksdale v.
Springfield School Comm., 237 F. Supp. 543 (D. Mass. 1965), which held that a
racially imbalanced school denied black students equal opportunity for
education.  Id. at 546.  The court ordered the Springfield School Committee to
devise a plan to "eliminate to the fullest extent possible racial
concentration in its elementary and junior high schools."  Id.  The First
Circuit, 348 F.2d 261 (1st Cir. 1965), ultimately reversed the trial court
because the School Committee had voluntarily undertaken substantially the same
steps that the district court required before the case was filed, id. at 265;
the First Circuit nonetheless observed that there was ample evidence to
support the district court's findings:

> [R]acially imbalanced schools are not conducive to
> learning, that is to retention, performance, and the
> development of creativity.  Racial concentration in
> his school communicates to the [African American]
> child that he is different and is expected to be
> different from white children.  Therefore, even if all
> schools are equal in physical plant, facilities, and
> ability and number of teachers, and even if academic
> achievement were at the same level at all schools, the
> opportunity of [African American] children in racially
> concentrated schools to obtain equal educational
> opportunities is impaired.

Id. at 263 (quoting the district court's findings).

> It is hereby declared the policy of the
> commonwealth to encourage all school committees to
> adopt as educational objectives the promotion of
> racial balance and the correction of existing
> racial imbalance in the public schools.

Mass. St. 1965, c. 641, § 1 (codified with amendments at Mass. Gen. Laws c. 71 § 37C).  Toward this end, the RIA encourages -- but does not require -- all schools to devise "plans" to promote racial balance. The only instance in which the law imposes a duty upon a school committee to prepare such a plan is when the school committee has proven unable to satisfy requests from nonwhite students attending racially isolated (predominantly minority) schools to transfer to racially imbalanced (predominantly white) schools.[25]  Mass. Gen. Laws. c. 71, § 37D; see also School Comm., 366 Mass. at 322-23.

---

[25] The RIA defines the terms "racial imbalance," "racial balance," and "racial isolation" as follows:

> "Racial imbalance," the condition of a public school
> in which more than fifty percent of the pupils
> attending such school are non-white.

> "Racial balance," the condition of a public school in
> which more than thirty percent but not more than fifty
> percent of the pupils attending such school are non-
> white.

> "Racial isolation," the condition of a public school
> in which not more than thirty percent of the pupils
> attending such school are non-white.

Mass. Gen. Laws c. 71, § 37D.  It is important to note that the Lynn student assignment plan at issue in this case has drafted its own definitions of these terms, as I explain below.  See infra Section IV.C.

The state Board of Education[26] is to assist in the development of
any plan, voluntary or mandatory, and must approve it prior to
implementation.  Mass. Gen. Laws c. 76, § 12A.  The plan must set forth
in detail the district's proposed changes in school attendance zones;
any possible alteration to or expansion of existing facilities, as well
as any planned addition of new school buildings; and any "other
measures" that the district anticipates implementing to ensure space
for students seeking "desegregative transfers," i.e., transfers that
will reduce racial imbalance.  Mass. Gen. Laws c. 71, § 37D.[27]

_____

[26] The Massachusetts Board of Education supervises the larger Department
of Education, of which it is a part.  Mass. Gen. Laws, c. 15, § 1.  The
remainder of the Department is comprised of advisory councils to the Board.
Id., § 1G.

[27] A "desegregative transfer" is defined by the Board of Education to
describe any one of the following conditions:

> Students transferred from a school in which racial
> imbalance exists to a school in which racial isolation
> or racial balance exists.

> Students transferred from a school in which racial
> isolation exists to a school in which racial imbalance
> or racial balance exists.

> Students attending a school other than their
> neighbourhood school (neighbourhood or attendance
> area) and are effecting racial balance.

> Students attending a school different from the one
> they would have been assigned if there were no
> desegregation plan, and such attendances are effecting
> racial balance or reducing racial isolation.

> Students who are assigned to a school different from
> the one they would have been assigned to prior to
> controlled choice.  Such attendance contributes to
> racial balance.

> Students who are not attending their walk-zone schools
> and are effecting desegregative choice.

Commonwealth of Massachusetts Department of Education, "Desegregative
Transfers."

Under the RIA, the Commissioner of Education has the power to withhold school construction funds and other state aid if a school district does not act within a reasonable time to reduce an identified racial imbalance in its system.  Mass. Gen. Laws c. 15, § 1I, ¶ 2; see also School Comm., 366 Mass. at 323.  A 1974 amendment provided affirmative financial rewards to school districts that undertake voluntary plans.  Mass. St. 1974, c. 636, § 1.  Such incentives included 100% state reimbursement of certain student transportation costs, substantial funding of the costs of establishing magnet schools, and payments of $500 to the district for each student transfer that reduces racial imbalance or isolation.  Mass. Gen. Laws c. 15, §1I, ¶¶ 3, 4.[28]  The city of Lynn submits yearly "entitlement reports" certifying the number of desegregative student transfers that occurred in its school system in the prior school year; the state responds with aid monies based on the numbers Lynn provides.

From 1974 until 1984, the Act authorized state reimbursement for up to 75% of the cost of approved school renovation or construction directed at reducing racial imbalance in school populations.  By 1984, the rate of reimbursement was increased to 90%, Mass. St. 1984, c. 394, § 5, where it remained until 2001, when the legislature eliminated the reimbursement, Mass. St. 2000, c. 159, § 36.[29]  In Lynn's case, state

---

[28]  The state deposits these payments into local "Equal Education Improvement Funds," from which the local school committees may draw monies to support the quality of education within their districts.  Id. § 1I, ¶¶ 4, 5.

[29]  This amendment applies prospectively and does not affect the state's existing 90% funding contributions to renovation or construction efforts in voluntary plans predating the amendment.

assistance provided under the RIA supplied 90% of the funding for
school renovations and construction that the city outlined in its 1990
voluntary plan.

**B.   Racial Imbalance in Lynn's Public Schools**

In the nearly ten years preceding the adoption of the Lynn Plan,
Lynn faced two serious problems -- substantial overcrowding of its
neighborhood schools and significant levels of racial imbalance.
Significantly, the state attributed the latter not only to growing
residential segregation within the community, but also to the school
district's own policies and practices.  Indeed, correspondence during
this period suggests that state officials felt Lynn's actions and
inactions made the city vulnerable to state and/or federal lawsuits
alleging de jure segregation.

The emergence of increasingly racially identifiable schools in
Lynn created a crisis.  A number of witnesses told of conditions not
unlike those targeted in the Kiernan Report.  Janet Birchenough
observed racial polarization and severe resource inequalities between
the predominantly minority and identifiably white schools where she
taught.  These inequalities were apparent on all fronts, including
building facilities, learning materials, and teacher commitment.  The
predominantly white schools were well-maintained and well-managed;
parents were deeply involved in their children's education.  The
minority schools, in contrast, limped along with crowded classes and
outdated materials.  There were discipline problems:  parents and
administrators alike were apathetic; students were angry, felt

-26-

abandoned, and often lashed out.  Attendance rates were low;
achievement at all levels suffered.  Class sizes were larger in
identifiably minority schools than in identifiably white schools.

Wherever possible, teachers with seniority -- who had priority in
choosing new openings -- transferred out of minority schools into the
identifiably white, wealthier schools, where the school climate was
more conducive to learning and teaching.  There was no professional
training for teachers to prepare them for teaching a diverse student
population, and little or no curricular support.

Birchenough observed that the racially charged and intolerant
atmosphere in the schools led to cross-racial conflict, the students'
frequent resort to racial slurs, as well as tendencies to self-
segregate by race at recess and in cafeterias and classrooms.  This was
so in all of Lynn's schools, in the better-off, predominantly white
schools that harbored small minority populations as well as in the more
racially mixed schools.  Birchenough's observations were confirmed by
other participants, including Principal Barton, Superintendent Kostan,
and Ms. Mallett.

### 1.  <u>1977:  The First Warning</u>

In 1977, the Board of Education first confronted Lynn about the
racial imbalance in its schools.  Specifically, the Washington
Community School ("Washington"), one of Lynn's elementary schools, was
found to have a 57.2% minority student population, when the overall
district was only 9% minority.  The Board of Education attributed the
concentration of minority students at Washington in part to residential

patterns, but more significantly to the district's school assignments, which the state roundly condemned.  Administrators regularly allowed minority transfers into the already racially isolated Washington Community School and assigned <u>all</u> bilingual classes to that school's annex.

Over the next decade the Board of Education regularly warned Lynn that its action and inaction exposed it to charges of <u>de jure</u> segregation.  In contrast to other cities across the nation, however, by implementing its voluntary Plan, Lynn officials ultimately headed off court involvement and dramatically changed its schools for the better.

### 2.   <u>1979: Washington, the First Magnet School</u>

In 1979 a magnet school program was established at the Washington school.  The state offered supplemental funding to the Washington magnet school program, conditioned on the district's adoption of a voluntary transfer policy that would attract white students.  Lynn accepted this invitation and adopted a voluntary transfer policy.

In April 1980 the district announced a more comprehensive plan. Neighborhood schools remained the centerpiece of the plan with these exceptions:  White students from schools that were 70% or more white had the right to transfer to the Washington school, whereas white students already enrolled in that school would not be permitted to transfer out of it.  Nonwhite students in the Washington district and elsewhere had the right to transfer to any school that was more than

70% white, but white students were not permitted to make such
transfers.

Again, there was official manipulation of the policy.  Officials
were accused of bending the rules for white parents.  Administrators
regularly approved the requests of white parents to transfer their
children out of predominantly minority neighborhood schools.  For
example, in the 1987-1988 school year 107 out-of-neighborhood white
students were attending the 93% white Aborn high school as a result of
transfers.  Of these 107 students, more than half of them resided in
the attendance zone that fed into the Ingalls high school, which was
located in a minority neighborhood.  Lynn officials conceded that these
transfers were in blatant violation of the school assignment policy in
place at the time.[30]

### 3.   <u>**1980s:  Profound Changes in Lynn**</u>

Between 1980 and 2000 racial and ethnic minorities moved into Lynn
in considerable numbers, transforming a city that was 93% white to 63%
white.  Defense expert Nancy McArdle, citing census data, noted that
the child population of Lynn went from 90% white to more than half
minority during this period.  More and more, Lynn's residents began to
self-sort into neighborhoods by race.

---

[30] The Department of Education was also concerned about the closing of
seven schools without taking racial balance into consideration, the loss of
seven teachers trained with state funds in facilitating integration, and the
increase in class size at the Washington school, well beyond the city's
average, which reduced its attractiveness to transfers.

The 1980 Census found that the northern and western areas of Lynn were 90% white, while a belt of moderately integrated neighborhoods surrounded a minority enclave in south central Lynn.  By the end of the decade, these trends intensified.

The schools, like Lynn's neighborhoods, likewise grew more and more racially polarized.  While the magnet program at Washington -- the only such program in Lynn in the early 1980s -- saw minor changes in minority concentration, dropping from well above 50% to 44% during this period, the minority share in other minority-identifiable elementary schools in Lynn dramatically increased.

The school system was troubled, with high absentee rates, racial tension and conflict, and chronically low test scores.  Racial polarization in Lynn's neighborhoods and schools continued into the mid-1980s.  By 1984, notwithstanding the city's demographics, then roughly 83% white and 17% minority, four of Lynn's seventeen elementary schools had minority populations of between 35% and 50%.  The remaining schools were overwhelmingly white and remained so until 1987, even as the minority student population in Lynn climbed to 26% over the intervening three years.[31]

---

[31] In May 1984, the Department of Education confronted Lynn a second time, this time to complain of the district's failures to meet various state and federal bilingual and special education requirements.  Hispanic students brought a federal civil rights suit in 1985 claiming that the district denied them appropriate language programming and educational services.  Lynn ultimately submitted to the terms of a consent judgment that required it to take steps to improve its bilingual education program.

### 4.   1986:  A Series of Failed Voluntary Plans

The state Department of Education urged Lynn to adopt a long-term, comprehensive plan to defeat racial isolation and imbalance.  Lynn formulated such a plan in April 1986 but elected not to seek state approval (as the RIA requires).  As a result, grant monies offered by the state for Lynn's "desegregation coordinator" were suspended mid-year, due to Lynn's stalled progress.  The district ultimately drafted a second voluntary plan, which the state approved in September 1986 but Lynn never implemented.

### 5.   1987-1988:  Greater Imbalance; More Accusations

By 1987 four elementary schools had become minority dominated, four other elementary schools were at least 95% white, and three more were hovering at around 90% white student enrollment.

In April 1987, the Lynn School Committee developed a third voluntary plan, which the Board of Education approved.  Lynn would launch and develop five schools, designated "magnet" schools, in the first year of implementation, with five more to follow in the next year.  With the state's approval would come additional funds to support the necessary construction and renovation of facilities to improve these schools.  The plan also approved a redrawing of elementary and junior high school attendance zones to assist with the desegregative effort.

However, certain aspects of the plan, slated for implementation in September of 1987, were delayed.  The district did not implement its

proposed class-size maximums, and the school year began with the elementary and middle school attendance zones unchanged.

Significantly, school officials continued to approve improper segregative transfers.  By January 1988, state officials made their accusations more pointed than ever before.  In a letter to Lynn's Superintendent they noted:

> It appears that the condition of minority
> identifiable schools in Lynn is directly
> [at]tributable to past actions and inactions by
> Lynn School officials.  The most significant
> finding is that the School Committee failed to
> enforce its own controlled transfer policy and has
> admitted to that fact.

Again, the message was clear:  Lynn's "actions and inactions," its failure to enforce its own plan in an evenhanded way, and its own admissions of these facts made the district vulnerable to charges of de jure segregation.  The state withdrew its approval of Lynn's Plan.

### 6.   1988-1990:  Drafting the Current Plan

In its February 1988 Plan, Lynn officials admitted that official actions had exacerbated racial isolation and imbalance.  They redoubled their efforts, this time soliciting feedback from the community, which -- no doubt because of Lynn's history -- eyed Lynn's proposed actions warily.  A letter from Christine Rossell -- who consulted for Lynn during this period but now serves as the plaintiffs' expert in this case -- was more sanguine, observing that Lynn stood "an excellent chance of desegregating its six minority schools and minority isolated schools."

A key point of contention was student assignment.  The state Department of Education was concerned that Lynn's use of voluntary transfers and magnet programs would not be sufficient to reverse the decades-long trends toward racial imbalance, a trend exacerbated by official action.[32]  Lynn, however, remained committed to a voluntary transfer plan and refused to assent to "restricted choice" or "controlled choice" regimes that the Department was recommending.

Finally, in September 1989, Lynn devised yet another amended plan, which the state accepted.  This new Plan, the terms of which I will set forth in detail below, guaranteed that every student could attend his or her neighborhood school.  In addition, a student could transfer from the neighborhood school to another school <u>as long as</u> the transfer improved the racial balance in either the neighborhood or the destination school.  The Plan gave assurances that there would be space for such transfers in new and renovated schools.

In February 1990 the Plan was amended to allow for "neutral transfers," that is, transfers that would neither improve nor adversely affect racial balance in the schools that were party to the transfer. The state approved this amendment.

A 1999 amendment to the Plan added more flexibility to the transfer system, instituting an appeals process for transfer denials

---

[32] At one point, Lynn proposed a plan that would gerrymander the Ingalls and Aborn neighborhoods to make them even more imbalanced.  Lynn proposed to redistrict the Ingalls school zone by annexing the white section of the Ingalls school zone, which was 53% minority, into the Aborn zone, which was overwhelmingly white.

and certain exemptions for bi- and multiracial students[33] and cases of extreme hardship.[34]  This Plan is the one that the plaintiffs challenge.

## C.  **The Current Plan**

It is important to note at the outset that under the Lynn Plan every student in Lynn is entitled to attend the school in his or her neighborhood.[35]  Students have options beyond their neighborhood schools if their proposed transfers are "desegregative" -- *i.e.*, when they contribute to the districtwide integration effort.  Additional "neutral transfers" are allowable as well, provided that they are approved by the school district's PIC and the sending and receiving principals.[36]

Whether or not a transfer is desegregative or neutral turns on the interplay of three factors:  the racial composition of the sending and receiving schools and the student's race.  Schools are classified as either "racially balanced," "racially isolated," or "racially imbalanced."  An elementary school is considered "racially balanced" if its minority[37] population falls within +/- 15% of the overall percentage

---

[33] As noted above, this requirement means that Angelica Jackson, daughter of plaintiff Stinson, would have been able to transfer freely out of her neighborhood school to any other school in Lynn.

[34] See infra Section V.A.2.

[35] The Lynn Plan does not apply to school assignments for students participating in bilingual or special education programs.

[36] Neutral transfers at the middle and high school level are available until August 1.  Elementary school students may participate in neutral transfers until December 1 -- or later, if the principals of the sending and receiving schools give their assent.

[37] The Lynn Plan's definition of minority includes African Americans, Asian Americans, Hispanics, and Native Americans.

of minority students in the Lynn district.[38]  For the middle and high
schools racial balance is +/- 10% of the district population.  When the
proportion of minority students in a school exceeds the range of racial
balance, that school is classified as "racially imbalanced."  Likewise,
a school in which the number of white students surpasses the outer
bounds of racial balance is "racially isolated."

For example, Lynn's student population for the 2001-2002 school
year was 42% white and 58% nonwhite.  By the Lynn Plan's definitions,
then, an elementary school that enrolled between 43% and 73% minority
students would qualify as racially balanced.  Middle and high schools
required a tighter fit of between 48% and 68% minority students.
Elementary schools with more than 73% minority students in the 2001-
2002 school year -- and middle or high schools with more than 68%
minority students -- were designated as racially imbalanced.
Conversely, an elementary school that was fewer than 43% minority or a
middle or high school that was fewer than 48% minority would be
considered "racially isolated."

A proposed transfer is desegregative -- always allowed, space
permitting[39] -- when it would improve the racial balance of the sending

---

[38] The Plan originally called for a 10% range of deviation for
elementary schools, but the district altered this range to 15%, as Birchenough
explained, "to allow for the window to be open a little more" and thereby
permit more choice to Lynn parents with elementary school children.  A 20%
range was considered in 1994, but the district ultimately concluded that this
"would open the window too wide," with the result that schools would lapse
into greater racial identifiability.

[39] Factors such as limits on class size and space availability can
result in denial of a transfer, but none of these are at issue in this case.

<u>or</u> the receiving school.  For example, a minority student may always transfer <u>out of</u> a racially imbalanced school ("School A") or <u>into</u> a racially isolated school ("School B").  Conversely, a white student may always transfer out of the racially isolated School B and into the racially imbalanced School A.  A transfer is segregative, and never allowed, when it would exacerbate an already existing condition of racial imbalance in the sending or receiving school.  A requested transfer that is neither desegregative nor segregative is "neutral" and conditionally allowable, as I explained above.

At a district level, white and nonwhite students are equally subject to the Plan; sometimes a white student may be denied a transfer, sometimes a nonwhite student.  But at the individual level, there are times when, all else being equal, a student's ability to transfer turns on his or her race.  To continue the above example, with School A as a racially imbalanced school and School B as a racially isolated school:  A student who seeks a transfer from School A to School B may do so (again, space permitting) if he or she is a minority student.  A white student requesting the same transfer, however, would not be eligible, unless she or he qualified for certain exceptions.

Such a student, denied a transfer because it would exacerbate racial imbalance in the system, may appeal the decision to the PIC's Director, who may occasionally refer the matter to or consult with the district Superintendent.  The appeals process is not an empty formality.  The district will override transfer denials on appeal when the denial would result in siblings attending different schools or when

-36-

parents can make a showing of medical, safety, or other extreme hardship.

Moreover, the PIC goes out of its way to make the appeals process accessible to everyone.  It assists parents in preparing documentation required to establish hardship.  It then arranges a meeting with the parents to discuss the student's options.  If conditions at the destination school preclude the transfer, the PIC will present the student with alternative destination schools.  Finally, the unique considerations posed by bi- and multiracial students have led Lynn to amend its Plan to permit parents to appeal the district's race designations directly to the Superintendent.  Significantly, a number of the plaintiffs in this case have successfully invoked the appeals process.

The Plan's drafters also recognized that integration involves more than race-conscious school assignment policies, more than simply the mixing of students of different racial backgrounds.  Thus, the Plan included substantial curricular innovations designed to ensure positive racial interaction; training and development of staff to address the challenges of teaching children of diverse backgrounds; programs that would create opportunities for positive interaction among students, school personnel and parents from different racial and ethnic groups, which are not normally found within regular school programming; integrated leadership opportunities and training to give students the skills necessary to deal effectively with racial tension and conflict, etc.

In addition, the Plan's drafters acknowledged that the
improvements it sought could not be sustained in the long term unless
all the schools were made attractive to all Lynn parents, whatever
their race.  Thus, the Plan included an ambitious construction program,
largely funded by the state, to ensure sufficient space for out-of-
neighborhood transfers.  It involved the development and
standardization of curriculum so that there would be equal
instructional opportunities across Lynn; development of indicators of
performance and achievement for individual schools, programs and
students; development of measures designed to improve school
attendance; and creation of business/college partnerships with the
schools to improve the quality of instruction.

### D.   **Continuous Monitoring**

The district's PIC oversees the ongoing implementation of the Lynn
Plan.  In effect, it is the vehicle through which the Plan
administrators certify that the Plan is narrowly tailored to meet its
goals.

Chief among the PIC's responsibilities is the processing of all
admissions and re-admissions to the district and all transfers within
the school system.  It assesses students for special needs and
maintains an ongoing database of each student's transfer history.  That
database, which features thirty-five data fields per student, enables
Birchenough to monitor class size and enrollment by school, as well as
the racial composition of individual schools and the district more
generally.

The PIC prepares monthly reports tracking movements of students into and out of the district, as well as between the schools, to ascertain how many of these transfers qualify as desegregative.  It provides regular reports to the state Department of Education on the progress and status of the district's magnet school programs, as well as the number of desegregative transfers.[40]

Significantly, the data that the PIC gathers enable it to continuously monitor the need for the Plan.  The PIC tracks the patterns of Lynn residential segregation.  It attempts to predict the choices of white or minority parents if there were no restrictions on transfers.  Based on that data, Birchenough (and the defendants' experts) predicted that in a pure choice model, white parents would seek transfers to predominately white schools, and minority parents to minority schools.[41]

**E.    A Current Snapshot of the Lynn School District**

**1.    Residential Segregation and Geographical Separation**

According to McArdle's expert testimony, recent censuses and the data kept by the Lynn PIC reveal that Lynn remains geographically segregated by race.  In the 1990s white populations continued to move

---

[40] Finally, beyond the issue of desegregation, the PIC in effect maintains a living archive of the Lynn school district.  Miscellaneous data that the PIC compiles and tracks include students' post-graduation plans, reasons for discipline, enrollment diversion to private and parochial schools, and indicators of student homelessness.

[41] Segregative transfers are sought between 500 and 800 times per year. White parents disproportionately seek transfers that the Plan forbids: although only about 40% of the student population is white, 70% of the segregative transfers proposed involve white students.

to the northern -- and particularly northeastern -- areas of Lynn, while the concentration of racial minorities in south central Lynn expanded to consume all of southern Lynn and more of central Lynn, with a transition zone of racially mixed neighborhoods between these two enclaves.  In addition, the elementary schools located in the predominantly white sections of Lynn and the elementary schools in the predominantly minority sections are separated by significant distances. The travel time between the two areas, whether by private car or public transportation, is not insubstantial.

### 2.   **"White Flight" and Its Decline after Implementation of the Lynn Plan**

In 1979, before the Lynn Plan's implementation, when the city's schools were the most polarized, statistics show that the overall number of students in the Lynn public schools began to decline -- a direct result of the decline in white enrollment, what has been described as "white flight."

Significantly, after the Plan's implementation, this trend began to reverse.  The number of students now enrolled in Lynn schools is similar to enrollment in the 1970s, just before the most significant increase in the number of minority students enrolled in the school system.  While the percentage of Lynn students attending private and parochial schools rose as high as 17.4% in 1987, it has since declined dramatically to a low of 10% in 2001.  Of the 15,444 students attending Lynn public schools in the 2001-2002 school year, 42% were white and 58% were nonwhite (15% African American, 29% Hispanic, and 14% Asian).

### 3.   <u>Racial Balance or Imbalance</u>

There are presently twenty-five schools in the Lynn system --
eighteen elementary schools, four middle schools, and three high
schools.[42]  Under the Lynn Plan, "racially balanced" elementary schools
in 2001-2002 had minority populations of between 43% and 73%; nine
schools qualified.[43]  Six schools were racially isolated.[44]  Four
elementary schools were "racially imbalanced."[45]

---

[42] There are eighteen elementary schools in total:  Aborn, Brickett,
Callahan, Cobbet, Connery, Drewicz, Fallon, Ford, Harrington, Hood, Ingalls,
Lynn Woods, Sewell-Anderson, Shoemaker, Sisson, Lincoln-Thomson, Tracy and
Washington Community Magnet.  Of these schools, five -- Aborn, Lynn Woods,
Sewell-Anderson, Shoemaker and Sisson -- are located in predominately white
residential areas of Lynn, whereas Cobbet, Connery, Harrington, Ingalls, and
Washington are located in predominately minority areas.

Lynn maintains four middle schools, which provide sixth, seventh, and
eighth grade instruction.  Barring a student's voluntary exercise of a
transfer, the middle schools act as neighborhood schools in their own right,
drawing students from nearby elementary schools.  The Brickett, Harrington,
and Ingalls elementary schools, along with portions of the Aborn, Ford, and
Hood schools, feed graduating students into the Marshall middle school.  The
Cobbet, Connery, and Washington elementary schools feed into the Fecteau-Leary
middle school.  The Breed middle school draws students from the Callahan,
Drewicz, Fallon, Sewell-Anderson, Lincoln-Thomson and Tracy elementary
schools.  Finally, the Pickering middle school receives students from Lynn
Woods, Shoemaker, Sisson and portions of the Aborn, Ford, and Hood schools.

The four middle schools in turn feed into three high schools:  Breed and
Fecteau-Leary feed into the Lynn Classical high school, and Marshall and
Pickering serve as feeder schools for the English high school.  The third high
school, Lynn Vocational Technical, draws from all parts of Lynn.

[43] Those schools included Lincoln-Thomson (43%), Sewell-Anderson (44%),
Fallon (48%), Callahan (56%), Brickett (57%), Tracy (66%), Drewicz (68%),
Washington (70%), and Ford (71%).

[44] Lynn Woods (25%), Sisson (27%), Shoemaker (30%), Aborn (35%), and
Hood (just barely at 42%).

[45] Connery (80%), Ingalls (81%), Cobbet (83%), and Harrington (84%).

Under the Plan's stricter requirements for the middle and high schools, namely, a racial makeup falling within +/- 10% of the districtwide breakdowns, which in 2001-2002 translated into 48% and 68% minority enrollment to qualify as racially balanced, only one middle school of the four was racially balanced, while all three high schools met the test.  The Breed middle school (49%) was racially balanced, while the Marshall (72%) and Fecteau-Leary (81%) middle schools were racially imbalanced, and Pickering (33%) was racially isolated.  Lynn's high schools were all racially balanced with the following percentages: Lynn Classical (51%), English (51%) and Lynn Vocational Technical (63%).

### 4.   **The Special Problem of Poverty**

Many of the city's resident families live at or near the poverty level, a situation that greatly complicates any school's educational mission.  In the 2001-2002 school year, 65% of all Lynn students received free or reduced-cost lunch (eligibility for which is based on family income), including 40.7% of white students, 72% of the African American students, and 79.8% of the Asian American students.[46]  Fourteen of Lynn's eighteen elementary schools enroll a sufficient number of impoverished students to qualify for federal Title I assistance. Significantly, the four that do not receive assistance are the four most identifiably white schools.

---

[46] Birchenough testified that at the high school level, students are often ashamed to fill out the paperwork necessary to obtain school lunch assistance, so that the numbers may under-represent the numbers of families who could qualify.

### 5.   School Construction and Renovation

Since the Plan was implemented, Lynn has been able to renovate and expand six of its elementary schools, for which the state provided 90% of the funding.  Lynn is currently planning another phase of construction that would include renovations to existing facilities and the construction of two new middle schools and two or three elementary schools.  Elimination of Lynn's restrictions on segregative transfers would render this project ineligible for 90% funding under the RIA.

### 6.   "Magnet" Schools

Of the ten magnet programs envisioned in early iterations of the Plan, only seven were ultimately developed.  The district added two more programs in September 1999.  However, the term "magnet school" in this setting needs to be clarified.  It does not connote a competitive admissions process or the provision of a more elite education.  See infra note 72.

Lynn's "magnets" differ from its other schools only insofar as they have adopted certain "educational themes."  The magnet themes currently include "Brickett by the Sea," "Reading and Writing Literary and Whole Language," "Technology and Language/Citizenship Skills for the Future," "Life Science," "Rainbow Connection Society," "User Friendly Society," "Pickering After School Support," and "Healthy Schools Make Healthy Communities."

While the schools offer and provide varying academic programs, which are designed to draw students from other neighborhoods elsewhere in Lynn in order to further the integration effort, the parties stipulate that "the education provided . . . in each of the elementary, middle, and high schools in Lynn is comparable in quality, resources, and curriculum."

**F.    The Lynn Schools at Present**

By all accounts, and by all measures, since the implementation of the Plan the Lynn schools have become a success story.  That success was recounted in the moving testimony of the participants, in expert testimony, and in the data.

The defendants have identified certain compelling interests to justify the Plan:  First, to prevent racial isolation; second, to promote racial and ethnic diversity; third, to increase educational opportunities for all students and to improve the quality of education[47]; fourth, to provide a sufficient education by state

_____

[47] There is no question that educational achievement has increased throughout the system by all measures.  For example, to the extent that the state-administered MCAS test is a barometer of academic achievement, Lynn students are performing at high levels relative to other students in the Commonwealth under similar socioeconomic conditions.  Likewise, Lynn's high school students scored above average among MCAS test-takers in urban areas. In addition to the improvement reflected in MCAS test results, data collected in the first three years after the Lynn Plan was implemented show improved reading and test scores.  The Massachusetts Department of Revenue, as part of its financial audit of Lynn schools, collected school achievement data from 1988 to 1996 that reflected sustained improvement in reading, language expression, and overall academic achievement.

Nevertheless, defendants do not claim that this improvement derives solely from the race-conscious aspects of the Lynn Plan.  As described above, from the outset the student assignment plan has been seen as an integral part of a larger, more comprehensive educational overhaul that involves improving school facilities, increasing resources, improving curricular offerings, as well as providing a wide variety of multicultural and multiracial educational

-44-

constitutional standards; fifth, to ensure the safety of Lynn's public school students; and sixth, to implement the clear command of the Supreme Court's decision in <u>Brown v. Board of Education</u>.

### 1. Observations by Participants

Since the Plan has been in place, Lynn school superintendent Nicholas Kostan has observed a "steady progression" of improvement in the schools.  Racial tensions have subsided, attendance and test scores have increased, and suspensions of students have declined.  Indeed, according to Kostan, Lynn's school attendance rates are remarkable for an urban school district.  He attributed this attendance record to the Lynn Plan, which he believes has cultivated feelings of comfort and safety among Lynn students that make them want to go to school.  He has also noticed that students no longer self-segregate by race in their social interactions, which he believes is also a result of the Lynn Plan.[48]

---

opportunities.

What the defendants do allege, and what the record establishes, is that the race-conscious and race-neutral components of the Plan are inextricably intertwined and each independently necessary.  The school assignment policy, without the support of the other elements, would not have resulted in these improvements.  Conversely, race-neutral strategies would not have been effective in creating a healthy multiracial learning environment without the Plan's use of race.

[48] Nicole Oak, a seventeen-year-old white student and recent graduate of Lynn Classical High School, started her Lynn career in a "very diverse" elementary school, with the result that multiracial environments seemed "just natural" to her by the time she graduated from high school.  In her experience, students from other school districts do not have the same healthy attitude toward racial difference; she suspects that hers is a result of her early exposure to students of other races.

Patricia Mallett, a teacher at the Brickett elementary school, testified that since the Lynn Plan's implementation, she has witnessed a stunning improvement in student race relations at Brickett.  Prior to the Plan, she observed self-segregation and racial tension in Brickett, a predominantly white school.  Now, students of different races seek out one another and form friendships, a result she attributes to the Plan's fostering of cross-racial interaction in the crucial formative years.[49]

### 2.  **Expert Testimony**

The expert testimony in this case corroborated the moving observations of the teachers, students, and administrators who testified on behalf of the district.  McArdle and Drs. Orfield, Dovidio, and Killen together gave an internally consistent, multi-disciplinary presentation that convincingly explained how essential the Lynn Plan's use of race in school assignment was to the school district's renaissance.

Broadly speaking, the expert presentation was compelling for three reasons:

First, Lynn's experts based their opinions on their considerable expertise and a tremendous amount of data -- the lion's share of it personally obtained -- specific to the conditions in Lynn.  Nancy

---

[49] Karen Horner, an African American parent of two children in the Lynn system, testified that she did not begrudge the district's denial of two transfers she sought on behalf of her son Errol.  Although the denied transfers would have made her life as a single parent substantially easier -- she preferred one school because the YMCA maintained an after-school program across the street and the other because she had recently moved into that school's neighborhood -- Horner respected the district's decisions.

McArdle, the defendants' demographics expert, performed a comprehensive study of demographic trends in Lynn.  School desegregation expert Dr. Gary Orfield put the resources of the prestigious Harvard Civil Rights Project into his study of Lynn.  Dr. Orfield oversaw the administration of the Harvard Project's standard data-gathering questionnaire ("Diversity Assessment Questionnaire") to eleventh grade students from all three of Lynn's high schools.  The 72-question survey, jointly designed by leading experts on school desegregation,[50] is used to compare the success of desegregation efforts nationwide.  Dr. Orfield followed up his survey with a visit to Lynn Classical High School in January 2002, where he met and spoke extensively with a number of leaders of student organizations.

In January and February 2002 Dr. Dovidio visited the Lynn school system, conducted formal and informal interviews with teachers and administrators, reviewed what he called "archival evidence" -- newspapers, yearbooks, student-made decorations, school mission statements -- and observed the students in the classrooms, between classes, at lunch, and before and after school.  Dr. Killen also visited the Lynn system independently of Dr. Dovidio.  Dr. Killen sought out schools with a range of racial homogeneity and heterogeneity.  With the students she deployed observational and interview methodologies standard in her field of developmental psychology.  Dr. Killen then supplemented her findings with more formal

---

[50] The survey instrument was designed by nationally recognized experts and peer-reviewed.  It has been administered at locations across the country.

interviews with teachers and administrators.   Drs. Dovidio and Killen
also reviewed Lynn student responses to the Harvard questionnaires.

Second, the experts looked at the data that they gathered from the
distinct methodological perspectives of their fields of expertise.   Dr.
Orfield, a desegregation expert, considered the whole picture -- the
survey data and his own observations as well as those of the other
experts -- and situated Lynn's experience in his broader experience
with the many school systems he had studied.   Drs. Killen and Dovidio,
a developmental and social psychologist, respectively, viewed the data
through the lens of their expertise:   social and cognitive development,
intergroup contact and attitudes, and racial stereotyping.   McArdle,
the demographer, analyzed data about residential and school
segregation.

Third, the defense experts were nationally renowned experts who
could cite with authority the studies in their field and who used
accepted methodologies and based them on opinions published findings in
peer-reviewed journals.   I found each of them to be credible and
extremely persuasive.

### a.   Dr. Orfield:   Desegregation Expert

Under Dr. Orfield's supervision, the Harvard Project analyzed the
survey returns and concluded that Lynn is

> a school district where all groups of students have
> experienced ability to work together, to share

> issues, to discuss across racial and ethnic lines,
> feel comfort -- feel that they are prepared to live
> and work in interracial communities, feel prepared
> to work under the supervision of somebody of
> another racial group, have worked on projects
> across racial lines in their classes, feel
> comfortable in discussing issues across racial
> lines.[51]

Dr. Orfield testified that the survey's conclusions about the Lynn

experience neatly align with the underlying theory of a new area of

desegregation research:  that benefits accrue to _all_ children, not just

minority children, as a result of school integration.  Dr. Orfield

cited several peer-reviewed studies -- and referred to a number of

other studies on their way to publication -- finding that parents and

students in areas where integration has been achieved (as it has in

Lynn) acknowledge that side-by-side learning with students of other

races confers substantial citizenship benefits on all students.  If

schools implement desegregation programs with supportive elements, such

as training of teachers, and the schools are committed to creating a

positive supportive atmosphere, all students obtain "benefits to the

way of thinking, understanding of the society, [and] ability to

function in society," as well as gains in academic achievement across

the board.[52]

---

[51] The students that Dr. Orfield consulted about race relations and the
nature and degree of cross-racial interaction among the students affirmed the
survey results.  Student responses were unequivocally positive, to such an
extent that they pitied students in adjoining communities who did not have the
benefit of integrated schools and regarded them as "completely clueless" about
race relations.

[52] For example, data from the survey of Lynn's eleventh grade students
suggest the following:  students across racial lines felt that they had
received information about college admissions and have been encouraged by

Relying in part on McArdle's demographic data, Dr. Orfield also testified that the Lynn Plan used race no more than was necessary to allow Lynn to meet its educational goal of preparing students to live in a multiracial society.  He observed that the Plan's specified range of racial balance -- for elementary schools, within 15% of the overall proportions of white and nonwhite students in the district, and for middle and high schools, within 10% -- was typical of desegregation planning.  In fact, Dr. Orfield found the range perhaps more flexible and accommodating to the interests of parents than he might have chosen:  he said he "probably would have chosen 10%."

Finally, Dr. Orfield testified about the likely impact of the resegregation of Lynn's schools.  He cited research on African American and Latino children concluding that educating students in racially isolated or segregated school environments has an adverse impact on school attendance and performance, with long-term consequences. Poverty exacerbates racial isolation and segregation for minority students.  When schools that are already in areas with an overwhelming minority residential population and extreme poverty resegregate, racial polarization is accelerated, with all of its deleterious effects.

---

teachers and counselors to attend college and to take honors or Advanced Placement courses, and that they have at least one teacher who takes a special interest in them.  Consistently, students across racial groups reported their convictions that teachers administer discipline fairly and that if they "try hard they can do well in school."

Students felt that integration was a fundamental characteristic of their schools.  It was part of the schools' mission statement and was reflected in the conduct of authority figures.

Significantly, resegregation would have a substantial impact on white students in Lynn as well.  Based not only on his research, but on the studies and research of other nationally known experts, Orfield opined that, as a result of racial isolation and segregation, these students forfeit the opportunity to learn from other groups and are less prepared to handle interracial settings as an adult, conclusions underscored by the testimony of Drs. Killen and Dovidio.

   **b.   Drs. Dovidio and Killen:  Social and Developmental Psychologist, Respectively**

Drs. John Dovidio and Melanie Killen, a social and developmental psychologist, respectively, gave psychological content to Dr. Orfield's conclusions.  Dr. Killen testified that because racial (and certain ethnic) differences are observable, children key on them early in their social development.  Differences that are visibly apparent to young children have deeper resonance with them.  As a consequence of this early attendance to observable difference, stereotypes about race and (visible) ethnicity set in early and are extremely difficult to correct in adolescence and adulthood.  Dr. Dovidio agreed that children attend more readily to racial distinctions than other differences.

Furthermore, Dr. Killen testified that the setting of stereotypes is harmful to all children.  Students on the receiving end of stereotypical assumptions feel stigmatized in ways that compromise their academic prospects.  Students who harbor stereotypes suffer as well:  their reliance on stereotypes inhibits their ability to make individualized judgments when they interact with students of other

races.  As a result, even students who are not themselves the objects of negative stereotypes are nonetheless impaired in their ability to live in an interracial society.

Stereotypes do not as easily take hold of children who interact early and often with children of other racial and ethnic groups.  The personal connections forged between students of disparate racial backgrounds challenge race-based assumptions they might otherwise develop about one another.  It is Dr. Killen's experience that children in heterogeneous environments understand better why it is wrong to judge or exclude others based on their race.

Both Drs. Killen and Dovidio testified that meaningful interracial exposure must occur early.  Dr. Dovidio described racial stereotyping as a "habit of mind" that is difficult to break once it forms.  It is more difficult to teach racial tolerance to college-age students; the time to do it is when the students are still young, before they are locked into racialized thinking.  For her part, Dr. Killen cited studies showing that students begin to form rigid social cliques around the sixth and seventh grades, and that race can be a dominant factor that governs who joins what clique.  Once students have found their cliques, the opportunity to defeat racial stereotypes with cross-racial interaction is lost.

### (1)  **Intergroup Contact Theory**

Drs. Killen and Dovidio both attributed the turnaround in race relations in Lynn -- and the overall preparedness of Lynn's students to

live in a multiracial society -- to the district's successful
implementation, through the Lynn Plan, of "intergroup contact."
Intergroup contact theory is a 50-year-old prescriptive theory of race
relations with volumes of support in the literature on social science,
including social and developmental psychology.  The theory holds that
under certain conditions, interaction between students of different
races promotes empathy, understanding, positive racial attitudes and
the disarming of stereotypes.  The four necessary conditions are (1)
equal status between or among different racial groups; (2) authority
support for interactions between members of the groups (that is,
teachers and staff who advocate and facilitate the contact); (3) common
goals and cooperative activities; and (4) opportunities for
personalized contact to disrupt stereotypes.

Drs. Dovidio and Killen testified, based on their personal,
independent observations, that Lynn schools amply satisfied all four of
these conditions and that the positive racial climate in Lynn was
directly attributable to intergroup contact.  Both expressed amazement
at how ideal the conditions in Lynn's schools were for learning racial
tolerance and concord.  Dr. Killen found that this was true of all the
schools she visited in Lynn:  racial environments were "uniformly
positive," and she noted that "it wasn't the case that one school

really stood out as being . . . seriously troubled, tough,

problematic."[53]


### (2)  **"Critical Mass"**

Drs. Killen and Dovidio alike testified that racial balance within

the schools is necessary and crucial to obtain the benefits of

intergroup contact that they observed in such abundance at Lynn.

Simply put, unless there is a "critical mass" of white and nonwhite

students in a given school, the efforts of schools to promote racial

harmony lose much of their force.  Such efforts are still desirable,

Dr. Killen explained, but they lack significance and relevance in a

---

[53] Dr. Killen's testimony was especially telling:

> I was very struck.  I was very surprised, because I
> went there really with no expectation. . . . And I
> went there just wanting to find out what it was going
> to be like.  And I've been in numerous, numerous
> schools in . . . different places in the United
> States.  And I was really surprised by the high level
> of positive interaction among children, among teachers
> and children in these schools.  I mean, I was really
> struck by this.  It was kind of astounding, especially
> in the informal settings, but also in the classrooms,
> as well.  But in the informal settings, of seeing
> children sitting next to one another from different
> races, interacting together in positive ways, seeing
> the teachers in the hallways in terms of their warmth
> expressed to children and the nurturing behavior to
> all children, different races.
> *    *    *
> [O]ne of the well-documented findings is that children
> in cafeteria settings often self-segregate.  They sit
> next to others who are of the same race and ethnicity,
> ungendered.  And I did not see that . . . .  It was
> very surprising.  They elected to sit next to others
> from different races, different ethnic backgrounds,
> positive interactions, positive discourse style,
> positive emotional display, affect display.

school that is racially isolated or imbalanced.  There is no "magical number," in Dr. Killen's experience, that indicates a critical mass, but she cited studies describing a 20% figure below which members of a racial minority in a given setting feel isolated or stigmatized.  Dr. Dovidio underscored a critical mass estimate of 20% -- a number well-established in the literature and affirmed in his own research as a prerequisite to making a meaningful amount of intergroup contact possible.[54]

Dr. Killen took pains to emphasize that 20% is not a magical shut-off point for gains from intergroup contact.  The gains occur along a continuum:  as the racial composition of school populations creeps closer to balanced, racial stereotyping and tension is reduced and racial harmony and understanding increases.  For example, the Fecteau-Leary middle school that Dr. Killen visited had a white population of just below 20% at the time.  Dr. Killen explained that Fecteau-Leary had very recently exceeded a 20% white share and that many of the elementary schools feeding into it were racially balanced in their own right.[55]

---

[54] Drs. Dovidio and Killen both summarized the research and cited specific authoritative studies on critical mass.

[55] Dr. Dovidio explained further that even though schools may occasionally dip under the 20% mark, as Fecteau-Leary did, the range of racial balance in Lynn's schools does not permit a statistically meaningful study of the relative ability of the schools to teach racial tolerance.  Such a study, which the plaintiffs proposed to Dr. Dovidio on cross examination, might in theory provide a measure of the contribution that student-body integration (as opposed to the other "inputs" provided for in the Plan) has made to the improvement in student attitudes about race.  But because the Lynn Plan has ensured that all its schools at least hover around the 20% mark, the range of racial balance available for study is too narrow to admit of a manageable analysis.

### (3)  Impact of Resegregation

Both Drs. Killen and Dovidio were convinced that reversion to a <u>de facto</u> segregated system would forfeit the gains that Lynn has made.  In fact, Dr. Dovidio noted, even when students in racially imbalanced schools receive the same instruction, skills, and training, they are "likely actually to have more racial incidents and racial problems" absent that critical mass of white or nonwhite students.

### c.  Nancy McArdle:  Limitations Imposed by the Demographics in Lynn

Just as critical mass is a precondition to achieving the benefits of intergroup contact, the defense experts agree that the Lynn Plan's race-conscious student assignment policies are necessary to ensure that white and nonwhite populations in its schools reach that critical mass. Demographics expert Nancy McArdle projected that Lynn's predominantly white residential areas will remain so in the coming five to ten years. Predominantly minority tracts in south central Lynn will become still more racially identifiable.  The minority share of the population will increase in the mixed area between south central Lynn and the white dominated northeast portion of the city.  Return to a strict no-transfer neighborhood school system would bring a number of schools below critical mass.  For example, a neighborhood system would take the Lynn Woods school from 24% to 8% minority, Shoemaker from 30% to 6% minority, Aborn from 35% to 12% minority, Cobbet from 83% to 86% minority, and Connery from 80% to 87%.  In McArdle's assessment, if Lynn were to abandon its existing student assignment plan and return to

a system of strict neighborhood school enrollment -- no transfers allowed -- the city's schools would immediately assume a high level of de facto racial segregation.

Birchenough added that the district has considered and even tried to implement a variety of race-neutral methods to achieve the same measure of integration but rejected them all as not feasible.  She testified that the present condition of residential segregation in Lynn is such that a redrawing of school attendance zones could not meaningfully alleviate the de facto segregation that a neighborhood school system would bring.  The areas that would need the most attention, the racial enclaves in northeast and south central Lynn, are simply too far removed from one another.  Because statistics show that white parents tend to request transfers to identifiably white schools and minority parents tend to prefer transfers to predominantly minority schools -- the district in fact denies 500 to 800 requested segregative transfers per year -- a system that allowed unfettered school choice would exacerbate segregation.  See also infra Section V.B.4.b(3).

### d.  **Plaintiffs' Rebuttal**

The plaintiffs stipulate to the improvements in the Lynn school system since implementation of the Plan.  Likewise, they do not dispute that Lynn meets the four conditions of intergroup contact.  What the plaintiffs dispute, through their expert, Dr. Rossell, is (1) the extent to which a race-neutral plan would have accomplished the same result and (2) the extent to which a certain percentage of white or

minority students is required in a school before the benefits of
intergroup contact can obtain.

Dr. Rossell's testimony was not credible.  As noted above, unlike
defendants' experts, she did no independent investigation of the
conditions in Lynn.  She made sweeping conclusions without reviewing
demographic or socioeconomic data and without having an accurate
understanding of the Plan itself.

Her testimony was based on her experience with other systems and
her memory of the Plan from her work fifteen years earlier.
Significantly, her report was based on a fundamental misunderstanding
of the Plan, which she characterized as a "controlled choice" plan.
Lynn's Plan in fact differs considerably from controlled choice.
Controlled choice authorizes the mandatory reassignment of students
from one school to another in the event that parents' exercise of
choice does not generate enough racial balance; likewise, controlled
choice does not guarantee that students can attend their neighborhood
schools.

Dr. Rossell treated Lynn's student assignment policy as a
controlled choice plan based on her experience in Lynn as a paid
desegregation consultant to the City in 1987.  She admitted that she
believed until just prior to her testimony that the Lynn Plan
incorporated provisions for mandatory reassignments from neighborhood
schools.

This was never the case.  A draft of the Plan subsequent to the
one Dr. Rossell saw in 1987 excised the provisions for mandatory

reassignments, and <u>before the Plan's implementation in 1989</u> the Plan guaranteed Lynn students without exception the right to attend their neighborhood schools.

In addition, Dr. Rossell's about-face on crucial issues is troubling here.  She was a supporter of the Plan when she was the city's paid expert, and when the draft Plan involved provisions far more intrusive than are at issue here.  In the instant litigation, retained by a different party, she testified to precisely the opposite conclusions.  Specifically, in this case, she challenged the concept of a critical mass, although in her earlier work, she was on record as having embraced it.[56]  While Dr. Rossell concedes that some measure of racial heterogeneity in the schools is a precondition to intergroup contact, she now takes the position that the schools in Lynn would meet that minimum, even under a neighborhood system -- a conclusion that every one of defendants' experts rejects.  Indeed, she testified that there is research to suggest that racial isolation can somehow facilitate the equal status contact that is a crucial element of intergroup contact, as racial groups of equal size might be more competitive with one another.

_____

[56] A 1983 publication entitled <u>Strategies for Effective Desegregation</u>, to which Dr. Rossell made substantial contributions, declared that "A critical mass of between 15 to 20% of any particular racial group should be maintained in a school" and that "A critical mass of students seems to encourage intergroup contact, discourage self-isolation, facilitate the responsiveness of teachers and administrators to the special needs of minorities, . . . and promote more parental involvement in the school."  When confronted with this work at trial, Dr. Rossell claimed that these conclusions were based on no studies whatsoever, but were pulled in effect, out of thin air.

Her testimony is unpersuasive on a number of fronts.  First, Dr. Rossell does not work in the fields in which the studies cited by Dovidio and Killen were generated.  She is not a social psychologist; she has no background in developmental psychology, the study of adolescent behavior, or the cognitive and social development of children.

Second, Dr. Rossell's position that there is "no research" supporting the critical mass concept is flatly contradicted by the testimony of the nationally known defense experts equipped with years of expertise in their fields, an armful of social science literature, including in social and developmental psychology, on both critical mass and intergroup contact, and their extensive firsthand observations of the conditions in the Lynn schools.

Third, it appears that Dr. Rossell's characterization of the field is skewed.  Her insistence that there is "no research" whatsoever supporting the concept of critical mass conveyed, in essence, that she does not accept the validity of the studies cited in bulk by Drs. Dovidio and Killen -- namely, studies in social and developmental psychology.  It is Dr. Rossell's position that unless the defense experts' conclusions are buttressed by statistical studies of the kind she conducts (in particular, multiple regression analyses), they are unacceptable.  I am not willing to jettison the considered judgments of the entire fields of social and developmental psychology and the nationally known experts within them.

Finally, taking a position diametrically opposed to Dr. Dovidio's, she stated that the experts could, for example, have surveyed schools with differing degrees of racial balance and determined the extent to which students at more balanced schools evinced healthier attitudes about race than their peers at less balanced schools. Dr. Dovidio suggested that such a study was impossible in Lynn because of the small numbers of schools that are racially imbalanced and the marginal differences among them. Moreover, Dr. Rossell testified that this "multiple regression analysis" could realistically control for race-neutral variables in the schools, including the schools' different extracurricular programs, the relative poverty level of students, the extent to which different teachers have different levels of experience in cooperative learning. But Dr. Rossell did not conduct this analysis herself. No other expert in this case believed that such a study could be done, or that it had to be done, given the weight of the scholarly literature.

Finally, Dr. Rossell catalogued race-neutral alternatives that are available to Lynn -- e.g., a transfer program that would permit any requested transfer (to a school with space) with continued use of magnet schools remaining an option. Dr. Rossell explained that Connecticut schools have created racial diversity by providing race-neutral magnet school programs. But whether the race-neutral alternatives she cited would work in Lynn was an opinion which Dr. Rossell was in no position to give -- she had not reviewed the

demographics of Lynn or studied the school system in recent years, and she fundamentally misunderstood the nature of the Plan.

## V.   <u>LEGAL ANALYSIS</u>

### A.   <u>Jurisdictional Issues</u>

#### 1.   <u>Amendments to Prior Decisions (Comfort Plaintiffs)</u>

Federal Rule of Civil Procedure 12(h)(3) authorizes, and in fact requires, a court to raise (or, as in this case, to revisit) a jurisdictional issue <u>sua sponte</u>.  <u>Comfort</u>, 150 F. Supp. 2d at 294 n.23 (citing Rule 12(h)(3)).[57]  Although it does not affect the substance of the matters litigated, for clarity's sake I take this opportunity to amend certain jurisdictional findings.

This Court earlier dismissed the <u>Comfort</u> plaintiffs' actions for declaratory relief against the Commonwealth of Massachusetts as barred by the Eleventh Amendment.  <u>Comfort</u>, 131 F. Supp. 2d at 256.  The decision to dismiss these claims was correct, but a clarification should be made.  The Eleventh Amendment precludes suit for damages only; a suit for <u>prospective</u> relief, including declaratory relief, is permissible when brought against state officials (but not against the state itself).[58]  <u>Mills v. Maine</u>, 118 F. 3d 37, 54 (1st. Cir. 1997); <u>see also</u> <u>Ameritech Corp. v. McCann</u>, 297 F.3d 582, 587 (7th Cir. 2002) (finding that a declaratory judgment claim is "prospective" and

---

[57] Because standing is an element of the constitutional requirement of "case or controversy," U.S. Const. art. III, lack of standing deprives a court of subject-matter jurisdiction.  <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 101-02 (1998).

[58] Thus, the Eleventh Amendment does not bar the <u>Bollen</u> plaintiffs' declaratory claims against state Board of Education members.

therefore, under Ex Parte Young, 209 U.S. 123 (1908), not subject to the Eleventh Amendment).

In a subsequent decision, I concluded that the Comfort plaintiffs lacked standing to sue the Lynn defendants for prospective relief, but I did allow them to sue for a declaration that the initial application of the Plan violated their rights. Comfort, 150 F. Supp. 2d at 302. I now find that holding was incorrect. In Berner v. Delahanty, 129 F.3d 20 (1st Cir. 1997), the court held that a claim under the Declaratory Judgment Act is not sustainable absent a showing of "actual or imminent, not conjectural or hypothetical" harm. Id. at 24 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks omitted)). If a plaintiff lacks standing for injunctive relief, he or she lacks standing to bring declaratory relief claims as well. Thus, the Comfort plaintiffs' declaratory claims against the Lynn defendants and the state defendants are dismissed in their entirety.

Ultimately these clarifications do not affect the substance of the lawsuit. With nominal damages at stake, the parties amply litigated all of the constitutional questions brought before the Court in the complaint.[59]

### 2.   Partial Motion to Dismiss (Bollen Plaintiffs)

---

[59] In addition, as described below, at least one plaintiff has standing to bring all claims.

After the trial, defendants filed a partial motion to dismiss
certain of the Bollen plaintiffs' claims on standing grounds.  This
motion is granted in part and denied in part.[60]

### a.   Claims for Injunctive and Declaratory Relief

Four of the Bollen plaintiffs, Todd and Laura Bollen,[61] Leanne
Manuel,[62] and Karen Tsaltas,[63] have stipulated that they are satisfied
with their existing school placements.  Since it is at best
speculative, and at worst unlikely, that these plaintiffs will request

---

[60] The plaintiffs argue that the defendants' motion makes improper
reference to trial testimony and stipulations.  A jurisdictional motion,
however, unlike a Rule 12(b)(6) motion to dismiss, may incorporate evidentiary
materials outside the pleadings, and the court may consider arguments beyond
the scope of the parties' memoranda and resolve factual disputes.  Jones-
Booker v. United States, 16 F. Supp. 2d 52, 58 (D. Mass. 1998).

[61] The Bollens brought suit on behalf of their son Michael, a white
student, for whom they sought a transfer from his neighborhood middle school,
the Marshall middle school, to the Pickering middle school.  Lynn denied his
request but approved Bollen's alternative request for a desegregative transfer
to the Fecteau-Leary middle school.  Indeed, when in the spring of 2001,
consistent with an agreement in the Bollen case, the district offered Bollen
an assignment to any school of his choice, Bollen elected to remain at
Fecteau-Leary, where he enrolled for the 2001-2002 school year.

[62] LeAnne Manuel's daughter Shanice left her neighborhood school to
attend Connery Elementary through the third grade.  In September 1999, Manuel
sought a second transfer, this time to the Sewell-Anderson school.  Lynn
denied this transfer and Manuel did not present a compelling reason for the
re-assignment.  When the Bollen agreement allowed Manuel her choice of schools
within the school district, she initially favored Sewell-Anderson but then
changed her request to the Callahan elementary school.  Significantly,
Shanice's ultimate transfer to Callahan was race-neutral and would have been
passable under the Plan, quite apart from the Bollen agreement.

[63] Karen Tsaltas sues on behalf of her son Michael, who attended his
neighborhood school, the Harrington elementary school, through the fifth
grade.  At the beginning of Michael's fourth grade year, Tsaltas requested a
transfer to the Washington elementary school.  Lynn initially denied Tsaltas'
request but reversed its position on appeal.  Tsaltas, however, ultimately did
not transfer her son to that school, choosing instead to keep her son at
Harrington.

segregative transfers for their children in the future, they lack standing to seek an injunction.[64]

I make a similar finding with respect to plaintiff Meta Stinson.[65] Although Stinson's daughter is presently registered with the district as white, she is in fact biracial, and therefore eligible under the Plan for essentially any transfer her mother might seek.[66]

Just as the Comfort plaintiffs did, the Bollen plaintiffs attempt to characterize their harm not as the race-based denial of a transfer, but as the denial of the ability to compete on equal terms for school transfers. See Comfort, 150 F. Supp. 2d at 296. The right to compete on equal terms is well-recognized as a passable, cognizable interest for standing purposes in cases involving a race-conscious government action. Donahue v. City of Boston, 304 F.3d 110, 119 (1st Cir. 2002) (citing Texas v. Lesage, 528 U.S. 18, 21 (1999)); Comfort, 150 F. Supp. 2d at 296 (citing Lesage and Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 280-81 n.14 (1978)).

_____

[64] For a more extensive description of the principles of standing, see Comfort, 150 F. Supp. 2d at 285, 296-297 (citing Lujan, 504 U.S. at 564 (finding that standing cannot be predicated on a plaintiff's "one day intentions")).

[65] See supra Section III.A (setting forth the particulars of Stinson's transfer denial). Although Stinson was advised of her right to appeal this decision, she did not do so, giving her assent instead to her daughter's continued placement at Sewell-Anderson, which, though an elementary school, had recently decided to continue sixth grade instruction for another year. Pursuant to the Bollen agreement, Stinson placed her daughter at Pickering for the 2001-2002 school year.

[66] The Plan's safeguards for biracial students ensure that Lynn will not deny a transfer to Stinson's daughter, if she follows the appeals procedures in place.

-66-

The flaw in the plaintiffs' argument is that they can show no imminent "competition."  Such disadvantage, if it even exists,[67] is speculative where it is not clear that the plaintiffs will again expose themselves to the race-conscious elements of the Plan by seeking transfers in the future.  See id.  Accordingly, the claims of these plaintiffs for declaratory and injunctive relief are dismissed for lack of subject-matter jurisdiction.

However, the defendants concede that one plaintiff, Gina Leone, who sues on behalf of her son Troy LaMothe, has standing to pursue prospective relief.  On March 24, 2000, Leone requested to transfer her son from Ingalls, his neighborhood elementary school, to Aborn.  The district denied the transfer.  Leone received no relief on appeal, which confirmed that the proposed transfer was segregative and concluded that she did not merit a hardship exception.  Pursuant to the agreement of counsel in the Bollen case, Leone was informed that her son could attend any school of her choice for the school year of 2001-2002.  Leone chose the Aborn school, to which he otherwise would have been unable to transfer under the Lynn Plan.


### b.   Nominal Damages

Nominal damages are another matter.  The defendants argue that Stinson and Karen Tsaltas have no standing to sue even for nominal

---

[67] Indeed, as I discuss below, whether the denial of a transfer ever can be said to work a "competitive disadvantage" injury is another question altogether, when the parties have stipulated that all of Lynn's public schools are equal in quality.

damages.[68]  Tsaltas's son was denied a transfer, but that denial was
reversed on appeal.  Stinson, pleased with the alternative assignment
that the district offered, never appealed the denial of her daughter's
transfer.

I find that all of the Bollen plaintiffs, including Stinson and
Tsaltas, can seek nominal damages, where the threshold for relief is
lower.[69]  Stinson and Tsaltas's transfer requests were both at least
initially denied pursuant to the race-conscious elements of the Lynn
Plan.  Since I held that Samantha Comfort could pursue nominal damages
notwithstanding her successful appeal, the same must be true for
Tsaltas despite her appeal, and certainly for Stinson, who did not
appeal.  The Motion to Dismiss on the issue of nominal damages is
denied.

B.  **Equal Protection**

The plaintiffs challenge the RIA on its face and as applied in the
Lynn Plan under the Equal Protection Clause of the Fourteenth
Amendment.  They urge the Court to evaluate the Act and the Plan by the
standard of "strict scrutiny." Adarand Constructors, Inc. v. Pena, 515
U.S. 200, 227 (1995) ("[W]e hold today that all racial classifications,
imposed by whatever federal, state, or local governmental actor, must
be analyzed by a reviewing court under strict scrutiny."); Wessmann,

---

[68] I earlier held provisionally that the Comfort plaintiffs could seek
nominal damages.  Comfort, 150 F. Supp. 2d at 301-02.

[69] For an extended discussion of the availability of nominal damages,
see Comfort, 150 F. Supp. 2d at 298-30.

160 F.3d at 794.   Under strict scrutiny, a racial classification is unconstitutional unless its proponent can establish, first, that the policy furthers a compelling state interest, and second, that it is narrowly tailored to achieve that interest.   <u>Adarand</u>, 515 U.S. at 227. The burden of proving a compelling interest and narrow tailoring rests on the defendant.   <u>Keyes v. School Dist. No. 1, Denver, Colorado</u>, 413 U.S. 189, 209 (1973).

As I discuss below, courts have used a different level of scrutiny, namely "intermediate scrutiny," for policies that are race-conscious but do not classify, <u>i.e.</u>, prefer, members of one race over another.   <u>See, e.g.</u>, <u>Jacobson v. Cincinnati Bd. of Education</u>, 961 F.2d 100, 102 (6th Cir. 1992); <u>Kromnick v. School Dist.</u>, 739 F.2d 894, 902-03 (3d Cir. 1984).   This test requires the government to show that the policy serves "important government objectives" to which the means chosen are "substantially related."   <u>United States v. Virginia</u>, 518 U.S. 515, 533 (1996) (citations omitted).   <u>Amicus</u> filings in this case argue that I should apply intermediate scrutiny to the Lynn Plan, whereas the parties prepared and argued their cases on the assumption that the Plan is subject to strict scrutiny.

### 1.   <u>Strict or Intermediate Scrutiny?</u>

<u>Amici</u> propose that I apply intermediate scrutiny to the Lynn Plan and the RIA because neither makes a racial classification in the sense of preferring the interests of one race over another.   That is, while in <u>Adarand</u> the Court subjected a racial <u>classification</u> to strict

scrutiny, the mere <u>consideration</u> of race, where no preference is given to members of one race over another, is distinguishable.

The <u>Adarand</u> Court confronted a federal policy that gave financial incentives to contractors on government projects to subcontract their work to small businesses certified as controlled by "social or economically disadvantaged" individuals.  The policy presumptively designated racial minorities as "socially disadvantaged."  <u>Adarand</u>, 515 U.S. at 205-07.  Adarand Constructors, Inc., which was not so certified, did not get a subcontract despite its low bid.[70]

The Court held similarly in other cases involving the use of race to prefer minorities for other benefits of limited availability, <u>i.e.</u>, statutory incentives to government contractors to favor minorities, <u>City of Richmond v. J.A. Croson Co.</u>, 488 U.S. 469, 493-94 (1989); racial preferences in the hiring and promotion of government workers, <u>United States v. Paradise</u>, 480 U.S. 149, 153 (1987); and redistricting efforts directed at carving out enclaves of minority voters, <u>e.g.</u>, <u>Bush v. Vera</u>, 517 U.S. 952, 965-67 (1996); <u>Miller v. Johnson</u>, 515 U.S. 900, 904 (1995).

In contrast, courts including the First Circuit have held that where differential treatment does not favor members of one race over another, there is no racial classification, <u>Adarand</u> is inapposite, and strict scrutiny does not apply.  <u>See, e.g.</u>, <u>Raso v. Lago</u>, 135 F.3d 11,

---

[70] The Court remanded the case to determine if the federal policy satisfied strict scrutiny.  After numerous further appeals and remands, the then-current program was found to meet "strict scrutiny."  <u>Adarand Constructors, Inc. v. Slater</u>, 228 F.3d 1147, 1187 (10th Cir. 2000)(holding that "the relevant programs now meet the requirements of narrow tailoring").

16 (1st Cir. 1998) ("The term [racial classification] normally refers to a governmental standard, preferentially favorable to one race or another, for the distribution of benefits.");[71] cf. Wessmann, 160 F.3d at 794 (quoting Adarand's requirement that "a government 'must justify any racial classification subjecting [a] person to unequal treatment under the strictest judicial scrutiny'" (emphasis added) (alteration in original)).

_____

[71] Raso involved the redevelopment of portions of the predominantly white Old West End in Boston.  The Boston Redevelopment Authority ("BRA") required the developer to give preference to displaced prior residents (mostly white) in leasing the redeveloped premises.  The developer, in turn, sought funding from the federal Department of Housing and Urban Development ("HUD"), which was operating at the time under a consent decree that required it to press for "the achievement of a racial composition, in HUD-assisted housing located in neighborhoods which are predominantly white, which reflects the racial composition of the City [of Boston] as a whole."  Raso, 135 F.3d at 14 (alteration in original).  HUD, the BRA, and the developer drafted a plan that reduced the number of units subject to the displaced resident preference.  A class of Old West End residents challenged the result under the Equal Protection Clause, citing the plan's racial motive of integrated housing.

The First Circuit affirmed the district court's dismissal of the case, rejecting the strict scrutiny test.  The court held that a mere "racial motive" does not raise equal protection concerns; every anti-discrimination statute has an underlying racial motive, and none of them are regarded as constitutionally suspect.  Id. at 16.  In addition, unlike the situation in Adarand, there was no racial classification to scrutinize because no preference was given to one race over another.  See id.

The parallels between Raso and this case are substantial.  In Raso, a government preference for displaced tenants would result in segregation.  The government therefore decided to modify (but not eliminate) the prior tenant preference in order to foster more integrated housing.  Similarly, in this case, a government policy of neighborhood school assignment would result in segregation.  The government therefore decided to allow transfers that promote integration.  In both cases, the government is taking race-conscious action aimed at integration.  In both cases, the policy is race-neutral on its face, in that it does not favor one race over another, although individuals may be deprived of a benefit they otherwise might have received.  The one difference here is that the Lynn Plan is race-conscious on its face and the plan at issue in Raso was not.  Accordingly, where Raso did not undertake any equal protection scrutiny, amici propose intermediate scrutiny in this case, in keeping with the practice of other courts that have examined similar issues.

Amici point out that in the present case, the evidence shows that each Lynn school provides equal educational opportunities to students. Indeed, the parties even stipulate, "the education provided to Lynn's regular education students in each of the elementary, middle, and high schools in Lynn is comparable in quality, resources, and curriculum, even though schools do offer and provide varying academic programs."[72] Thus, this is not a case, as in Adarand (government contracting), Bakke (medical school admissions), or Grutter v. Bollinger, 288 F.3d 732 (6th Cir.), cert. granted, 123 S.Ct. 618 (2002) (law school admissions), in which the defendant, in the distribution of limited resources, gives preference to some persons on the basis of race. Students like the plaintiffs may not be able to attend the specific school they want, but no student is advantaged over another on the basis of race. Cf. Hampton v. Jefferson Cty. Bd. of Education, 102 F. Supp. 2d 358, 380 (W.D. Ky. 2000) (observing that race-based assignment in elementary and secondary school education is distinguishable from other contexts in

---

[72] Although Lynn officials refer to some of the city's schools as "magnet schools," this is something of a misnomer. Ordinarily, the term "magnet school" refers to schools that confer unique educational benefits and draw from a districtwide geographic base through a lottery system. See, e.g., Hampton v. Jefferson Cty. Bd. of Education, 102 F. Supp. 2d 358, 377 (W.D. Ky. 2000); see also, e.g., Tuttle v. Arlington Cty. School Bd., 195 F.3d 698, 701 (4th Cir. 1999). In contrast, as described in section IV.E.6, supra, Lynn's so-called "magnet" schools are really just neighborhood schools with a "theme" designed to attract some transfer applications and thereby promote integration. While parents may prefer a particular school for any number of subjective personal reasons -- the school's "theme," geographic proximity to a parent's workplace, etc. -- the parties agree that Lynn's schools, and the educational benefits they provide, are essentially fungible.

which strict scrutiny is applied, where assignment to one school over
another does not confer a preference based on race).[73]

Indeed, in an earlier decision, I analogized the Lynn Plan to a
situation in which a school administrator sought to assign students to
classrooms within a given building in order to maximize diversity and
to prevent minority children from choosing one classroom and white

_____

[73] As the Hampton court aptly observed:

> The workplace, marketplace, and higher education cases
> are poor models for most elementary and secondary
> public school education [cases] because they always
> involve vertical choices -- one person is hired,
> promoted, receives a valuable contract, or gains
> admission.  Ordinarily, when [the Jefferson County
> school system] assigns students to a particular
> elementary, middle, or high school, the assignment has
> no qualitative or "vertical" effects.  This is because
> the Court concludes that as between two regular
> elementary schools, assignment to one or another
> imposes no burden and confers no benefit.  The same
> education is offered at each school, so assignment to
> one or another is basically fungible.  As a logical
> consequence, most courts have concluded that there is
> no individual right to attend a specific school in a
> district or to attend a neighborhood school. . . .
> Under this analysis, [the Jefferson County school
> district] would not be prohibited from using race in
> its general student assignments to maintain its
> desegregated school system . . . .

Hampton, 102 F. Supp. 2d at 380 (footnote and citations omitted).

-73-

children another.  <u>Comfort</u>, 100 F. Supp. 2d at 67 n.17.[74]  Clearly this kind of decision would not warrant strict scrutiny.

I recognize, however, the need to proceed with caution.  The parties may agree that all of Lynn's schools provide equal educational opportunities, but the voluntary transfer system is rooted in the principle that parents will find one school preferable to another for personal reasons -- <u>e.g.</u>, the convenience of its location or attractiveness of its "theme" program.  As a result, although I am convinced by <u>amici</u> that intermediate scrutiny is the correct test to apply here, my analysis below will apply the more rigorous standard which the parties have briefed, strict scrutiny.

### 2.   Facial Challenge to the Racial Imbalance Act

The plaintiffs argue that the RIA violates the Equal Protection Clause of the Fourteenth Amendment and is therefore facially invalid.  The standard for facial invalidation of a statute is rigorous:  "[T]he challenger must establish that no set of circumstances exists under which the Act would be valid."  <u>United States v. Salerno</u>, 481 U.S. 739,

---

[74] Likewise, courts in the Sixth and Third Circuits have refused to apply strict scrutiny to school district policies that assigned teachers to certain schools based, in part, on their race.  <u>Jacobson</u>, 961 F.2d at 102-03; <u>Kromnick</u>, 739 F.2d at 903.  The <u>Jacobson</u> court found that intermediate scrutiny was warranted because, as the <u>Jacobson</u> court observed, the teacher assignment plan at issue "is applied equally to both black and white teachers. In some instances, it will benefit or harm white teachers; in others, it will benefit or harm black teachers."  <u>Id.</u>

An even stronger case for intermediate scrutiny can be made here, where the parties have stipulated that no one school is superior to another -- a concession that was not apparent in <u>Jacobson</u> or <u>Kromnick</u>.

745 (1987).[75]  It is clear to me that the plaintiffs cannot make out a facial claim against the statute.

As I have noted above, the RIA includes both hortatory and mandatory components.  The statute urges school districts to adopt voluntary plans to alleviate racial imbalance.  Mass. Gen. Laws c. 71, § 37C.  The state is also empowered to induce compliance by offering grants and/or by withdrawing existing financial assistance.  Id., § 37I; Mass. Gen. Laws c. 15, § 1I, ¶¶ 2, 3, 4.  However, if space limitations preclude a school district from accommodating a desegregative transfer out of a neighborhood school, the mandatory

---

[75] The Salerno Court observed that where First Amendment claims are raised, there is another basis for invalidation, namely, overbreadth, which plainly does not apply here.  Salerno, 481 U.S. at 745.

Other courts also have suggested that the broad language of Salerno may no longer be valid.  As the Seventh Circuit observed, the Supreme Court in both Stenberg v. Carhart, 530 U.S. 914 (2000), and Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992), invalidated abortion restrictions that "might have been construed by the state courts to have at least some proper applications," without even mentioning Salerno.  A Woman's Choice--East Side Women's Clinic v. Newman, 305 F.3d 684, 687 (7th Cir. 2002). Thus, the Eighth Circuit has concluded that "an abortion law is unconstitutional on its face if, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'"  Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1457 (8th Cir. 1995) (quoting Casey, 505 U.S. at 895). A more general standard could be applied outside the abortion context that would "hold a law to be facially unconstitutional when it would operate as a substantial obstacle to an otherwise lawful course of action in a large fraction of relevant cases."  S.D. Myers, Inc. v. City & Cty. of San Francisco, 253 F.3d 461, 467 (9th Cir. 2001) (ultimately concluding, "we will not reject Salerno in other [non-abortion] contexts until a majority of the Supreme Court clearly directs us to do so").

This debate is of little import here.  First, the First Circuit has not yet joined this fray and continues to use the Salerno standard for facial challenges.  See Pharmaceutical Research and Mfrs. of Am. v. Concannon, 249 F.3d 66, 77 (1st Cir. 2001).  Second, this Court is not aware of any decision repudiating Salerno outside the context of abortion restrictions.  Third, even if the narrower Casey standard applied, there is no suggestion in this case that the RIA in any way restricts, impedes or deters lawful action "in a large fraction of relevant cases."  Fourth, in contrast to the constitutional right to abortion, there is no constitutional right to school choice.

provisions of the Act are triggered.  The school district is then required either to devise its own plan to accommodate such a transfer (subject to the approval of the state Board of Education) or to implement a plan drafted by the state.  Mass. Gen. Laws c. 71, § 37D; Mass. Gen. Laws c. 15 § 1I, ¶ 1.

Although the plaintiffs challenge it, the mandatory provision of Section 37D is not at issue here;[76] Lynn adopted its plan voluntarily. The state never found that space constraints in Lynn schools precluded requested desegregative transfers.  The compulsory provisions of the RIA were never triggered.  As such, the plaintiffs can claim no injury from the mandatory provisions of the Act.  See Daggett v. Comm'n on Governmental Ethics and Election Practices, 205 F.3d 445, 463 (1st Cir. 2000) (citing Lujan, 504 U.S. at 560).

Plaintiffs claim that the distinction between the mandatory and hortatory elements of the law is a distinction without a difference. The statute, they say, not only encourages school districts to adopt racial balancing plans and rewards compliant school districts with funds, Mass. Gen. Laws c. 15, § 1I, ¶¶ 3, 4, it effectively coerces this practice by making state assistance to school districts contingent on the implementation of these "voluntary" plans, id., § 1I, ¶ 2.

But even if I were to find that the RIA's use of funds to encourage voluntary plans were in fact coercive, and therefore the

---

[76] Were I to reach the challenge to the mandatory provision, the same principles that govern the constitutionality of the Lynn Plan would apply here, as the trigger for the provision -- namely, the denial of a student's request for a desegregative transfer -- uses race in much the same way as the Lynn Plan does.

functional equivalent of its mandatory provisions, I would not find it
unconstitutional.  A school district may theoretically adopt a plan
that improves racial imbalance without explicitly introducing race-
based criteria at all.[77]  In fact, the City of Boston satisfied the
Board of Education's RIA review with a student assignment policy that
this Court recently found to be completely race-neutral.  Boston's
Children First v. Boston School Comm., ___ F. Supp. 2d ___, ___,
available at 2003 WL 1957480, at *9 (D. Mass. Apr. 23, 2003) (observing
that the state Board of Education accepted Boston's school assignment
plan even though it did not incorporate racial enrollment targets or
racial guidelines and likewise finding it immune to equal protection
challenge).[78]

---

[77] The plaintiffs admitted as much at trial, when I raised the following
hypothetical:  Assume two contiguous school attendance zones, one of which is
predominantly minority and the other predominantly white.  Plaintiffs' counsel
conceded that a school district would satisfy the RIA and the Equal Protection
Clause if it closed the two schools and opened a new, larger school between
the neighborhoods that consolidated the student populations.  Similarly, if a
small district with racially identifiable school attendance zones built a
single central elementary, middle, and high school to absorb its entire
enrolled student populations, this strategy would qualify as a racial
balancing plan under the RIA, and it would not trigger any equal protection
scrutiny.

[78] The plaintiffs in this case also facially challenge the provision of
the RIA that reimburses the transportation costs of desegregative transfers.
Mass. Gen. Laws c. 15, § 1I, ¶ 3 provides, in pertinent part:

> The commonwealth shall . . . pay to a city, town, or
> regional district school committee one hundred percent
> of the cost of transportation of non-white pupils and
> minority pupils . . . transferred from schools in
> which racial imbalance exists and one hundred per cent
> of the cost of transportation of white pupils
> transferred from schools in which racial isolation
> exists to schools in which racial imbalance or racial
> balance exists for the purpose of reducing or
> eliminating racial imbalance as provided by said
> section thirty-seven D.

Moreover, the fact that the goal of the RIA's funding is race-conscious -- to improve racial balance in the Massachusetts schools -- does not necessarily invalidate it.  See Raso, 135 F.3d at 16.  Were that the case, Congress could never validly exercise its § 5 enforcement powers.  See U.S. Const., amend. XIV, § 5 (noting that Congress "shall have power to enforce, by appropriate legislation, the provisions of this article," including the Equal Protection Clause of § 1).  All nondiscrimination statutes take notice of race in some way.

### 3.   **The Strict Scrutiny Standard**

As noted above, proponents of a racial classification ordinarily must demonstrate that it advances "a compelling state interest," an interest above and beyond ordinary government goals, and further, they

---

Unlike the RIA provisions that fund and encourage racial balancing plans, which admit of race-neutral possibilities (e.g., locating schools on the borders of segregated enclaves), the Commonwealth's decision to reimburse transportation costs necessarily takes account of a student's race in each transfer.  Although reimbursements may be made available to all students, white or nonwhite, who choose desegregative transfers, whether or not a transfer is desegregative, and therefore eligible for state funding of its transportation costs, must turn in part on the student's race (as well as the racial makeup of the student's current and destination schools).

This fact would trigger the same form of equal protection scrutiny that I apply to the Lynn Plan, which approves desegregative and neutral transfers, but not those that would exacerbate racial imbalance.

However, the reimbursement provision bears only on the question of which government entity -- the state or the school district -- pays the transportation costs of a transfer.  There is no evidence in the record to suggest that any student's transfer went unfunded by Lynn or the Commonwealth.  As such, it is difficult to see what possible injury students could suffer as a result of one government entity's funding their school transportation costs, as opposed to another.  Absent any injury, the plaintiffs' facial challenge to the RIA on this basis must fail.  See Casey v. City of Newport, R.I., 308 F.3d 106, 119 (1st Cir. 2002) (reciting the standing requirement that the plaintiff's claimed injury be causally related to the action it challenges).

must demonstrate that the classification is "narrowly tailored" to that end.

While these questions are ultimately questions of law, <u>Cotter v. City of Boston</u>, 193 F. Supp. 2d 323, 341 n.8 (citing <u>Wygant v. Jackson Bd. of Education</u>, 476 U.S. 267, 274-76 (1986)), and legal precedent can give guidance to courts, each case turns on the peculiarities of its own facts.  <u>See, e.g.</u>, <u>Wessmann</u>, 160 F.3d at 797-98, 802 (finding the necessity of a race-based policy to be a "fact-sensitive inquiry" and cautioning that the "devil is in the details").

An important part of this "fact-sensitive inquiry" is the setting -- that is, the kind of policy at issue and the context in which it operates.  Significantly, the Supreme Court has not yet heard a case dealing with the issues raised here -- the use of race in a voluntary transfer program to maximize integrated learning in the K-12 grades. It is not easy to apply to public elementary school education the same legal frameworks established for employment, as, for example, in <u>Adarand</u> or <u>Croson</u>,[79] or even higher education, as in <u>Bakke</u>.  Nor is it easy to apply legal standards designed to analyze when race may be used retrospectively, to remedy past intentional discrimination, in settings where race is used prospectively, as part of a curriculum that encourages students to learn to interact in a multiracial environment.

---

[79] <u>See</u> <u>Wessmann</u>, 160 F.3d at 829 (Lipez, J. dissenting) (observing on the subject of numerical goals that elements of the "narrow tailoring" analysis may not make the transition from the employment to the educational context gracefully; education, after all, is directed at shaping individuals in a prospective manner").

### a.  **Compelling State Interest**

"Diversity" may well be a compelling state interest in an educational setting, depending on the nature of the setting and the reasons why diversity is sought.  In Regents of the University of California v. Bakke, 438 U.S. 265 (1977), the Supreme Court evaluated an affirmative action program for medical school admissions.  The University of California argued that it had a compelling interest in cultivating a "diversity" of viewpoints in its student body, and that an applicant's racial background was relevant to the views that he or she would bring to the class.  Id. at 311-15.  A plurality of the Court held that "genuine diversity" was a valuable contributor to a "robust exchange of ideas" at the university and so passable as a compelling interest.  Id. at 312-14.  The Court explained, however, that the university's use of race and ethnicity alone in its cultivation of genuine diversity would "hinder rather than further [its] attainment." Id. at 315.  In other words, the university could not establish that its policy furthered its announced compelling interest of fostering "viewpoint diversity," because that interest "encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element."  Id.

Considerable debate has followed Bakke about the extent to which racial diversity can ever be a compelling interest.  What the Bakke Court did make clear was that sounding the inherent value of "diversity" is not enough; the analysis is incomplete unless one looks

-80-

to the specific, tangible benefits that diversity actually confers in a given situation.[80]

The First Circuit spoke to this issue in <u>Wessmann</u>.  There, the court confronted the Boston school district's racial preference to African American and Hispanic applicants in its admissions process to the Boston Latin School, a competitive and prestigious public high school to which students applied for limited slots and were selected for admission primarily on the basis of academic merit.  <u>Wessmann</u>, 160 F.3d at 791, 793.  Following <u>Bakke</u>'s cue, the <u>Wessmann</u> court observed that Boston Latin's exclusively racial preference could not foster the "genuine diversity" approved in <u>Bakke</u>.  Nevertheless, in <u>Wessmann</u>, the court (following the Second, Fourth and Ninth Circuits) refused to hold that race-based classifications are constitutional <u>only</u> when they are directed at redressing prior unlawful discrimination.  <u>Id.</u> at 795-96.  In that regard, the court expressly parted company with the Fifth Circuit's holding in <u>Hopwood v. Texas</u>, 78 F.3d 932 (5th Cir. 1996).

And further, like the Second, Fourth, and Ninth Circuits, the <u>Wessman</u> court acknowledged that diversity could well be a compelling state interest in an educational setting, depending on the circumstances.  <u>Wessmann</u>, 160 F.3d at 796; <u>see also</u> <u>Brewer v. West Rondeeequoit Cent. School Dist.</u>, 212 F.3d 738, 748-49 (2d. Cir. 2000)

---

[80] This Court recognized that axiom in <u>McLaughlin v. Boston School Comm.</u>, 938 F. Supp. 1001 (D. Mass. 1996), in which it observed that "the phrase 'educational diversity' is less than fully explanatory . . . . It is, rather, the many educational benefits to which racial [and] ethnic diversity might be thought a conduit that, when taken together, constitute the compelling diversity interest defendants here assert."  <u>Id.</u> at 1014.

(citing <u>Eisenberg v. Montgomery Cty. Pub. Schools</u>, 197 F.3d 123, 130 (4th Cir. 1999) (assuming that diversity can be a compelling interest)), and <u>Hunter v. Regents of the Univ. of Cal.</u>, 190 F.3d 1061, 1067 (9th Cir. 1999) (affirming the constitutionality of race-based admissions processes to an experimental elementary school based on the need for researchers to work with racially diverse classes of students)).[81]  The court rejected an all-or-nothing approach:  Fostering diversity is not <u>always</u> a compelling interest, nor is it true that diversity is <u>never</u> a compelling interest.  <u>Id.</u> at 796 ("[W]e assume <u>arguendo</u> . . . that some iterations of 'diversity' might be

---

[81] The <u>Wessmann</u> court also cited <u>Lutheran Church-Missouri Synod v. Fed. Communications Comm'n</u> ("<u>Lutheran Church</u>"), 141 F.3d 344 (D.C. Cir. 1998), which rejected FCC equal employment opportunity regulations that used a racial classification directed at "fostering [radio] programming that reflects minority viewpoints or appeals to minority tastes."  <u>Id.</u> at 354.

In so doing, the D.C. Circuit addressed whether the goal of promoting "diverse" programming satisfied the compelling state interest standard and concluded that it did not.  The setting, however, was very different from the instant case.  Since the FCC never defined what "diverse programming" meant, and any content-based definition would raise First Amendment concerns, the Court suggested that the "government's formulation of the interest seems too abstract to be meaningful."  <u>Id.</u>  While it acknowledged that an earlier Supreme Court decision (in <u>Metro Broadcasting v. Fed. Communications Comm'n</u>, 497 U.S. 547 (1990)) recognized such an abstract diversity interest as "important," the court suggested that this characterization was bound up in the Court's use of intermediate scrutiny in <u>Metro Broadcasting</u>, a standard that <u>Adarand</u> had overruled in the interim.  <u>Id.</u>  In any event, the diversity interest at issue in <u>Lutheran Church</u> was an interest in viewpoint diversity that is not at issue here, and which the First Circuit found absent in the Boston Latin policy.  <u>Wessmann</u>, 160 F.3d at 798.

In the <u>Wessmann</u> decision the First Circuit found <u>Lutheran Church</u> to have limited import.  <u>Wessmann</u>, 160 F.3d at 795 ("We think that any . . . consensus [among the circuit courts that diversity may never be a compelling interest] is more apparent than real.  <u>In the education context</u>, <u>Hopwood</u> is the only appellate court to have rejected diversity as a compelling interest, and it did so only in the face of vigorous dissent from a substantial minority of the active judges in the Fifth Circuit." (emphasis added)).

sufficiently compelling, in specific circumstances, to justify race-conscious actions.").

Although Wessmann and Bakke address race-conscious policies in public education, their holdings are of limited import here.  First, both involve race-based preferences in the allocation of a limited government resource -- a slot in a medical school or in an elite and selective high school.  This is not an issue in Lynn.  Second, in each case the defendant sought to justify its preference on the ground that, in the abstract, racial diversity is necessary to ensure viewpoint diversity.  In contrast, Lynn's appeal to diversity as described below is directed at altogether different and more specific goals, namely, preparing students to be citizens in a multiracial society and eliminating the concrete harmful consequences that de facto segregation inflicts on a public school system.

### b.   Narrow Tailoring

The goal of the "narrow tailoring" requirement is to ferret out illicit uses of race by governments, to make certain that a racial classification is neither pretextual nor overbroad.  Croson, 488 U.S. at 493; Boston Police Super. Officers Fed'n v. City of Boston ("Boston Police"), 147 F.3d 13, 23 (1st Cir. 1998). Three concerns are evident in the case law: (1) the extent to which the challenged policy is necessary to pursue a compelling interest (and whether there are adequate race-neutral alternatives), (2) the extent to which the policy is proportional to that interest, and (3) the proportionality between

the benefits the policy provides and the harm caused to "innocent persons" as a result of its implementation.

**(1)   Are the means necessary; are there adequate race-neutral alternatives?**

The question of necessity logically breaks down into two components -- (1) does the race-based policy <u>actually</u> further the compelling interest? and (2) might race-neutral alternatives to the policy be as effective in pursuing the interest?

It goes without saying that a race-conscious policy is not narrowly tailored to a compelling interest if it does not, in practice, effectuate the ends contemplated by that interest.  A classification that does not further the legitimate ends of government obviously would not even survive the less exacting rational basis review reserved for nonracial classifications.  <u>E.g.</u>, <u>Bd. of Trustees of Univ. of Ala. v. Garrett</u>, 531 U.S. 356, 367 (2001).  Strict scrutiny incorporates this bare-minimum requirement, but reaches still further for a showing of <u>necessity</u>.

Since "narrow tailoring" is all about the "fit" between compelling ends and race-conscious means, a review of the goals of the enterprise and its settings is critical.  The mission of the schools in <u>Wygant</u>, 476 U.S. at 270-71 (reviewing preferential protection from layoffs for minority teachers), was to educate students.  The mission of the City of Richmond in <u>Croson</u>, 488 U.S. at 481 (reviewing preferences for minority contractors), was to install plumbing fixtures in a city jail. The mission of the Alabama Department of Public Safety in <u>Paradise</u>, 480

U.S. at 153 (reviewing racial preferences in state trooper promotions), was to provide public safety.  The reason for being, respectively, of these institutions was not to provide work for teachers, contracts for minority-owned businesses, or promotions for African American troopers. In those settings, the Court's analysis started with proposed compelling interests and institutional ends askew.  While that does not mean that such programs necessarily fail to pass constitutional muster, it does mean that the program's proponents face an especially complex task of justification.

In contrast, an important mission of K-12 schools, in addition to fostering academic achievement, is the cultivation of social skills that enable students to function as citizens in a complex and diverse world.  If "narrow tailoring" is about "fit," the creation of an integrated school environment is surely likely to be a better "fit" relative to this goal than an integrated workplace is to a commercial setting.

Moreover, where educational policy is concerned, in contrast to a commercial enterprise, school officials possess a special expertise acknowledged in the case law.  That expertise must play an important role in evaluating whether race-neutral alternatives will be effective in creating a multiracial learning environment and whether they are adequate to the task.  <u>See</u> <u>infra</u> Section V.B.3.b.(4).

> **(2)** <u>**Is the policy proportional to the compelling**</u>
> <u>**interest?**</u>

Courts must also ascertain the extent to which the imposition of the challenged policy is proportional to the urgency of the stated government interests.  A race-based government practice must not overshoot its articulated purpose by using race too often, too heavy-handedly, or for too long.

Again, the examples come from employment.  In order to determine whether the use of race went beyond what was remedial, the <u>Paradise</u> Court, for example, scrutinized the <u>quantum</u> of racial preferment given to minorities and its relationship to the defendant's interest in remedying the effects of discriminatory hiring practices.  <u>Paradise</u>, 480 U.S. at 179.  The Court focused on the proportionality between the "numerical relief ordered and the percentage of nonwhites in the relevant work force."  <u>Id.</u>

Where the means are modest, and in fact undershoot the remedial goal, a court will affirm the policy, as in the <u>Cotter</u> case.  The City of Boston departed from strict rank order to promote African American police officers in three of thirty-six promotions.  Since the police department would have had to promote twenty African American officers to equalize the percentage of African American officers and African American sergeants, the Court concluded that the modest means chosen signified narrow tailoring.  <u>Cotter</u>, 323 F.3d at 171.[82]

---

[82] The Court cited <u>McNamara v. City of Chicago</u>, 138 F.3d 1219 (7th Cir. 1998), for the proposition that the narrow tailoring test is "whether the increase is a plausible lower-bound estimate of a shortfall in minority representation among [sergeants] that is due to the [Department's] intentional discrimination in the past."  <u>Id.</u> at 1224.

A policy that is flexible and changes with changing conditions is also more likely to meet the proportionality test. Id. at 177-78. In addition, the duration of the state actor's use of race figures into the analysis. Id. at 172; see also, e.g., Paradise, 480 U.S. at 178 (touting the limited duration of a race-based remedial promotions policy as a sign that the policy was not a tool for the implementation of racial balancing in government employment); Boston Police, 147 F.3d at 23 (inquiring into whether the challenged policy "contains (or fails to contain) built-in mechanisms which will, if time and events warrant, shrink its scope and limit its duration").

Duration is an especially critical factor when the compelling interest involves remedying past discrimination. Once the problem is "cured," the need for race-based standards arguably disappears. Mackin v. City of Boston, 969 F.2d 1273, 1278 (1st Cir. 1992) ("Finally, the decree's life is limited, remaining in force only until its requirements have been met. Limitations of this sort are crucial factors in deflecting overbreadth challenges." (citation omitted)). In contrast, where the targeted problem is ongoing and persistent, the analysis is more complex. Narrow tailoring does not necessarily require a predetermined shut-off point. The parties can offer a more fluid approach so long as the race-conscious policy dovetails with the conditions that made it necessary in the first place.

### (3)  What Is the Impact on Third Parties?

A court will also assess the promised and proven benefits of the racial criterion against the depth and breadth of its impositions upon

innocent third parties.  Bakke, 438 U.S. at 308-09.  Innocent third

parties are more at risk in decisions about hiring and firing in a

commercial setting, the awarding of public contracts, or admission into

a school of higher education.  Each case represents the classic zero-

sum game, where one party wins and another necessarily loses.

Moreover, where the benefit requires specialized skills, the

impact on a qualified applicant with settled expectations, or even with

an entitlement to the job or to a slot in a school, is more

significant.  See Paradise, 480 U.S. at 182 (finding significant the

fact that a racial classification prefers only qualified applicants of

one race for hiring or promotion, and that the impact on qualified

applicants of another race is minimal); Boston Police, 147 F.3d at 24

(listing "the extent to which . . . legitimate expectancies are

frustrated or encumbered" as a factor in the narrow tailoring

analysis).

Again, in a K-12 school system, educational and curricular

policies intended to benefit all students may have an impact on

"innocent third parties," but not to the same degree as in competitive

commercial or higher-education settings.  The question in a school

setting, to which I have already alluded, is not whether a given

plaintiff will receive a given limited benefit (like a job or access to

a unique institution of higher learning) to which he or she is

entitled.  Rather it is whether any student is entitled to a particular

school assignment at all and, in any event, whether the education the

plaintiff will get at his or her second choice is comparable to that
which he or she would receive at his or her first choice.

**(4)   Miscellaneous Concerns:   Deference to School
Boards' "Narrow Tailoring"**

A school setting necessarily raises other questions relevant to
the "narrow tailoring" analysis:  To what extent do school boards
deserve deference in making school assignment decisions that are
intertwined with curricular decisions?  Or, to rephrase the question,
how far must a federal court go to micromanage the school board's
choices, after the court has assured itself that the basic
constitutional standards are met?  How perfect must be the "fit" once
the broad legal standards have been met?

Clearly, in the school cases involving remedial race-conscious
plans imposed to eliminate the vestiges of prior de jure segregation,
courts have carefully supervised local school boards to make certain
that they were dismantling the dual school systems for which the
school boards were found responsible.  But when the records have
suggested that those boards were finally operating in good faith to
create an integrated system, the courts have done an about-face,
giving deference to their determinations that unitary status has been
achieved and that remedial plans should be discontinued.  See Freeman
v. Pitts, 503 U.S. 467, 489-90 (1992).  As the First Circuit has
observed:

> Unitary status is not simply a mathematical
> construction.  One non-quantitative factor of
> particular significance is whether the school
> defendants have a sufficiently well-established

history of good faith in both the operation of the
educational system in general and the
implementation of the court's student assignment
orders in particular to indicate that further
oversight of assignments is not needed to
forestall an imminent return to the
unconstitutional conditions that led to the
court's intervention.  See Morgan v. McDonough,
689 F.2d 265, 280 (1st Cir. 1982) ("the ending of
obstructionism plainly signals a return to greater
local control"). . . .

The relevance of good faith underscores the notion
that unitariness is less a quantifiable "moment"
in the history of a remedial plan than it is the
general state of successful desegregation.

Morgan v. Nucci, 831 F.2d 313, 831 (1st Cir. 1987).  It is only

logical to afford at least as much deference to a school board that

voluntarily undertakes desegregation efforts.

In Swann v. Charlotte-Mecklenburg Bd. of Education, 402 U.S. 1

(1971), one of the first remedial cases, the Court described the

deference due to school districts in dicta:

School authorities are traditionally charged with
broad power to formulate and implement education
policy and might well conclude, for example, that
in order to prepare to live in a pluralistic
society each school should have a prescribed ratio
of Negro to white students reflecting the
proportion for the district as a whole.  To do
this as an educational policy is within the broad
discretionary powers of school authorities; absent
a finding of constitutional violation, however,
that would not be within the authority of the
federal court.

Id. at 16.  Swann was cited by the Second Circuit in Brewer, 212 F.3d

at 749, a nonremedial case affirming a race-conscious school transfer

program to ameliorate the impact of de facto segregation.

There are good reasons to give deference to school boards' attendance to the details of their student assignments and determinations of whether race-neutral alternatives are adequate. They are the experts in what will or will not work because they are uniquely attuned to the needs of a diverse urban community.  Over and over again, courts have given school boards discretion to weigh the constitutional rights of students against the unique demands of a public education setting and curricular needs.  See, e.g., Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 226 (1985) (emphasizing courts' "reluctance to trench on the prerogatives of state and local educational institutions," as federal courts are ill-suited to "evaluate the substance of a multitude of academic decisions that are made daily" by experts in the field).[83]  To be sure, strict scrutiny requires a rigorous analysis of the plan and its ramifications.

---

[83] See also Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 664-65 (1995) (holding that random drug testing of student athletes in public schools does not violate the Fourth and Fourteenth Amendment protections against unreasonable searches and seizures); Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988) (holding that the contents of a school newspaper were a curricular matter within the school's discretion such that the principal's significant edits did not implicate the First Amendment); Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (holding that a sexually suggestive student government speech was not protected by First Amendment free speech and expression rights); New Jersey v. T.L.O., 469 U.S. 325, 339-41 (1985) (holding that to require probable cause before school administrators might conduct a search or seizure would constrain the school's control and articulating a "reasonable suspicion" test for Fourth Amendment cases in the public primary school context); Ingraham v. Wright, 430 U.S. 651, 664 (1977) (holding that "the Eighth Amendment does not apply to the paddling of children as a means of maintaining discipline in public schools"); Goss v. Lopez, 419 U.S. 565, 581-84 (1975) (finding a student's due process rights under the Fourteenth Amendment to be limited in cases of short-term school suspension); Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 510-11 (1969) (allowing school officials to regulate student political speech when it threatens "material and substantial interference with schoolwork or discipline").

Nevertheless, these cases should, at the very least, inform the weight I give to the conclusions of the administrators of the Lynn Plan.

### 4.   **The Goals of the Plan**

The Lynn Defendants claim that the race-conscious element of its school assignment plan is narrowly tailored to achieve several compelling state interests.  Some interests are proactive, that is, affirmatively related to meeting the curricular goals and the educational mission of a diverse urban public school:  promoting racial and ethnic diversity, increasing educational opportunities for all students and improving the quality of education and ensuring student safety.  Several interests are more reactive, that is, related to the goal of eliminating the negative effects of <u>de facto</u> residential segregation on public education:  reducing minority isolation and ensuring the safety of its public school students. Finally, some goals are related to the federal constitutional requirements spelled out in <u>Brown v. Board of Education</u> and the state constitution.

I have divided these goals into three categories, although they are analytically interwoven.

### a.   **Curricular Goals: "Promoting Racial and Ethnic Diversity," "Increasing Educational Opportunities for All Students and Improving the Quality of Education," "Ensuring Safety"**

#### (1)   **Are These Curricular Goals Compelling State Interests?**

The defendants claim that their goals -- promoting racial and ethnic diversity, increasing educational opportunities for all students, improving the quality of education, and ensuring school safety -- are compelling state interests inextricably tied to the mission of a public K-12 school system.  As I have noted, the purpose of the public school system is as much to teach citizenship to its students as it is to teach academic subjects.  Indeed, at the elementary school level, to which this challenge is principally directed,[84] teaching citizenship -- the proverbial effort to ensure that students "work and play well with others" -- is one of a school's highest educational priorities.

And this is especially the case in a multiracial, urban community like Lynn.  The years predating the Lynn Plan saw a district riven by racial tension, with the promise of still-greater tension due to deepening residential segregation.  Lynn school officials had to confront a decline in day-to-day school attendance, a decrease in white enrollment, a sharp increase in incidents of conflict and confrontation between white and nonwhite students, and a specific failure in the district's educational mission:  Lynn's students were

_____

[84] Lynn's high schools all meet the standard for racial balance.  Any Lynn student may apply to, or transfer to, any of them.  While a high school's mission is surely more academic-oriented than that of the elementary schools, citizenship training is still part and parcel of the enterprise.   The testimony of Lynn high school student Nicole Oak, as well as the responses that juniors attending all three of Lynn's high schools gave to Dr. Orfield's Diversity Assessment Questionnaire, speak to the value of continuing to teach racial issues through high school.

not prepared to live and work in an increasingly racially diverse society.

The Plan was essential to reverse these trends.  Its approach was comprehensive, going well beyond a race-conscious transfer policy to include specific curricular offerings on race relations, specialized training for teachers and students on diversity, standardization of curriculum and resource distribution between schools in white and minority neighborhoods, and the establishment of the Parent Information Center to foster parent involvement in the schools.

And the Plan was successful.  The defendants point to evidence of significant improvements in Lynn schools occasioned by the district's adoption of the Plan -- improvements that have increased educational opportunities for all students:  the amelioration of racial and ethnic tension in Lynn schools, the emergence of a prevalent racial and ethnic tolerance in the schools, increased attendance, a growing feeling of comfort among students in engaging and confronting issues of race, an emerging sense of community that crosses racial barriers, improved student discipline, a stable enrollment of white students, and safer schools.

The plaintiffs concede the importance of these goals. Indeed, they agree that Lynn schools are considerably better and safer than they were before the Plan was instituted.  What they dispute is whether the race-conscious elements of the Plan are crucial to achieving these benefits, that is, whether the Plan's use of race is narrowly tailored within the meaning of the law.

### (2)  Is the Plan Narrowly Tailored to These Compelling Interests?

#### (a)  Are the Plan's Means Necessary to Achieve its Ends?

As a general matter, the Lynn Plan necessarily meets the requirement of narrow tailoring:  When a government's ends are fundamentally concerned with race -- and those ends are recognized as compelling -- it is natural that race-conscious means provide the "snuggest fit" to those ends.  Brewer, 212 F.3d at 752 (finding that "there is no more effective means" of reducing racial isolation "than to base decisions on race").[85]

The evidence from defendants' impressive array of experts established the essential relationship between the race-conscious aspects of the Plan and the curricular ends outlined above.  The evidence establishes the following:  If the compelling goal of the Plan is to train citizens to function in a multiracial world, actual intergroup racial contact is essential.  No amount of race-neutral resource apportionment would accomplish this result.  Second, intergroup contact cannot be achieved with only token numbers of minorities in a overwhelmingly white school (or vice versa).  Third, there is a tipping point of 20% white or nonwhite students, well-

---

[85] See also Elizabeth S. Anderson, Integration, Affirmative Action, and Strict Scrutiny, 77 N.Y.U. Law Rev. 1195, 1243-44 (2002) ("[W]hen the state's purpose is explicitly race-conscious . . . its use of racial means is not only clearly relevant to its purpose, but more narrowly tailored to that purpose than race-neutral means could be.").

recognized by experts in this field and dubbed the "critical mass,"
that is crucial to catalyzing positive intergroup contact.[86]

### (b)  **Proportionality of the Means**

The Plan's use of race is measured and proportional to these
compelling goals.  The policies that have been implemented are less
intrusive than other potential means at the district's disposal.
Every parent can choose a neighborhood school for his or her child.  A
parent has the further option of participating in the district's
integration effort.  Should the parent choose to do so, his or her
child is entitled to any transfer that does not exacerbate racial
segregation in the schools.

There are no rigid quotas, no unchanging formula -- even with
respect to the 20% figure advocated by the experts.  While the Plan
aims for that number because of its acknowledged effect of improved
race relations, only the demographics of Lynn at this time (42% white

---

[86] As Dr. Dovidio -- as well as each and every one of the other experts
noted, the use of race in Lynn's school assignments and its achievement of
critical mass was the cause of the improved race relations:

> I focused on trying to distinguish what the effects of
> the plan were, the effects of achieving 20 percent or
> more of split within the schools to see if that had
> effects that seemed to be over and above any other
> effects, effects that could be explained primarily due
> to the plan and not due to these other factors.
>
> I didn't come up with -- there was no
> parsimonious explanation for the improvements that I
> saw.  There was no reasonable explanation.  There was
> no valid explanation that consistently explained the
> data, except for the plan, in my judgment.
>
> Q.   And that is all aspects of the plan?
>
> A.   That has to do with the fact that the plan produces the
> critical mass of 20 percent . . . .

and 58% nonwhite) make it possible to achieve that number systemwide. In effect, the Plan has a hybrid goal that befits the complexity of the situation and evinces a sensitivity to all of Lynn's constituencies -- to maximize integration and aim for a minimum 20% minority representation, consistent with a neighborhood school system and Lynn's demographics.

The Plan's use of race is flexible, and of limited duration.  An automatic shut-off mechanism is built in:  If the racial composition of a school falls in line with the districtwide white/nonwhite ratio, the limits on transfers evaporate.  In fact, because all of Lynn's high schools meet the district's racial balance standard, students may transfer freely among them, space permitting.

As the demographics of the city of Lynn change, so do the parameters of the Plan.  It foists no more or no less "diversity" on the schools of the city than the demographics of the city and a neighborhood system allow.

(c)   **Minimal Burden on Third Parties; the Issue of Stigma**

Finally, Lynn's chosen means place a minimal burden on innocent third parties.  Nothing compels a school district to allow parents to choose their child's school.  There is no entitlement to attendance at a given school, and no special qualifications or prerequisites for admission to any school.

Nor does any stigma attach to the failure to get one's first choice of transfer school, or to the government's recognition of an

individual's race.   Part of the thrust of <u>Brown</u> was that <u>de jure</u>
segregation sent a clear message to minority students that school
officials believed they did not belong in classrooms with their white
counterparts.  <u>Brown</u>, 347 U.S. at 493-94 ("To separate [minority
students] from others of similar age and qualifications solely because
of their race generates a feeling of inferiority as to their status in
the community that may affect their hearts and minds in a way unlikely
ever to be undone.").

The Lynn Plan sends quite the contrary message -- it conveys to
all students that notwithstanding residential segregation, students of
different races can and should coexist in integrated, cooperative
learning environments, and that the school district is committed to
encouraging that.  Lynn uses race in school admissions not because an
individual student's race matters, but because the district recognizes
that race relations matter.  Dr. Dovidio testified that racial
identity is a social construct:  although racial differences are
perceived and not real, that perception of difference has enough
historical momentum that one must acknowledge it in order to defeat
it.  Race is the elephant in the room that does not go away until it
is confronted.

It has been suggested that when a school district inquires into a
child's race at registration for school assignment purposes, that
gesture, whatever the underlying motives, leaves an indelible scar on
the child's psyche.  <u>See</u> <u>Tuttle v. Arlington Cty. School Bd.</u>, 195 F.3d
698, 707 & n.12 (4th Cir. 1999).  Putting aside the fact that this

view, as a general matter, would impugn remedial desegregation orders even in de jure cases, the Lynn school district's commitment to promoting racial harmony and celebrating the city's diversity deprives this argument of any specific force in this case.

Even if it were reasonable to conclude (and I find it highly doubtful) that students in Lynn come away from school registration with the mistaken belief that the district means to remind them of racial difference, everything about the Lynn experience is directed at clarifying and correcting this misapprehension.  As Drs. Killen and Dovidio testified in their discussion of the "authority sanction" component of intergroup contact, Lynn's teachers, administrators and staff are committed to the principle that students of all races are to enjoy equal status, that the city's multiracial character is something to celebrate, and that students have much to gain from cross-racial relationships.  Indeed, that Lynn officials have tried to accomplish their integrative purpose through a voluntary transfer system -- with neighborhood schools absolutely available should parents so desire -- speaks volumes about their sensitivity to third-party interests.

Unlike programs in colleges and universities, the Lynn Plan does not control access to any limited benefit.  The parties agree that all students will get a comparable education.  Curricula are standard and the differences between schools are largely variations on a theme. Competency levels are evaluated on a systemwide basis; if any given school falters, remedial action will be taken to ensure that it meets the standards set by its counterparts in the district.

Finally, there are no race-neutral adequate alternatives for
integrating the school populations.   _See_ _infra_ Section V.B.4.b(3).

**(3)   Plaintiffs' Arguments Do Not Apply in Lynn**

The plaintiffs make several "narrow tailoring" challenges.
First, they suggest that the Plan's focus on racial minorities is
inconsistent with the end of "genuine diversity."   Second, plaintiffs
argue that the improvements in Lynn schools could have been
accomplished through additional resources.

**(a)   A White/Nonwhite Distinction Is
Appropriate**

There are sixty-five racial and ethnic groups within Lynn's
student population, the plaintiffs argue, and far from targeting
classrooms that reflect the range of ethnic diversity in Lynn, the
Plan's notions of racial balance seek only to ensure extensive
contacts between whites and nonwhites.   Relying on _Wessmann_, the
plaintiffs claim that a policy that targets racial diversity, rather
than "genuine diversity," can never be narrowly tailored.

Plaintiffs' critique is off the mark.   The Plan does not target
the "genuine diversity" that the First Circuit found absent in
_Wessmann_.   In _Wessmann_, as I have noted, the court held that the
Boston Latin School's commitment to "racial and ethnic diversity" did
not comport with the "genuine diversity" that a plurality of the
Supreme Court approved in _Bakke_ as a means to foster a robust exchange
of ideas.   _Wessmann_, 160 F.3d at 798.   _Bakke_-type diversity is an
expressive "diversity of viewpoints" and is predicated on the notion

that people of different backgrounds will make unique contributions to academic discourse.  As such, it "encompasses a far broader array of qualifications . . . of which racial or ethnic origin is but a single though important element."  Id. (quoting Bakke, 438 U.S. at 315) (internal quotation marks omitted)).  In any case, race classifications directed at viewpoint diversity, the Wessmann court held, are nothing more than mechanisms for "racial balancing" based on broad generalizations about the contributions different races and ethnic groups will make to the classroom.  Wessmann, 160 F.3d at 799.

The Lynn Plan does not pursue "racial balancing" toward the end of filling stereotyped "viewpoint" niches.  As I stated earlier:

> The diversity interest defendants argue here makes
> no assumptions about any groups' unique
> contribution.  Rather, it reflects a concern that
> elementary school children simply get used to
> being in classrooms with people different from
> themselves.  In fact, it assumes that the more
> diverse a classroom is, the more likely students
> will learn that all people are different no matter
> what their color or ethnic background.  It is not
> a form of stereotyping, but a method to prevent
> the formation of stereotypes.

Comfort, 100 F. Supp. 2d at 65, n.12.  If the goal is to block the formation of stereotypes and racist attitudes, the most effective route, bar none, is to promote multiracial interaction.

The Lynn Plan's white/nonwhite distinction does indeed, as the plaintiffs suggest, "paint with a broad brush," but one that precisely reflects the facts on the ground in Lynn.  Lynn school officials and teachers observed that in the years predating the Plan, racial divisions and ethnic conflict between students occurred predominantly

along a white/nonwhite axis.  The growing gap in understanding between these groups burdened the schools in ways that more precise shades of racial and ethnic difference did not.

Defense experts cited evidence in developmental psychology to support the view that tolerance of difference begins with acceptance of <u>visible</u> difference.  A white elementary school student is more likely to differentiate himself from an English-speaking student in a racial minority than for a white European immigrant student who does not speak his language.[87]

In fact, were Lynn to set its eye on a "true diversity" that reflected in each school the range of sixty-five ethnicities represented in its student body, the Plan's use of race (and now ethnicity as well, which is also subject to strict scrutiny, <u>see</u> <u>Bakke</u>, 438 U.S. at 290) would be substantially <u>more intrusive</u> than is currently the case.  The Plan is crafted to use race only as frequently as is necessary to produce a measure of racial diversity that is meaningful enough to enable the schools to teach their students citizenship in a multicultural society.  <u>See Jacobson</u>, 961 F.2d at 102 (citing <u>Swann</u>, 402 U.S. at 16)).[88]

---

[87] Dr. Dovidio testified as well that race plays "a fundamental part of the socialization of students in America today."  Dr. Killen, too, affirmed that race is a "predominant group identity" in American culture.

[88] The categories on which this diversity is based -- white and nonwhite -- have been accepted by other courts, <u>see, e.g.</u>, <u>Jacobson</u>, 961 F.2d at 102 (affirming the use of these categories in teacher assignments within a district); <u>Brewer</u>, 212 F.3d at 752-53, (finding, at the preliminary injunction stage, that the use of white/nonwhite categories in deciding student transfer requests at public schools is narrowly tailored to a different kind of compelling interest than "true diversity," such that <u>Bakke</u>'s holding is inapplicable).

> **(b)  Additional Resources Would Not Have Been Adequate to Accomplish the Curricular Goals; the Significance of "Critical Mass"**

Plaintiffs' second argument is that Lynn could have accomplished the stunning turnaround in the fortunes of its schools since the 1980s with race-neutral policies.  They contend that other components of the Plan -- new facilities, increased funding from the state, teachers' commitment to and cultivation of equal status and diversity -- amply account for the strides that Lynn's schools have taken.

Implicit in the plaintiffs' critique are two others:  (1) Integrated classrooms are not necessary to achieve the curricular benefits Lynn touts.  Merely deluging the system with additional resources would surely do the trick.  And (2) even if integrated classrooms are necessary, this race-conscious plan is not required to accomplish them.  A free choice plan coupled with magnet school incentives would have been as effective.  Because it bears on Lynn's compelling interests in reducing de facto segregation as well as the district's curricular goals, I will address (2) in a separate Section V.B.4.b(3), infra, on whether the Lynn Plan was necessary to effect systemwide integration.

Deluging the system with resources -- without the race- conscious transfer policy -- would not have been adequate.  With respect to intergroup contact, the number of students in a classroom of a racial minority matters.  Abstract instruction about racial tolerance is insufficient without meaningful contact with students of a different

race.  Social science literature -- including social and developmental

psychology literature -- cited by the defendants' experts instructs

that racial isolation adversely impacts both minority attitudes and

the attitudes of those in the majority.  This impact becomes more

pronounced as a racial minority within a group dwindles in size.[89]

There is a point at which the presence of a racial minority

becomes substantial enough to catalyze intergroup relations, a tipping

point" or "critical mass"[90]:  Defendants' experts were unanimous on

---

[89] The experts noted that in other settings, such as employment, this
stigmatization is demonstrated to result in poor job performance.

[90] It must be noted that the Sixth Circuit, sitting en banc, confronted
the question of "critical mass" in an altogether different context in Grutter
v. Bollinger, 288 F.3d 732 (6th Cir. 2002).  Grutter dealt with an equal
protection challenge to the use of race as a factor in deciding admissions to
the University of Michigan Law School.  The university's use of race, as is
true of Lynn's, was "aspirationally" gauged to generate a "critical mass" of
under-represented minority students in an incoming law school class; that is,
it did not guarantee any number of slots to minorities.  Id. at 747-48.

However, the compelling interest that the university recited was not the
interest at stake here.  Grutter argued for the "viewpoint diversity" interest
that the Supreme Court recognized as compelling in Bakke.  Specifically, a
diverse student population in higher education "enrich[es] students' education
with a variety of perspectives, experiences, and ideas."  Id. at 738 (quoting
Bakke, 438 U.S. at 313).  The Sixth Circuit upheld the university's admissions
practices, id. at 752, and the case is presently before the Supreme Court,
Gratz v. Bollinger, 123 S.Ct. 617 (granting certiorari).

Experts and administrators testified in Grutter that a "critical mass"
of minority students is necessary to achieve the true benefits of the
viewpoint diversity that the university was after.  Under-represented
minorities must populate a class in sufficient number that they may
comfortably contribute their unique viewpoints in classroom discussions
without feeling as though they are "spokespersons for their race."  Grutter,
288 F.3d.

In contrast, as described above, the "critical mass" sought by the Lynn
Plan is different, because Lynn's goal is not viewpoint diversity.  As I have
said, at the elementary, middle, and high school level, the goal of teaching
socialization is at least as important as the subject matter of instruction.
The value of a diverse classroom setting at these ages does not inhere in the
range of perspectives and experience that students can offer in discussions;
rather, diversity is valuable because it enables students to learn racial
tolerance by building cross-racial relationships.  In this context a
meaningful presence of racial minorities -- and of whites at minority-

this issue.  Dr. Killen analogized the accrual of intergroup contact
benefits to a continuum:  as a school's racial balance increases,
racial tolerance accrues.  Studies suggest, however, that the most
significant increase in benefits occurs as the share of a school's
racial minority students surpasses the 20% mark. The direct
observations of the experts on the ground in the Lynn schools buttress
this view,[91] as did the testimony of teachers, students and
administrators.

Plaintiffs counter by suggesting first, that even a few
minorities are enough to achieve the effects the Lynn Plan seeks,
second, that even if "more" integration is needed, no research
provides support for a specific percentage, and finally, whatever the
legitimacy of the "critical mass" concept, it is not effected in Lynn.
After all, the Plan, keyed to the demographics of the city, does not
necessarily assure the critical mass.  Several schools already have
fallen out of line.  Moreover, plaintiffs' expert, Dr. Rossell,

---

dominated schools -- is crucial not only to reducing feelings of tokenism, but
also to disarming stereotypes that students in the classroom majority might
harbor about students of other races.

[91] Dr. Killen also attributed districtwide racial harmony, improved
discipline and attendance, etc. to the Lynn Plan's fostering of integration
through school assignment.  In her expert opinion, a critical mass of white or
nonwhite students is essential to achieving the benefits of intergroup
contact.  Dr. Killen emphasized that race-neutral factors like diversity
training for teachers are desirable, but if "your school is made up of kids
who are 90% of one race, whether it's white or black, you're not going to
achieve the goals set out that these techniques were designed to accomplish."

Likewise, Dr. Orfield testified that increased de facto segregation that
would necessary follow from suspension of the Lynn Plan, see infra Section
V.B.4.b, would curtail the citizenship benefits that flow to all students in
an integrated environment.

testified that as long as schools maintain <u>some</u> degree of
heterogeneity (the amount, unclear) such that there is <u>some</u> percentage
of both whites and nonwhites to interact cross-racially, it is
possible to obtain benefits from intergroup contact.

Plaintiffs' position is totally inconsistent with the credible
evidence, and the aspects of the Plan that they identify as the
weaknesses of the plan are in fact its strengths.  As I have noted
earlier, I find Dr. Rossell's testimony to be less than credible and
surely less reliable than the defense experts.  Although Dr. Rossell
based her opinions on twenty-six years of experience with other
schools, she made no firsthand observation of Lynn's schools and
conducted no surveys or interviews of Lynn's students, teachers, or
parents.  <u>See</u> <u>Wessmann</u>, 160 F.3d at 804 (discounting an expert's
testimony because it "relies on evidence from one locality to
establish the lingering effects of discrimination in another").  In
fact, at the time she formulated her opinion in this case and for some
time afterward, Dr. Rossell's understanding of Lynn's student
assignment process was fundamentally wrong.  She insisted that it was
a "controlled choice plan" that did not guarantee students access to
their neighborhood schools.  Not only did Dr. Rossell's testimony
reflect an unfamiliarity with the conditions in the Lynn district; it
is not clear from the record that she <u>ever</u> understood exactly how the
challenged practice in this lawsuit -- Lynn's school assignment policy
-- actually works.

And as to critical points in her testimony, Dr. Rossell has taken contradictory positions in the past.  In this proceeding, she testified that there are no "concrete data" that show that a "critical mass" of minority students is a precondition for the success of intergroup contact techniques.  Yet a 1983 publication to which Dr. Rossell was a major contributor advocated the very proposition she rejects here, namely, cultivation of critical mass of racial and ethnic minorities within schools.[92]  In a striking admission for an expert, Dr. Rossell dismissed the earlier work as not based on "an ounce of research," but instead "on people's intuition."  And she testifies as an expert in this case against the Lynn Plan, a position diametrically opposed to the position she took in 1988, when she was a consultant to the Lynn schools and noted that Lynn "stood an excellent chance" of desegregating its schools.

In any event, Dr. Rossell's current positions are without basis. It cannot be her position that there are no scientifically acceptable studies validating the concept of "critical mass."  There plainly are, and the defense experts noted, summarized, and cited them -- in testimony that I credit. Rather, what she seems to be saying is that

---

[92] This 1983 publication stated:

> A critical mass of students seems to encourage
> intergroup contact, discourage self-isolation,
> facilitate the responsiveness of teachers and
> administrators to the special needs of the minorities,
> especially when remedial or bilingual programs are
> needed, and promote more parental involvement in the
> school.

These are exactly the effects that defendants and their battery of experts
have attributed to the Lynn Plan.

the studies and conclusions of social and developmental psychologists
somehow do not count, no matter how esteemed the scholar or how peer-
reviewed and accepted are his or her findings.  To Dr. Rossell, the
only satisfactory proof would be statistical, the result of a rigorous
multiple regression analysis that quantified intergroup contact
benefits and statistically isolated those that were directly
attributable to classroom integration.

Defense experts suggest that such a study cannot be done in Lynn,
and indeed, need not be done.  For example, Dr. Dovidio noted that the
study Dr. Rossell suggested could not be done in Lynn because the
range of racial balance (or imbalance) in Lynn's schools is not broad
enough to conduct a meaningful study of this kind.  Isolation of the
importance of racial balance to intergroup contact efforts might be
possible if the range were broader -- that is, if some schools
enrolled as few at 6% white or nonwhite students.  At best, Dr.
Dovidio explained, the study that Dr. Rossell proposed "doesn't
provide a critical test of [whether] the plan [is] working, it just
says within the context of a plan that is working, is more [minority
representation] better?"

Moreover, such a study need not be done.  Desegregation experts
and social and developmental psychologists nationwide, using
methodologies established in their fields, have conducted studies,
published their findings, presented papers, and even testified in
court as experts, all concluding that a critical mass of 20%
facilitates intergroup contact.  Just because Dr. Rossell, a political

scientist, rejects their approach does not mean that I should as well. Plainly, not everything admits of quantification.

This is not a case of scientific precision, where too much or too little of an active ingredient ruins a chemical reaction -- and scientific precision should not be required.  See Parents Ass'n of Andrew Jackson High School v. Ambach (hereinafter "Andrew Jackson II"), 738 F.2d 574, 580-81 (2d Cir. 1984) (requiring, for narrow tailoring purposes, that a race-conscious school assignment plan's articulate a "tipping point" for white flight that triggered not "the only significant drop in white enrollment," but that triggered "(on average) the most significant drop").

The dynamics in this case -- interpersonal relations -- are far more complex than that.[93]  Statistical analysis may suffice to establish narrow tailoring in remedial cases, where the state's compelling interest is to correct minority under-representation within an institution, that is, where the wrong to be righted is quantifiable.  Where, as here, the compelling interest fundamentally relates to shaping human growth and relations, a Rossell-style multiple regression analysis cannot be necessary -- and arguably could not be sufficient on its own -- to justify the use of race.

---

[93] Indeed, the dynamics of human interaction are so complex -- with so many possible internal and external dynamics shaping the course of relationships between white and nonwhite students in Lynn schools -- that I found it difficult to believe Dr. Rossell's claim that her multiple regression analysis could control for all other differences between schools except their measure of racial balance, difficult to believe.

Finally, plaintiffs contend that "critical mass" is obviously not essential because some Lynn schools have achieved positive race relations without these numbers, pointing particularly to the Fecteau-Leary middle school.[94]  The defendants' response to this is more convincing.  First, as they have noted, the 20% mark is aspirational, not written in stone.  The Plan seeks to achieve that level in a manner that is consistent with a neighborhood school model of a student assignment that is in turn keyed to the demographics of Lynn. In any case, all defense experts credibly suggest a continuum of effects leading to the point when intergroup contact is finally significant.  It would be absurd to suggest that when a school dips marginally below 20% critical mass, a climate of racial tolerance evaporates and racial infighting instantly follows.[95]

In any case, what the plaintiffs view as a fatal flaw, I understand to be a point in the Plan's favor.  Plaintiffs claim  that Lynn's student assignment policy is not narrowly tailored because it is not designed to guarantee a 20% critical mass in every school misses the mark.  The Lynn Plan is not a "20% no matter what" plan; the use of race only triggers when the schools pertinent to a proposed transfer deviate too much from districtwide demographics.  Were the

---

[94] The Ingalls (81% minority), Cobbet (83%), and Harrington (84%) elementary schools, and the Fecteau-Leary (81%) middle school were all perched below critical mass in the 2001-2002 school year, and Dr. Killen did some of her observations at Fecteau-Leary.

[95] Dr. Killen explained that in Fecteau-Leary, though its white population was at 19% during the 2001-2002 school year, the school had recently reached critical mass, and a number of the elementary schools feeding students into Fecteau-Leary were at or above critical mass.

Plan calibrated to yield, without fail, a 20% critical mass in every school, it would risk characterization as a quota, be needlessly rigid and neglectful of changing conditions in Lynn.  Likewise, it would override the wishes of parents who want their children to attend their neighborhood schools and would entail a more intrusive use of race in school assignment than the Lynn Plan currently provides.  As such, it would hardly be "narrowly tailored."

In fact, plaintiffs' position turns on its head the very purpose of the narrow tailoring requirement, to invalidate a program because it does not use race <u>enough</u> to establish a perfect "fit" between means and end.  As I noted before, the Plan's goals are hybrid and flexible: It effectively generates integration in Lynn's schools in such quantity as to catalyze intergroup contact while still respecting the neighborhood school principle and Lynn's ever-changing demographics.  As such, it ensures all the corollary educational benefits to which the parties stipulate.

### b.  Remedying the Effects of De Facto Segregation: "Reducing Minority Isolation"

#### (1)  Is this Remedial Interest Compelling?

An important goal of the Lynn Plan is to ameliorate the effects of <u>de facto</u> residential segregation.  It cannot change demographic patterns.  It chose not to trench on the ability of a parent to send his or her child to a neighborhood school.  Rather, the Plan tries to shape educational environments that neutralize the effects of these

patterns, to make certain that these patterns are not determinative of a child's opportunity. <u>Comfort</u>, 100 F. Supp. 2d at 65 n.12.

A number of adverse educational effects flow from racially segregated schools, as described generally in the Kiernan Report that led to the RIA's enactment, and, more importantly, in the record in this case.  In the 1980s the increasing racial polarization of Lynn schools, created in part through official misconduct, led to documented inequalities within the system:  minority schools had inferior materials and facilities and the more experienced teachers transferred to the better funded, managed, and maintained white schools.

It would make no sense if Lynn officials were obliged to take responsibility for addressing these adverse consequences but at the same time were constitutionally barred from taking voluntary action aimed at nipping some of these effects in the bud.  In effect, what the Plan sought to do was to forestall the development of racially isolated schools before the separation and the inequities become so intense that even more intrusive action -- perhaps court-ordered -- was required.

Plainly the "reduction of racial isolation resulting from de facto segregation can be a compelling government interest justifying racial classifications." <u>Brewer</u>, 212 F.3d at 753.  In <u>Brewer</u> the Second Circuit vacated a district court's preliminary injunction suspending the race-conscious elements of a student assignment plan very much like the one presently before this Court.  The plan at issue

in Brewer allowed students to transfer from their neighborhood schools

under strict conditions:

> [O]nly minority pupils are allowed to transfer
> from "predominantly minority city schools" to
> participating suburban schools, and non-minority
> students may transfer from suburban schools to
> city schools provided that their transfers "do not
> negatively affect the racial balance of the
> receiving school."

Id. at 742.  The Second Circuit found that the plaintiff parents were

not likely to succeed in their challenge to these race-based

restrictions on transfers.

The Brewer court relied on the "Andrew Jackson cases," in which

the Second Circuit held that a school district may take affirmative

steps to combat de facto racial imbalance, even though such steps are

not constitutionally required.  See Parent Ass'n of Andrew Jackson

High School v. Ambach (hereinafter "Andrew Jackson I"), 598 F.2d 705,

713-14 (2d Cir. 1979); see also Andrew Jackson II, 738 F.2d at 581

n.9.  Like Brewer, the Andrew Jackson cases dealt with integration

plans restricting the availability of student transfers that

exacerbated conditions of racial imbalance.  Specifically, the New

York City school district implemented a "Controlled Rate of Change"

scheme designed to reduce racial imbalance at the predominantly

minority Andrew Jackson High School in Queens.  Minority students in

the school's attendance zones were given the opportunity to attend any

high school in New York City whose student body was more than 50%

white.  Andrew Jackson I, 598 F.2d at 710-11.

There was a further restriction due to the district's concern
that these transfers might trigger "white flight";  minority students
could not transfer to schools in such numbers as to alter the racial
balance by 4% or one fourth of the difference between the school's
white enrollment and a 50% white enrollment (whichever was less).  Id.
at 711-12.

The Andrew Jackson court, applying strict scrutiny, id. at 718,
affirmed the Plan.  It agreed that integration -- or "inhibiting the
process of resegregation" -- was in itself an end sufficient to
justify the racial classification.  Id. at 718 (citing Otero v. New
York City Housing Auth., 484 F.2d 1122, 1140 (2d Cir. 1973) (affirming
a housing authority's ability to limit the availability of units to
would-be tenants based on their race, "where it can show that such
action is essential to promote a racially balanced community")).[96]

As I explained above, the defendants in the present case offered
substantial expert testimony as to the educational benefits that
obtain from reducing minority isolation and de facto segregation in

_____

[96] The Andrew Jackson court remanded for further development of the
issue of narrow tailoring; the court was particularly interested in how the
Board hit upon its 50% figure.  Id. at 720.  The school district justified
that percentage to the trial court as a "tipping point" of a different kind
than the defendants' proposed "critical mass" here.  Their data suggested that
fifty percent was the point beyond which a minority presence in the school
triggered white flight to suburban school districts.  The district court
rejected this theory, on the ground that the data showed that in some schools
white flight occurred at similar or even greater rates when minority
enrollment reached the 60% or 70% level.  Andrew Jackson II, 738 F.2d at 579-
80.

The Second Circuit vacated and remanded the case once again.  Its review
of the 50% tipping point was not as exacting as the district court's.  The
Court of Appeals found it sufficient that the 50% tipping point produced the
"most significant drop" in white enrollment and did not require the school
district to show that 50% hosted the "only significant drop."  Id. at 580.

public schools.  In this respect I predicate my conclusion, that
reducing minority isolation is indeed a compelling interest that can
justify race-conscious student assignment, on a record far more
developed than the district and appeals courts had before them in the
Andrew Jackson cases, or in Brewer.

### (2)  Is the Lynn Plan Narrowly Tailored to this Compelling Interest?

There is no doubt that Lynn's race-conscious restrictions on
voluntary transfers actually reduce minority isolation.  The evidence
is uncontroverted -- and the logic unquestioned -- that Lynn's Plan,
which forbids white students from transferring into and minority
students from transferring out of schools regarded as "racially
isolated."  Arguably, since the Plan's attention to a student's race
is strictly limited to contexts in which a proposed transfer would
exacerbate an identified condition of racial isolation, it is by
definition narrowly tailored to the Lynn Defendants' stated purpose of
reducing racial isolation.

But that logic obviously cannot alone vindicate the Plan's use of
race.  Lynn has to justify the specific parameters it has settled
upon, and whether there are race-neutral alternatives to their use.  A
broader view of racial isolation, for example, would justify the use
of race more often.  If, for example, Lynn narrowed the range of
allowable deviation from districtwide percentages to 1%, a school
would be "racially isolated" in the 2001-2002 school year if fewer

than 57% of its students were minorities.  More schools would fit the definition of racial isolation, and the race-conscious restrictions on transfers would trigger more often.  If Lynn is to appeal to "reducing racial isolation" as a compelling government interest, it must answer, in the context of narrow tailoring, for its definition of what "racial isolation" is.

I conclude that Lynn's definition of racial isolation is appropriately calibrated.  As the Second Circuit's review of the school district's 50% tipping point marker in <u>Andrew Jackson II</u> illustrates, this is an inexact science.  A race-conscious recourse must be minimally intrusive, but it must also have enough force to effectuate its ends in a meaningful way, <u>see</u> <u>Wessmann</u>, 160 F.3d at 810 (Boudin, J., concurring).  This is a difficult channel for a school district to navigate, and if a court gives too little leeway, strict scrutiny becomes what the Supreme Court never intended it to be -- "fatal in fact."  <u>See</u> <u>Adarand</u>, 515 U.S. at 237 (quoting <u>Fullilove v. Klutznick</u>, 448 U.S. 448, 519 (1979) (Marshall, J., concurring)).

In this case Lynn's definition of racial isolation is narrowly drawn.  First, if the goal is to prepare students to live in a multiracial world, it makes sense to begin with an environment reflective of that world, namely, the demographics of the City of Lynn.  The measure of balance that Lynn has selected, as Dr. Orfield, an expert on desegregation planning, noted, was tied to the overall breakdowns within the district, and so typical of desegregation efforts.  <u>Cf.</u> <u>Belk v. Charlotte-Mecklenburg Bd. of Education</u>, 269 F.3d

305, 319 (4th Cir. 2001) (observing that "the plus/minus fifteen percent variance is clearly within accepted standards, and provides a reasonable starting point in the unitary status determination"). Second, the demographics of Lynn's school-age children (42% white and 58% nonwhite) ensure that the most racially isolated schools in the district, Lynn Woods (25%), Sisson (27%), and Shoemaker (30%), have at least a "critical mass" of minority students.  Third, the plan attempts to minimize racial imbalance and isolation while preserving neighborhood schools and eschewing forced busing.

### (3)  <u>Race-Neutral Alternatives are not Feasible</u>

The plaintiffs maintain that, even if (as I have concluded) an improved racial balance in Lynn's schools is crucial to Lynn's educational goals, there were race-neutral methods of assignment that could have been adequate.

McArdle's analysis of residential patterns in Lynn suggests that residential segregation is deepening.  She described a community with neighborhoods that are growing increasingly segregated by race -- in her expert opinion, that would not change in the next five to ten years.  McArdle and Drs. Dovidio, Killen, and Orfield all predicted that Lynn's schools would become more and more racially identifiable if students were allowed to attend only their neighborhood schools. In fact, McArdle gave evidence that, if school attendance zones were to remain intact, a neighborhood-only plan would reduce the minority population of Lynn Woods from 24% to 8%, Shoemaker from 30% to 6%, and

Aborn from 35% to 12%.  Conversely, minority populations would increase at Cobbet, from 83% to 86%, and at Connery, from 80% to 87%.

Dr. Rossell's rebuttal was curious.  She suggested that the school could redraw the neighborhood attendance zones to maximize integration.  To be sure, Dr. Rossell did not bother to verify the feasibility of this alternative against the particulars of Lynn's geographical residential patterns.[97]  Moreover, she conceded that, as McArdle described, there is a large "separate and physically distinct" portion of northeastern Lynn that is predominantly white, but she could not explain how attendance zones would be drawn to integrate neighborhood schools given this geographic dispersion.[98]  Indeed, Superintendent Kostan, with far greater experience in Lynn, predicted that "even if we redistricted, you still would have predominantly . . . minority schools and predominantly racially isolated white schools."

---

[97]     Q.    Did you perform any evaluation or study of the
geographic locations of schools and each of their
attendance zones to come to the conclusion that, in
fact, they could move attendance zones and would be
able to integrate their schools similar to what they
currently have in their schools?

         A.    I haven't done that particular analysis of Lynn,
but I have designed many desegregation plans, and I
know it can be done.

[98] Dr. Rossell's conclusion seemed to be predicated in part on a
different standard of what was an acceptable amount of integration -- that is,
her view that there is no "critical mass" that marks a significant upturn in
the benefits obtained from intergroup contact:

         Q.    So, it's your testimony that the Aborn school .
. . which is currently at 34% minority, and would
become 12% minority, would continue to be a racially
integrated school under your definition?

         A.    Twelve percent is racially diverse, yes.

Emphasis added.

While I agree with Dr. Rossell that it may always be <u>possible</u> in theory to craft attendance zones so that they draw equally from geographically separate racial enclaves, at a certain point they would be "neighborhood schools" in name only.  Students would be required to travel considerable distances to attend schools that are suddenly, by the fiction of redistricting, announced to be in their "neighborhood." Students in the city's minority core would be obliged to go to school in the overwhelmingly white northeastern region of Lynn (and <u>vice versa</u>).  In fact, it is hard to imagine how, given Lynn's existing pattern of residential segregation, the district could redraw its neighborhoods to desegregative effect without compromising the integrity of the neighborhood-school principle and, worse yet, initiating forced busing.[99]

In contrast, the Lynn Plan, which guarantees a student's admission to a "true" neighborhood school and affords additional options subject to overt racial restrictions, is more flexible and less restrictive than would be a race-motivated redrawing of neighborhoods.

---

[99] The present location of Lynn's schools would make a redrawing of neighborhoods -- even so minimally as to achieve the limited integration that the Lynn Plan effectuates -- a race-neutral cover for forced busing.  Earlier in this decision I raised hypothetically the prospect of a district locating schools between or on the borders of racially identifiable neighborhoods. This approach would be less intrusive than would be a redrawing of neighborhoods to shape the populations of schools where they are presently placed.  It might well be the most desirable means to achieve racial balance, but the Constitution takes note of practicality.  The alternative must be economically feasible, <u>see</u> <u>Wygant</u>, 476 U.S. at 280 n.6 (finding race-neutral alternatives relevant if they achieve the stated end "about as well and at tolerable administrative expense").  The periodic demolition, relocation, and reconstruction of schools in response to changes in residential patterns is a far from viable alternative.

Dr. Rossell also suggested that Lynn could create real magnet programs that would draw white students voluntarily from their predominantly white neighborhood schools into minority identifiable schools, and vice versa.  Again, however, Superintendent Kostan, citing data culled by Lynn's PIC on trends in transfer requests, and Lynn's past experience, testified that a pure choice plan would result in resegregation:  "trends would indicate that if you implemented a plan such as that, you probably would find that minority students would gravitate to racially isolated minority schools and white students would gravitate to racially isolated white schools."  And in fact. Lynn tried, without success, in the 1980s to draw white students into a magnet school in a minority neighborhood.

Studies by the Lynn PIC of parent preferences in Lynn show that minority parents favor schools in minority-dominated areas and white parents prefer schools in white areas.  Parents tend to seek transfers to neighborhood schools contiguous to their own, as opposed to schools across town, with the result that -- regardless of whether they intend to self-segregate -- they choose schools in their own racial enclaves. Lynn school official and PIC director Janet Birchenough observed that white parents request 500 to 800 segregative transfers in a given year under the current Plan; all of these would have to be approved under a free-choice plan.  Given the likelihood that free choice would result in still more requests for segregative transfers than are made presently (as the deterrent restrictions on such transfers would have

been eliminated), it is difficult to see how a comparable measure of desegregation can be achieved this way.

Birchenough testified that Lynn has also considered school assignment by lottery.  A lottery would randomly arrange students on a list; the school would make its assignments by proceeding down the list, accepting every parent's first school choice, unless the favored school was already filled.  In that case the student would be assigned to his second choice, and so on.  This policy suffers from the same flawed underpinnings:  the PIC has documented trends showing that white parents tend to choose schools that are predominantly white, and nonwhite parents favor predominantly nonwhite schools.

In fact, even to the extent that white and nonwhite students would seek transfers to the same school, resort to a lottery system would not result in an integrated population at that school.  The PIC's data demonstrate that under the current Plan white parents tend to bid for transfers much earlier in the year than do minority parents.  Minority parents move into and between locations in the city more often, due to their comparative socioeconomic disadvantage.  They are often not in a position to consider their children's school options in March and April and May, when white parents typically register their children.  Most minority registrations occur later in the year, particularly on the cusp of the school year in August and September.

According to Birchenough, the district could not feasibly hold a single end-of-summer lottery to determine school assignments for the

entire district in order to accommodate minority parents.  In order to make appropriate staff assignments and resource allocations, the district must have some measure of notice of what schools its students will be attending.  Conversely, a monthly lottery system that slotted students beginning in March would be workable, but it would effectively result in white students obtaining their first choice placements before minority students even articulate their preferences. If there are schools that white and nonwhite students both want to attend, the monthly lottery system would ensure that these schools remained predominantly white.[100]

### c.  Interest (5): "Providing an Education to All Students that Satisfies Federal and State Constitutional Requirements"

#### (1)  The Command and Promise of Brown v. Board of Education

The Lynn defendants argue that the Plan "serves the compelling state interest in voluntarily achieving the 'clear command' of Brown v. Board of Education."  While I conclude that the defendants are

---

[100] There is a rough correlation between socioeconomic status and race in Lynn:  the wealthier areas of the city are predominantly white, and the poorer areas tend to be minority dominated.  Lynn's PIC has studied the possibility of using this correlation to foster racial integration in a race-neutral way. Birchenough testified on the feasibility of a school assignment plan, facially race-neutral, that would make the ability to transfer contingent on one's socioeconomic status.  This use of socioeconomic status as a "cover" for race, the PIC concluded, would not ameliorate de facto segregation in Lynn.  The white students who live in poor, largely nonwhite neighborhoods typically have the same socioeconomic status as their nonwhite neighbors.  These white students would be eligible to transfer out of their predominantly minority schools into white schools, thereby exacerbating racial imbalance.

If the only result of a socioeconomic approach is socioeconomic desegregation, the approach is not helpful in addressing issues of race.  Dr. Orfield testified that "you can't really learn about racial differences just by socioeconomic desegregation if it does not produce racial desegregation."

wrong to suggest that the Lynn Plan is <u>compelled</u> by <u>Brown</u>, since there is no evidence of ongoing <u>de jure</u> segregation, they surely have an interest in fulfilling the <u>promise</u> of <u>Brown</u>.  For nearly fifty years, courts have recognized that eliminating school segregation -- whatever its cause -- is a proper and compelling governmental objective.  While the courts in recent years have imposed more demanding requirements on the <u>means</u> to achieve integration, they have never repudiated the <u>goal</u>.

Clearly, there was a period in time -- during the 1970s and 1980s -- when Lynn was vulnerable to a suit challenging the acts of school officials who knowingly exacerbated racial segregation within the district.  But that moment passed, headed off by the very Plan in contention here.  To be sure, it cannot be credibly suggested that this Plan in 2003 is narrowly focused on remedying the effects of 1980s discrimination.[101]  The focus has to be in the present.  And today, if Lynn eliminated the Plan, school segregation would follow directly on the heels of residential segregation.  While Lynn contends that lifting the Plan's restrictions, with knowledge of what would

---

[101] Indeed, to conclude that Lynn must continue to maintain a race-conscious school assignment plan in order to eradicate the segregative effect of transfer practices abandoned fifteen years ago -- when Lynn was a predominantly white community -- would require me to ignore the testimony of the defendants' own demographics expert, Nancy McArdle.  As I explain above, McArdle ably demonstrated that residential segregation in Lynn is severe enough that the Lynn Plan is necessary to forestall <u>de facto</u> segregation that would necessarily follow from a strict neighborhood attendance zone plan.  It is inferable from parents' tendencies to self-sort into neighborhoods by race that, given an open transfer program that accommodated segregative and desegregative transfers alike, the lion's share of transfers sought would be segregative.  The evidence clearly establishes a risk of reversion to segregation, but of a <u>de facto</u> nature.  Conversely, I have no factual or expert testimony before me to suggest that there are still lingering effects of Lynn's <u>de jure</u> practices to redress.

follow, would expose them to a charge of discrimination, see, e.g.,
Diaz v. San Jose Unified School Dist., 733 F.2d 660, 670-71 (9th Cir.
1984); NAACP v. Lansing Bd. of Education, 559 F.2d 1042, 1051 (6th
Cir. 1977), it overstates its exposure under current case law.  Brown
appeared to suggest that, whatever its cause, segregation in schools
results in unequal educational opportunities that violate the
Constitution.  See Brown, 347 U.S. at 494 (noting that segregation is
generally detrimental although the impact is "greater when it has the
sanction of the law" (emphasis added)).  However, in the years since
Brown, it is clear that inequality born of residential segregation --
the choices of citizens, and not government -- is unlikely to expose
the Lynn defendants, as they contend, to legal attack under the Equal
Protection Clause.  In short, Brown does not command school systems to
redress de facto segregation.  See Freeman, 503 U.S. at 495.

    Nevertheless, in recognizing the consequences of de facto
segregation, Brown and its progeny, quite apart from their mandatory
elements, also have a powerful hortatory significance aimed at
eventually uprooting school segregation "root and branch."  Green v.
Cty. School Bd., 391 U.S. 430, 437-38 (1968).  In pursuit of the
promise of integration, the Supreme Court has repeatedly affirmed in
principle voluntary desegregation policies adopted by school districts
to foster, preserve, and operate "unitary" school systems.  See, e.g.,
Busstop, Inc. v. Bd. of Education of the City of Los Angeles, 439 U.S.
1380, 1383 (1978) (Rehnquist, J.) (expressing "very little doubt" that
states can order desegregation beyond what the Constitution requires);

Swann, 402 U.S. at 45.  Even Justice Powell, author of the Bakke

plurality opinion, endorsed a state's voluntary desegregation statute

as "the sort of effort that should be considered by state and local

officials and elected bodies."  Columbus Bd. of Education v. Penick,

443 U.S. 449, 488-89 n.7. (1979) (Powell, J., dissenting).[102]

As Justice Marshall pointedly observed:

> The real irony of the argument urging mandatory,
> formal findings of discrimination lies in its
> complete disregard for a longstanding goal of
> civil rights reform, that of integrating schools
> without taking every school system to court. . . .
> It would defy equity to penalize those who achieve
> harmony from discord, as it would defy wisdom to
> impose on society the needless cost of superfluous
> litigation. . . . [F]ormal findings of past
> discrimination are not a necessary predicate to
> the adoption of affirmative action policies, and
> the scope of such policies need not be limited to
> remedying specific instances of identifiable
> discrimination.

Wygant, 476 U.S. at 305 (Marshall, J., dissenting).

To say that school officials in the K-12 grades, acting in good

faith, cannot take steps to remedy the extraordinary problems of de

facto segregation and promote multiracial learning, is to go further

than ever before to disappoint the promise of Brown.  It is to admit

that in 2003, resegregation of the schools is a tolerable result, as

if the only problems Brown addressed were bad people and not bad

impacts.  Nothing in the case law requires that result.

### (2)  State Constitutional Requirements

---

[102] Notably, the Supreme Court has never even suggested that a
voluntarily-adopted forced busing plan would be illegal.

Defendants also argue that state law requirements justify the Plan.  As a general matter, I do not agree that a state constitutional requirement is a _per se_ compelling interest in the Equal Protection analysis.  The Fourteenth Amendment specifically empowers the federal government to act against discriminatory government actions at the state and local level, particularly those made on the basis of race. _See, e.g._, _Shelley v. Kraemer_, 334 U.S. 1, 23 (1948) ("The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten.  Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color.").  An interest therefore cannot rise to the level of "compelling" solely because it is enshrined in a state's constitution.[103]  Something more is required -- something about the principle reflected in the state constitution that either comports with federal principles or offers greater protection than the federal law.

The principle articulated here is that under Part 2, Chapter 5, § 2 of the Massachusetts Constitution, every resident of the Commonwealth is to be guaranteed an "adequate" education.  _McDuffy v._

---

[103] Federal courts have stricken state constitutional provisions under the Equal Protection Clause -- finding at least one not even to pass rational basis review.  _See, e.g._, _Romer v. Evans_, 517 U.S. 620, 631-32 (1996) (invalidating a state constitutional provision that refused protected status to homosexuals).

Sec'y of Exec. Office of Education, 415 Mass. 545, 617 (1993) ("It is
clear that [the Massachusetts Constitution] obligates the Commonwealth
to educate all its children." (emphasis in original)).  To the extent
that the adequacy requirement bears on the overall quality of
education made available, this "compelling interest" folds into the
analysis I have already done in Section V.B.4.a, supra: The Lynn Plan
is narrowly tailored to the compelling interests of cultivating racial
diversity and reducing minority isolation in amounts sufficient to
create an atmosphere of racial tolerance in Lynn's schools and prepare
Lynn's students to live in a multicultural society.  To the extent
that the Massachusetts Supreme Judicial Court ("SJC") has found the
adequacy requirement to command that schools offer equal resources to
students, id., the "compelling interest" of state constitutional
compliance on that score folds into my analysis of Lynn's interest in
reducing de facto segregation, with all its burdensome consequences on
nonwhite children, in Section V.B.4.b, supra.[104]

## C.   Other Federal Claims

As I find that the Lynn Plan does not violate the Equal
Protection Clause, I likewise conclude that the plaintiffs have not
established their claims of unlawful racial discrimination under 42

---

[104] The compelling nature of Lynn's articulated educational interests, as
well as the extent to which the Lynn Plan is narrowly tailored to them, are
established above on the strength of evidence submitted regarding the city of
Lynn and the state of its school system before and after the Plan's
implementation.  I am reluctant to leverage these very specific facts to
conclude that the state's "adequacy" mandate is necessarily compelling in the
abstract.  As to Lynn, it is nonetheless clear on the record before me that
the race-conscious elements of the Plan are crucial to its educational
mission.

U.S.C. §§ 1981 and 2000d or the derivative claims under 42 U.S.C. §§
1985 and 1986.


### 1.   <u>Title VI</u>

42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964)
forbids racial discrimination "under any program or activity receiving
federal financial assistance."  The plaintiffs' Title VI claims
against the state defendants were earlier dismissed, <u>Comfort</u>, 131 F.
Supp. 2d at 254, but the claims against the Lynn defendants remain.
The plaintiffs identify no act of racial discrimination under Title VI
other than the Lynn defendants' use of race in student assignments, a
practice that I found did not violate the Equal Protection Clause.
Title VI "proscribe[s] only those racial classifications that would
violate the Equal Protection Clause or the Fifth Amendment."
<u>Alexander v. Sandoval</u>, 532 U.S. 275, 280-81 (2001) (quoting <u>Bakke</u>, 438
U.S. at 287).  The plaintiffs thus have not established a claim under
Title VI.

### 2.   <u>42 U.S.C. § 1981</u>

Likewise unavailing are the plaintiffs' claims under § 1981,
which, "like the Equal Protection Clause, can be violated only by
purposeful discrimination."  <u>General Bldg. Contractors Ass'n, Inc. v.
Pennsylvania</u>, 458 U.S. 375, 391 (1982).  Section 1981's ban on racial
discrimination, when applied to state actors, is coextensive with the
nondiscrimination principle in the Equal Protection Clause.  <u>Ohio
Contractor's Ass'n v. Keip</u>, 713 F.3d 167, 175 (6th Cir. 1983) (finding

that a remedial program that did not violate the Equal Protection Clause of necessity did not violate § 1981); <u>Mescall v. Burrus</u>, 603 F.2d 1266, 1271 (7th Cir. 1979) ("The relationships of §§ 1981 and 1983 to the Fourteenth Amendment are so close and they are each so strongly under its influence that we believe the use of each section must be guided by the principles announced by the Supreme Court for application of the Fourteenth Amendment to discrimination cases."). Accordingly, because the Lynn Plan does not violate the Equal Protection Clause, the plaintiffs have likewise failed to make out their claims under § 1981.[105]

Moreover, the discrimination shown must specifically impair one or more of the following rights:

> to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.  I already held, as to the Comfort plaintiffs, that Lynn's school assignment plan has no bearing upon any of the rights set forth in § 1981.  <u>Comfort</u>, 131 F. Supp. 2d at 255 n.5.

### 3.    <u>42 U.S.C. §§ 1985, 1986</u>

---

[105] This reading of § 1981 does not render it superfluous.  The value added of the statute, over and above the Equal Protection Clause, is that it is binding on private as well as public actors.

42 U.S.C. § 1985(3) furnishes a cause of action against anyone who conspires to deprive citizens of their right to equal protection under the law.  42 U.S.C. § 1986 further authorizes suit against any person who fails to act to prevent a § 1985 violation.  As the plaintiffs have not established any civil rights violation or any unrealized conspiracy on the part of the defendants to commit such a violation, judgment must enter for the defendants on these claims as well.

**D.**   **Article 111 of the Massachusetts Declaration of Rights**

Plaintiffs advance a pendent state law claim that the Lynn Plan violates Article 111 of the Amendments to the Massachusetts Declaration of Rights, which provides that "[n]o student shall be assigned to or denied admittance to a public school on the basis of race, color, national origin or creed."  Mass. Const. amend. art. 111. Plaintiffs contend that when a child's option to attend a school other than his or her neighborhood school is limited in order to avoid fostering racial imbalance, he or she is illegally "denied admittance to a public school on the basis of race."

While this position has certain surface appeal, the plaintiffs' reading of Article 111 cannot stand up to historical and legal scrutiny against the backdrop of SJC's canons of state constitutional interpretation and the requirements of the United States Constitution. First, the Lynn Plan's modest limitations on the range of transfer options beyond neighborhood schools do not "deny admittance to a public School on the basis of race" in the meaning of Article 111,

which was designed chiefly to limit forced busing and preserve neighborhood schools.  Second, while no court has ever expressly interpreted Article 111, the SJC has consistently construed similarly worded statutes narrowly, holding that they do not categorically ban suspect classifications but rather merely subject them to strict scrutiny.  Third, the broad reading of Article 111 that the plaintiffs propose, which would flatly prohibit any race-conscious assignment policies in the public schools, must be rejected because its validity under the United States Constitution and consistency with other provisions of the Declaration of Rights is highly doubtful.  In short, it is no accident that Article 111 has coexisted peacefully for decades with race-conscious integration efforts in the state's public schools.  The amendment poses no obstacle to the Lynn Plan.

### 1.   Applicable Principles of Constitutional Interpretation

The SJC has outlined a series of considerations to guide judicial interpretation of the Massachusetts Constitution.

> In determining the meaning of a constitutional
> provision, we look to the language and structure
> of the provision, so that it is "construed so as
> to accomplish a reasonable result and to achieve
> its dominating purpose."  We do so bearing in mind
> the Constitution was "written to be understood by
> the voters to whom it was submitted for approval.
> It is to be interpreted in the sense most obvious
> to the common intelligence.  Its phrases are to be
> read and construed according to the familiar and
> approved usage of the language."  The words of a
> constitutional provision "are to be given their
> natural and obvious sense according to common and
> approved usage at the time of its adoption."
>
> Moreover, the Constitution "is to be interpreted
> in the light of the conditions under which it and

-131-

its several parts were framed, the ends which it
was designed to accomplish, the benefits which it
was expected to confer, and the evils which it was
hoped to remedy." . . .

Lastly, the Constitution "is a statement of
general principles and not a specification of
details . . .  It is to be interpreted as the
Constitution of a State and not as a statute or
ordinary piece of legislation.  Its words must be
given a construction adapted to carry into effect
its purpose.

<u>McDuffy v. Sec'y of the Executive Office of Education</u>, 415 Mass. 545,

558-59 (1993) (citations omitted).  In addition, "constitutional

provisions must be construed together to make an harmonious frame of

government."  <u>Opinion of the Justices</u>, 303 Mass. 631, 640 (1939).

Finally, "[w]hen the validity of an act . . . is drawn into

question, and even if a serious doubt of constitutionality is raised,

it is a cardinal principle that this Court will first ascertain

whether a construction of the statute is fairly possible by which the

question may be avoided."  <u>School Comm.</u>, 366 Mass. at 338) (Quirico,

J., concurring).  This "rule is a venerable one and is often repeated

in opinions by courts throughout the United States." <u>Id.</u> at 339-40

(Tauro, J., concurring).  It "evolved because of a judicial desire to

preserve amicable relations with coordinate branches of government and

to assure the fullest possible consideration of constitutional

questions before decision." <u>Id.</u> at 345.  The same logic would apply

when, as with a statute, a proposed construction of a state

constitutional provision provokes federal constitutional doubt.

### 2.    <u>The Lynn Plan and the Purpose of Article 111</u>

The Lynn Plan does not conflict with the "natural and obvious" meaning or the "dominating purpose" of Article 111 because it neither "assigns" students nor "denies admittance" to them "on the basis of race."  The Plan plainly has no effect on school assignments in the first instance; typically, as a default matter, a child in Lynn attends his or her neighborhood school.  The Plan never, under any circumstances, denies admittance to a child's neighborhood school or compels a child to attend a more distant school.

The Plan does not entail rigid racial classifications -- e.g., all white students must transfer from a certain school, all black students may not transfer to a certain school.  Every student may attend his or her neighborhood school.  The Plan simply operates to define the range of elective attendance options open to each student in a way that avoids fostering racial imbalance and isolation.  This governing principle -- desegregating the schools -- is in fact the only reason why transfers are permitted in the first place.

These are meaningful distinctions -- not mere sophistry -- that fully comport with the underlying purposes of Article 111. The legislative history of Article 111 clearly demonstrates that the "benefit it was expected to confer" was preservation of neighborhood schools, and the "evil which it was hoped to remedy" was the politically divisive resort to forced busing.  Article 111 was adopted by joint sessions of the Massachusetts General Court in 1975 and 1977 and was approved by ballot measure in 1978.  The House and Senate bills that became Article 111 were introduced by a group of

-133-

legislators on behalf of the Massachusetts Citizens Against Forced

Busing.  <u>See</u> Mass. Sen. Jour. 52 (1975); Mass. H. Jour. 510 (1975);

Mass H. Jour. 257, 565 A (1977).  The constitutionally-required

description of the proposed article in the 1978 Massachusetts

Information for Voters[106] stated:

> A "YES VOTE" would guarantee the right of parents
> or guardians of school-age children to educate
> those children free from any arbitrary assignment
> by school authorities to schools outside the
> school district.  Any public assignment to a
> school outside the school district, based on
> achieving any established racial quota-system or
> ethnic balance[,] would require the permission of
> the parent or guardian.

Massachusetts Information for Voters (1978).[107]  Contemporaneous press

accounts from each hurdle in the passage of Article 111 likewise

emphasized its aims of preserving neighborhood schools and eliminating

forced busing.  <u>See, e.g.</u>, <u>Constitutional Convention Approves</u>

<u>Antibusing Amendment as Filibuster Fails</u>, Boston Globe, June 12, 1975,

---

[106] The Massachusetts Constitution requires that the Secretary of State
publish and distribute to voters certain information regarding ballot
questions, which includes:

> The full text of every measure to be submitted to the
> people, together with . . . a fair, concise summary of
> the measure as such summary will appear on the ballot
> [and] other information and arguments for and against
> the measure.

Mass Const. art. 48, General Provisions pt. IV, as amended by arts. 74 and
108.  The SJC commonly uses the contents of Information for Voters to discern
legislative intent.  <u>See e.g.</u>, <u>Bates v. Director of Office of Campaign and
Political Finance</u>, 436 Mass. 155, 166 (2002); <u>Commonwealth v. Colon-Cruz</u>, 393
Mass. 150, 161 (1984).

[107] Significantly, this text both confirms the amendment's intended focus
on neighborhood schools/busing and, with the "parental consent" exception
language, further suggests that it was not intended as a blanket prohibition
on race-conscious assignment policies.

at 11 ("The joint House and Senate approved the anti-busing amendment
to the Massachusetts Constitution . . . "); Legislature Talks Little
but Enacts a Great Deal, Boston Globe, Sept. 8, 1977, at 3 ("A joint
session of the Legislature, after moderate debate, approved an
amendment to the state Constitution that would prohibit the busing of
public school children to achieve racial balance."); Six Referendums
Win -- Seventh Close, Boston Globe, Nov. 8, 1978, at 14 ("The
proposal, which fosters the neighborhood school concept and is
regarded by many as being antibusing, was leading . . . in latest
returns . . . .").

The Lynn Plan expressly preserves neighborhood schools while at
the same time managing to ameliorate racial imbalance and isolation,
all without resort to coercive school assignments or forced busing.
It neither assigns students to distant schools nor denies admittance
to neighborhood schools.  At most, it sometimes may limit the range of
available elective out-of-neighborhood transfers, not "on the basis of
race," but in order to avoid creating racial isolation or imbalance.
The Lynn Plan is thus consistent with both the letter and the spirit
of Article 111, as broadly envisioned by the legislators who drafted
it and the voters who ultimately enacted it.

### 3.   SJC Interpretation of Similar Language

While the Lynn Plan is consistent even with the broad intentions
of Article 111's proponents, SJC decisions interpreting similar
statutory language suggest an even narrower construction under which
suspect classifications in the schools are not prohibited

categorically but rather are simply subject to strict scrutiny.  The
logical conclusion from this SJC reasoning is that Article 111 is
simply an education-specific analog of more general constitutional
provisions that guarantee equal rights and equal protection.

For example, in <u>Attorney General v. Mass. Interscholastic
Athletic Ass'n, Inc.</u> ("MIAA"), 378 Mass. 342 (1979), the SJC held that
an Association rule -- "No boy may play on a girls' team" -- ran afoul
of both the Massachusetts Equal Rights Amendment and Chapter 76, § 5
of the Massachusetts General Laws, a statutory precursor of Article
111.  <u>Id.</u> at 363.  The Equal Rights Amendment, Mass. Const. pt. 1,
art. 1 as amended by Mass. Const. amend. art. 106, provides broadly
that "[e]quality under the law shall not be denied or abridged because
of sex, race, color, creed, or national origin."  At the time, Chapter
76, § 5 provided -- in language later mirrored in Article 111 -- that
"No person shall be excluded from or discriminated against in
admission to a public school of any town, or in obtaining the
advantages, privileges and courses of study of such public school on
account of race, color, sex, religion, or national origin."  Notably,
the SJC held that the "absolute bar on male participation" imposed by
the Association rule was not categorically invalid but rather "prima
facie invalid under ERA or our <u>cognate statute</u>, [Mass. Gen. Laws c.
76, § 5], barring sex discrimination in the educational sphere."
<u>MIAA</u>, 378 Mass. at 353 (emphasis added).  "[S]uch classifications,"
the SJC explained, "are not permissible unless they meet two
conditions:  they must 'further a demonstrably compelling interest and

limit their impact as narrowly as possible consistent with their legitimate purpose.'"  Id. at 354 (internal citation omitted); see also Opinion of the Justices, 374 Mass. 836, 842 (1977) (holding that a proposed amendment to Mass. Gen. Laws c. 76, § 5 that would prohibit women from participation with men in contact sports would fail a strict scrutiny test and violate the states Equal Rights Amendment); Opinion of the Justices, 373 Mass. 883, 888 (1977) (holding that a proposed statutory exclusion of Lowell's "Girl Officers Regiment" would fail constitutional scrutiny and violate the Equal Rights Amendment).

In other words, notwithstanding the apparent language of absolute prohibition in Chapter 76, § 5, the legality of suspect classifications in educational programs under the statute simply boils down to a strict scrutiny test.  The SJC treated Chapter 76, § 5 as a specific statutory embodiment of constitutional equal protection principles for the education sphere -- a "cognate statute" -- and nothing more.  The obvious conclusion is that nearly identical language concerning school assignment in Article 111 likewise boils down to a strict scrutiny equal protection test, a cognate constitutional provision enshrining the general principle of equality in the particular realm of public education.[108]

---

[108] The long-term historical coexistence of anti-discrimination provisions of the state constitution and various statutes with race-conscious school assignment programs further reflects the lack of inherent conflict between the two.

As yet another example, the 1972 Fair Educational Practices statute, Mass. Gen. Laws ch. 151C, § 2 -- which provides, "it shall be an unfair

As I have explained in Section V.B.4, <u>supra</u>, the Lynn Plan is a narrowly tailored measure aimed at promoting compelling governmental interests.  It therefore comports with the requirements of Article 111, as the SJC has construed similar language.

### 4.   <u>State Constitutional Harmony and Federal Constitutional Doubt</u>

The SJC's consistent view that various anti-discrimination and equal protection laws boil down to a "strict scrutiny" test -- even where language might suggest absolute prohibition of suspect classifications -- is not surprising when viewed in historical context.  Indeed, the plaintiff's proposed broader reading of Article 111 would conflict with other parts of the Massachusetts Constitution and would provoke serious doubt as to its validity under the United States Constitution.  In contrast, a construction of Article 111 that

---

educational practice for an educational institution . . . [t]o exclude or limit or otherwise discriminate against any United States citizen or citizens seeking admission as students to such institution because of race, religion, creed, color, or national origin" -- has <u>never</u> been held to prohibit any public or private institution's affirmative action program.

The Massachusetts Department of Education's current Equal Opportunity regulations expressly recognize the compatibility of nondiscrimination principles and racial balancing.  They provide, consistently with Article 111, that "[a]ll public schools in the Commonwealth shall admit students without regard to race, color, sex, religion, national origin, or sexual orientation."  Mass. Regs. Code tit. 603, § 26.02(1) (cited locally as 603 CMR 26.02(1)).  At the same time, they emphasize that "[n]othing in 603 CMR 26.00 shall control the interpretation of or interfere with the implementation of M.G.L. c. 71, § 37C [the Racial Imbalance Act] and related statutes, providing for the elimination of racial imbalance in the public schools."  <u>Id.</u> § 26.02(6).

To accept the plaintiffs' argument that the Lynn Plan violates Article 111 would, without any directly applicable state precedent or judicial sanction, potentially upend a host of long-accepted state statutory and constitutional law and practice.

applies strict scrutiny, rather than categorically prohibit the use of race, avoids these constitutional tensions.

While the SJC has never expressly construed Article 111 itself, the court's analysis of other proposed anti-busing measures is revealing.  In 1973, for example, the SJC rendered an advisory opinion that a bill entitled "An Act prohibiting transportation of pupils without the written consent of their parents or guardians" would violate both the federal and state constitutions.[109]  Opinion of the Justices, 363 Mass. 899, 908 (1973).

First, the SJC explained, the anti-busing legislation would be invalid because it would categorically prohibit measures that might be required to remedy unconstitutional discrimination.

> In North Carolina State Bd. of Educ. v. Swann, 402
> U.S. 43 (1971), the [U.S.] Supreme Court struck
> down a statute prohibiting the involuntary busing
> of students to achieve racial balance in North
> Carolina Schools.  In an unanimous opinion, Chief
> Justice Burger concluded that 'an absolute
> prohibition against transportation of students
> assigned on the basis of races, or for the purpose
> of creating a balance or ratio,'will similarly
> hamper the ability of local authorities to
> effectively remedy constitutional violations.' . .
> . [This bill] suffers from the same constitutional
> defect to the extent that its absolute prohibition
> against involuntary busing 'would inescapably
> operate to obstruct' remedies granted by Federal

---

[109] The bill provided, inter alia, that "[n]otwithstanding any law to the contrary, no child attending public school shall be transported to or from any public school without the prior written consent of his parent or legal guardian.  Each of such children shall be permitted to attend the school nearest his residence within his city or town, which has a seat available in his grade, unless his attendance at another school has been requested by his parent or legal guardian."  Opinion of the Justices, 363 Mass. 899, 842 (1973).

or State courts that have found de jure
segregation.'

Id. at 901-02 (citations omitted).  Significantly, the court found

that an absolute ban on busing in Massachusetts would be invalid under

Swann even though, at the time, no Court had ordered desegregation

measures within the Commonwealth.[110]   See id. (acknowledging "full

awareness that there has been no holding by any court that de jure

segregation exists in Massachusetts, nor has any State court been

called upon to decide that question").[111]

Second, the SJC held that the anti-busing bill would be

unconstitutional under Reitman v. Mulkey, 387 U.S. 369 (1967), because

it "serves to perpetuate existing segregation in some of the schools,

regardless of its cause, and thus 'significantly encourage[s] and

involve[s] the State' in racial discrimination."  Opinion of the

Justices, 363 Mass. at 902-03 (quoting Reitman, 387 U.S. at 381)).

> The facts of the Reitman case parallel the
> tortured history of our racial imbalance law.  The
> California Legislature had enacted legislation
> which prohibited private racial discrimination in
> the sale or rental of private dwelling.  In 1964,
> the California Constitution was amended by passage
> of Proposition 14, which gave every Californian
> the constitutional right to lease or sell his

---

[110] Morgan v. Hennigan, 379 F. Supp. 410 (D. Mass. 1974), which did find
de jure segregation in Boston, was still pending at the time.

[111] Swann also recognized the importance and value of race-conscious
assignment policies in operating an integrated, or "unitary" school system.
"[S]chool authorities have wide discretion in formulating school policy, and .
. . as a matter of educational policy school authorities may well conclude
that some kind of racial balance in the schools is desirable quite apart from
any constitutional requirements. . . . [I]f a state-imposed limitation on a
school authority's discretion operates to inhibit or obstruct the operation of
a unitary school system or impede the disestablishing of a dual school system,
it must fall. . . ."  402 U.S. at 45.

private dwelling to whomever he wanted.  The
California Supreme Court conceded that since there
was no constitutional duty upon the State to end
private housing discrimination the State could
constitutionally repeal such legislation and
retain a neutral stance toward such private
discrimination.  But the California Supreme Court
held that Proposition 14 not only repealed pro
tanto existing legislation prohibiting racial
discrimination in housing, but also encouraged and
significantly involved the State in private racial
discrimination contrary to the Fourteenth
Amendment by expressly sanctioning the private
right to discriminate as a matter of State policy.
In affirming the California Supreme Court's
decision invalidating Proposition 14, the Supreme
Court of the United States recognized that courts
must assess the historical context, immediate
objective, and "potential impact of official
action in determining whether the State" has
merely adopted a position of neutrality or one of
encouragement of and involvement with private
racial discrimination.

*     *     *

This language suggests that even in situations
where there is only de facto segregation, if the
State adopts a policy which freezes these de facto
conditions by imposing severe limitations on local
school officials' discretionary authority to take
effective remedial action, then the State policy
constitutes State action serving to continue
segregation in the schools and thus "significantly
encourage[s] and involve[s] the state in private
racial discrimination.

*     *     *

We conclude that this type of State-imposed
limitation on a school authority's discretion not
only "operates to inhibit or obstruct the
operation of a unitary school system" but also
uses State power to promote and entrench racial
separation in all those schools whose communities
have segregated residential patterns."

Id. at 903-06 (citations omitted); see also id. at 904-05 (citing Lee
v. Nyquist, 318 F. Supp. 710, 712 (W.D.N.Y. 1970) (invalidating a
section of state education codes that "prohibit[ed] state education
officials and appointed school boards from assigning students, or
establishing, reorganizing, or maintaining school districts, school
zones or attendance units for the purpose of achieving racial equality
in attendance")).

Third, and finally, the SJC held that the anti-busing bill "also
violates arts. 1 and 10 of the Declaration of Rights of the
Massachusetts Constitution.  The guaranties contained in these
articles are at least as great as those guaranties provided in the
equal protection clause of the federal constitution." Opinion of the
Justices, 363 Mass. at 908; see also generally Herbert P. Wilkins,
Judicial Treatment of the Massachusetts Declaration of Rights in
Relation to Cognate Provisions of the United States Constitution, 16
Suffolk L. Rev. 887 (1980) (noting the independent significance of the
state constitution).

The SJC retread this ground in 1974, when it rendered an opinion
that proposed legislation to bar the Boston School Committee "from
assigning children to schools on the basis of race, sex, or creed
without parental consent" was unconstitutional.  Opinion of the
Justices, 365 Mass. 648, 659-50, 652-03 (1974) ("[A]s a constitutional
matter, the bill now before us is virtually indistinguishable from the
bill we found to be unconstitutional in our earlier opinion.  Each is
unconstitutional on its face because it serves to perpetuate existing

segregation in some of the schools, regardless of its cause, and thus 'significantly encourage[s] and involve[s] the State' in racial discrimination") (citations omitted).  Later that year, the Court employed similar reasoning to find that amendments to the Racial Imbalance Act could not forestall the implementation of a desegregation plan in Springfield.  See School Comm., 366 Mass. at 327-29 ("[A]ny action taken by the Legislature or by the school committee of Springfield which would tend to reverse or impede the progress toward the achievement of racial balance in Springfield's schools would constitute a violation of the Fourteenth Amendment to the United States Constitution and of arts. 1 and 10 of the Declaration of Rights of the Massachusetts Constitution. . . . [E]ven where steps toward desegregation are made voluntarily rather than pursuant to constitutional mandate[,] any subsequent State action which would cause a return of the preexisting segregation would itself be an act of de jure segregation.").

The constitutional objections to the 1970s anti-busing legislation outlined above would apply with even greater force to the plaintiffs' reading of Article 111 in this case as a sweeping prohibition on race-conscious assignment policies in the schools.  I do not hold definitively that this reading of Article 111 violates the federal constitution -- the issue is not fully joined and there is no need for me to reach it.  The point is that the plaintiff's position provokes grave constitutional doubt, the SJC has recognized the basis for that doubt, and the narrower "strict scrutiny" construction that

the SJC has bestowed on language similar to Article 111 -- which poses no obstacle to the Lynn Plan -- would avoid those doubts.[112]

## VI.   <u>CONCLUSION</u>

This decision follows a very lengthy trial in which the defendants presented substantial evidence and data on the Lynn Plan and its ramifications.   They did not seek to defend the Plan by referring to unsubstantiated generalizations about race relations, or the subjective perceptions of school officials.   Nor did they rely on experts who knew everything about other systems in other parts of the country, but nothing about Lynn.

Rather, the defendants focused their attention, as they should, on this city, its school system, and the young children who attend it. They looked at it from the macro level -- census data, surveys, statistics, and from the micro level -- the heartfelt observations of the participants, children, teachers, administrators, parents.

The picture they painted not merely justified the Lynn plan as a constitutional matter.   It celebrated the Plan and all the changes it has brought about in Lynn.

---

[112] With regard to the State Constitution, the SJC's determination that the anti-busing legislation violated Articles 1 and 10 of the Declaration of Rights would not necessarily preclude plaintiffs' reading of Article 111 because a subsequent amendment can repeal or curtail existing constitutional law.   However, the canon of construing constitutional provisions "together to make a harmonious frame of government" supports a reading of Article 111 as an educational "cognate" of Articles 1 and 10 that simply subjects racial classifications in education to strict scrutiny.

Nothing in the constitutional or statutory law of the United States or the Commonwealth of Massachusetts obliges me to dismantle the Lynn Plan and, in so doing, undermine defendants' commendable efforts to run a thriving, multiracial, and successful school system. **SO ORDERED.**

**Dated: September 5, 2003**                    _____/s/_____
                                         **NANCY GERTNER, U.S.D.J.**